## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

```
                                    FILED: AUG 19, 2008
                                    08CV4709
SKF USA INC.                  :     JUDGE MORAN
                              :     MAGISTRATE JUDGE DENLOW
                              :     RCC
                              :
                              :
          Plaintiff,          :
                              :     CIVIL ACTION
      v.                      :
                              :     NO. __-CV-____
DALE H. BJERKNESS, KEVIN KOCH,:
JOSEPH J. SEVER, and WALTER   :
REMICK, JR.                   :
                              :
                              :
          Defendants.         :
```

### VERIFIED COMPLAINT

This is an action for preliminary and permanent injunctive and monetary relief to restrain and otherwise redress Defendants' ongoing violations of their non-competition, non-disclosure, and non-solicitation agreements with Plaintiff SKF USA Inc. ("SKF") in the area of its business known as Reliability Systems business ("SKF Reliability Systems"). All four Defendants resigned their employment with SKF to work for Equipment Reliability Services, Inc., a company owned and operated by Defendant Dale H. Bjerkness ("Bjerkness") that directly competes with SKF. SKF has learned that Bjerkness, in violation of his agreements with SKF, solicited and induced Defendants Kevin Koch ("Koch"), Joseph J. Sever ("Sever") and Walter Remick, Jr. ("Remick") to leave their employment with SKF to work for Bjerkness in the same line of business that competes with SKF Reliability Systems. In addition, SKF has learned that Defendants have solicited SKF Reliability Systems' customers; interfered with SKF contracts; and have copied and maintained SKF Reliability Systems' confidential information and trade

secrets that they have used or inevitably will use, all in direct violation of their agreements and other common law and statutory obligations.

SKF brings this action seeking (1) preliminary and permanent injunctions prohibiting Defendants from calling on and soliciting business from SKF's customers, potential customers, and employees, and from disclosing or using SKF's trade secrets and confidential information; (2) an order mandating the return of all of SKF's confidential and proprietary information; and (3) money damages to compensate SKF for the harm it has suffered as a result of Defendants' violations of their legal duties.

I.    The Parties

1.      SKF is a Delaware corporation with its principal place of business at 1111 Adams Avenue, Norristown, Pennsylvania 19403.  SKF is engaged in, among other things, the business of manufacturing and selling ball and roller bearings, bearing housings, seals, and other related products and in performing equipment monitoring services for customers.  SKF Reliability Systems, with its main office in Elk Grove Village, Illinois, operates in the SKF business areas that provide performance equipment monitoring services for customers.

2.      Bjerkness is an individual residing at 11342 Sorenson Lake Lane, Merrifield, Minnesota, and is a former Director for SKF Reliability Systems.

3.      Koch is an individual residing at 713 Bourgin Road, Virginia, Minnesota and is a former Reliability Engineer Manager for SKF in its Reliability Systems business.

4.      Sever is an individual residing at 11751 West River Hills Drive, Apartment 215, Burnsville, Minnesota and is a former Reliability Engineer for SKF in its Reliability Systems business.

5. Remick is an individual residing at 1200 Augusta Drive NE, Bemidji, Minnesota and is a former Reliability Engineer for SKF in its Reliability Systems business.

II. Jurisdiction and Venue

6. This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because the defendants are citizens of a different state than is SKF and the matter in controversy exceeds $75,000, excluding interest and costs.

7. Venue in this District is proper under 28 U.S.C. § 1391(a) because this action arises in part on the following:

a. Defendants Bjerkness and Koch performed a portion of their job duties within the state of Illinois and with individuals working for SKF in Elk Grove Village, Illinois, where SKF Reliability Systems has its main offices.

b. Defendants Bjerkness' and Koch's employment agreements that are the subject of this action provide that any disputes under the agreements shall be heard in Illinois.

c. Although they did not perform their job duties in Illinois, Defendants Remick's and Sever's employment agreements that are the subject of this action provide that any disputes under the agreements shall be heard in Illinois.

III. Background

A. SKF's Business in the Equipment Prevention Arena

8. In January 2007, SKF purchased 100% of the stock of Preventive Maintenance Company, Inc. ("PMCI"). Defendants worked for PMCI at the time of the stock purchase and thereafter were employed by SKF.

9. SKF paid approximately $22 million for PMCI's stock.

10.     As conditions for their employment with PMCI, Defendants each executed agreements with PMCI, as described in detail below. The agreement of each Defendant stated that his obligations "shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, and assigns." See Exhibits A, B, C, and D, ¶ 8.

11.     SKF Reliability Systems, as did its predecessor, PMCI, offers unique and highly effective methods for its customers to manage and improve the functioning of their equipment and machinery by providing equipment monitoring and problem detection services to avoid unexpected equipment shutdowns and to provide for scheduled maintenance.

12.     To achieve its status and competitive position in the industry, SKF (with its predecessor PMCI) has created a strong reputation and is recognized in the U.S. market as a company that supplies high quality, innovative products and services.

13.     In addition to providing high quality, innovative products and services, SKF Reliability Systems' success is dependent upon the relationships it fosters and substantial goodwill with its long-term customers.

14.     SKF Reliability Systems typically provides services to its customers pursuant to purchase orders for service, many of which are annual or multiple (three to five) year commitments and some of which renew automatically.

15.     Approximately 90% of SKF Reliability Systems customers renew their agreements with SKF as they come up for renewal and, of those customers who do not renew their SKF agreements, most have plant shut downs or other facility-related issues that cause them to no longer need reliability system services.

16.    In 2007, only one customer (out of $9 million of business) in the Midwest territory did not renew its SKF Reliability Systems agreement.

17.    For approximately two-thirds of its customers, SKF Reliability Systems places a full time SKF employee on the customer's site to provide continuous oversight, management, analysis, and customer service.

18.    The average annual purchase order for SKF Reliability Systems services is approximately $175,000 to $200,000, with some purchase orders in excess of $1 million per year.

19.    SKF's customer relationships and goodwill are of paramount importance to SKF in that many of its customers have been customers for many years and are near permanent.

B.    Defendants' Employment with SKF

(1)    Bjerkness' Employment

20.    On or about March 12, 2001, Bjerkness began working for PMCI as a Sales Engineer for the Minnesota Region, with responsibility for technical assistance and account management.  He later was promoted to Regional Manager and also served as Vice President. The last position he held with SKF Reliability Systems before resigning was Director, SKF Reliability Systems.

21.    As Director, SKF Reliability Systems, Bjerkness held a leadership role and was responsible for developing and growing the sales, resources, and customer relationships in the Midwest territory, which included Minnesota, most of Wisconsin, Iowa, North Dakota, and South Dakota.

22.    Bjerkness also had responsibility for SKF Reliability Systems' Stevens Point, Wisconsin location, customer scheduling, reporting and technical support center for all of Bjerkness' geographic territory and for most of SKF Reliability Systems at large. In this capacity, Bjerkness oversaw all of SKF Reliability Systems' customer relationships, concerns, problems, and scheduling.

23.    Bjerkness' primary responsibilities with SKF were to manage and develop regional key accounts, manage account profitability, and manage and sell SKF Reliability Systems products and services. In addition to establishing new business, Bjerkness also was responsible for maintaining current business, managing all SKF Reliability Systems employees in his territory, contributing to the development of SKF Reliability Systems strategic plan, and developing regional budgets.

24.    To perform his job, Bjerkness regularly traveled to SKF's office in Elk Grove Village, Illinois and communicated regularly with PMCI, and later SKF, personnel there.

25.    As recently as April 2008, Bjerkness attended meetings with other SKF leaders where confidential business strategies, hiring strategies, sales strategies, specific needs of prospective customers, and current and future business were discussed. In February 2008, Bjerkness attended a week-long SKF Reliability Champions Meeting in Malaga, Spain, at which 250 SKF Reliability high-level employees from around the world came together to discuss new products and global strategies and plans. All participants at the meeting, including Bjerkness, were given CDs of the meeting presentations.

26.    While employed by SKF, Bjerkness was responsible for approximately 30 to 40 existing customer relationships and for more than $5 million in revenue.

27.    Many of the customers for whom Bjerkness had responsibility are on multi-year service purchase orders with SKF.  Some of these are scheduled to renew automatically, unless cancelled or changed.

(2).    <u>Koch's, Sever's, and Remick's Employment and Resignations</u>

28.    Koch began his employment with PMCI on June 10, 1998.  He became an employee of SKF when SKF purchased the stock of PMCI.  Koch's last position before resigning from SKF was Reliability Engineer Manager.

29.    As a Reliability Engineer Manager, Koch's responsibilities included overseeing mechanical services for customers, supervising engineers who worked at customer sites, visiting customer sites, learning about customers' safety requirements, equipments needs, and guidelines, ensuring efficient operation of customer accounts (including setting up new accounts), preparing reports and reviews of customer accounts for management and the sales teams, and identifying opportunities to expand SKF business.

30.    As part of his job duties, Koch traveled to SKF's Illinois offices at least several times per year.  Koch also communicated regularly with PMCI and, later SKF, personnel in Illinois.

31.    On June 16, 2008, Koch notified SKF that he was resigning effective June 27, 2008.

32.    Remick began his employment with PMCI on January 16, 2006.  He became an employee of SKF when SKF purchased the stock of PMCI.  Remick's last position before resigning was Reliability Engineer.

33.    On June 24, 2008, Remick notified SKF that he was resigning effective July 7, 2008.

34.    Sever began his employment with PMCI on April 7, 2003. He became an employee of SKF when SKF purchased the stock of PMCI. Sever's last position before resigning was Reliability Engineer.

35.    As Reliability Engineers, Remick and Sever worked at customer sites and were responsible for learning customer expectations, equipment needs, equipment reliability, and safety requirements. They also provided customer technical support and monitored customer applications and needs.

36.    On July 1, 2008, Sever notified SKF that he was resigning from SKF effective July 15, 2008.

C.    Defendants' Confidentiality, Non-Solicitation, and Non-Competition Agreements

37.    On March 12, 2001, as a condition for employment by PMCI, Bjerkness executed the Agreement attached hereto as Exhibit A.

38.    On June 10, 1998, as a condition for employment by PMCI, Koch executed an Agreement virtually identical to Bjerkness' Agreement. Koch's Agreement is attached hereto as Exhibit B.

39.    On April 7, 2003, as a condition for employment by PMCI, Sever executed an Agreement virtually identical to Bjerkness' Agreement. Sever's Agreement is attached hereto as Exhibit C.

40.    On January 16, 2006, as a condition for employment by PMCI, Remick executed an Agreement virtually identical to Bjerkness' Agreement. Remick's Agreement is attached hereto as Exhibit D.

41.    Each of Defendant's Agreements prohibits Defendants from using or disclosing, among other things, PMCI's confidential information, including PMCI's methods of

doing business, valuation methods, business ideas, pricing and commission data, and client

names, lists, needs and requirements, at any time.

42.     As to PMIC's property, each Defendant agreed that:

All tangible items furnished to or created by Employee from time
to time in connection with the performance of Employee's duties,
including but not limited to client lists, procedures manuals,
proposal materials, prospective client lists, client reports, and work
papers, shall at all times remain the sole property of PMCI.
Employee acknowledges that the information contained in the
tangible property is a valuable asset of PMCI's business and is
highly confidential. Employee shall not duplicate tangible items.
They are provided to Employee for the limited purpose of enabling
the Employee to perform duties of employment, and Employee
hereby convents not to use or permit any of the same to be used for
any other purpose . . . Upon the demand of PMCI, at any time or
upon the termination of employment under any circumstances,
Employee shall promptly tender all such items to PMCI.
Employee convents that he/she will not provide PMCI's tangible
property to any competitor of PMCI nor use PMCI's tangible
property or the information contained therein in furtherance of the
business of any competitor of PMCI. (Exhibits A, B, C and D, ¶
1).

43.     As to PMCI's Confidential and Proprietary Information, each Defendant

agreed that

a.     All information imparted to Employee by PMCI, or
otherwise obtained by Employee, at any time, relating to PMCI's
methods of doing business; valuation methods, computer
programs, business ideas; billing procedures; pricing and
commission data; client names and lists; clients needs and
requirements; client servicing methods; prospective client lists; and
any other client data, is revealed and entrusted to Employee in
confidence, solely in connection with and for the purpose of
employment on behalf of PMCI. Employee shall not, at any time,
either during or after employment with PMCI, divulge any of this
information to any other person, firm, or entity, nor use or permit
the use of any of it, other than pursuant to Employee's employment
on behalf of PMCI. Without limiting the generality of foregoing,
upon termination of employment, under any circumstances,
Employee shall promptly tender to PMCI all lists, records, work
papers, reports and other documents in Employee's possession or

control relating to any clients, prospective clients or the business of PMCI.

b.    Further, Employee promises to maintain as confidential all information Employee may obtain, learn or be entrusted with as an Employee of PMCI, regarding any proprietary information belonging to any of PMCI's clients, including but not limited to any client's methods or processes of production, pricing, marketing, servicing of research and development. Employee shall not, at any time, either during or after the term of employment, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of PMCI. (Exhibits A, B, C and D, ¶ 2).

44.    Each Defendant also agreed that, for two years after the termination of his

employment, he would not

under any circumstances, as proprietor, partner, joint venture, stockholder, director, officer, trustee, principal, agent, servant, employee or in any other capacity whatsoever, directly or indirectly, solicit business or sell or render services of the sort provided by PMCI to any client for which PMCI or its Employee has rendered services of the sort provided by PMCI or about whom Employee has learned confidential information during the twelve (12) months preceding Employee's separation from PMCI; nor shall Employee, directly or indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts. (Exhibits A, B, C and D, ¶ 3).

45.    Each Defendant further agreed that after termination of his employment

with PMCI, he would not solicit or induce PMCI employees to leave PMCI for a competitor.

(Exhibits A, B, C and D, ¶ 3).

46.    Specifically, each Defendant agreed that "due to the confidential nature of

the proprietary information and considerable amount of money, time and effort expended to

develop such proprietary information" and "due to PMCI's considerable investment in training

employees and allowing them access to confidential and proprietary information," for a period of

two years following termination of their employment, he would not "directly or indirectly, solicit

or induce any employee of PMCI to leave PMCI's employ for any employment in a line of business similar to that conducted by PMCI in locations where PMCI services clients, or locations where PMCI has solicited clients" within one year preceding each Defendant's termination of employment. (Exhibits A, B, C and D, ¶ 3).

47.    Each Defendant also agreed "not to solicit, sell or render services of the sort provided by PMCI to any individual or entity that has a business location in the locations serviced or solicited by PMCI within the twelve (12) months preceding Employee's termination nor will Employee, directly or indirectly, aid or assist any other person, firm or corporation" to do so. (Exhibits A, B, C and D, ¶ 3).

48.    Each Defendant agreed that the PMCI Agreement would be "governed in all respects by the substantive laws of the State of Illinois without reference to the choice of law provisions of Illinois or any other state." Defendants also agreed that "any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Employee hereby consents and submits his or her person to the jurisdiction of any such Court for such purpose." (Exhibits A, B, C and D, ¶ 10).

D.    Defendants' SKF Secrecy Agreements

49.    In early January 2007, at the time that SKF purchased the stock of PMCI, Bjerkness and Koch executed SKF's "Employee Invention, Patent and Secrecy Agreement" ("Secrecy Agreement"). Sever and Remick executed identical Agreements in March 2008. Copies of each Defendant's Secrecy Agreements are attached hereto as Exhibits E, F, G and H.

50.    In the Secrecy Agreements, Defendants acknowledged, among other things, "the vital importance of maintaining the secrecy of SKF's trade secrets and confidential business matters." Defendants each agreed in Paragraph 3:

that he will not in any way during his employment and at any time
thereafter, without SKF's written approval, disclose or publish to
any unauthorized person, firm or corporation any technical or
proprietary information, trade secrets and confidential business
matters, including but not limited to secret processes, formulae,
sequences, equipment, research items and results, drawing, prints,
customers lists, costs, technical sales and marketing programs.

E.    Defendants' Access to Confidential Information

51.    SKF has developed a substantial amount of confidential and proprietary

information ("Confidential Information"), including but not limited to methods of its doing

business, valuation methods, computer programs, business ideas, billing procedures, pricing and

commission data, client names and lists, clients needs and requirements, client servicing

methods, prospective clients lists, and client data.

52.    SKF's products, services and business operations incorporate and are

based on the Confidential Information.

53.    SKF has expended a great deal of time, effort and money to develop and

acquire the Confidential Information. It uses the Confidential Information to develop its

products and services, to retain and service customers, to secure new customers, to train and test

its employees, and to establish a competitive edge in its business. Thus, the Confidential

Information is of substantial value to SKF in its business.

54.    When SKF purchased PMCI, it purchased the Confidential Information

that was developed by PMCI.

55.    The Confidential Information is not available to the general public or to

SKF's competitors through legitimate means.

56.    It would be difficult for competitors to know SKF's customers and the

locations of the customers for whom SKF provides services but for inside knowledge of SKF.

57.    SKF takes reasonable steps to protect the secrecy of its Confidential Information, including requiring employees in sensitive positions to sign a Secrecy Agreement similar to the agreements signed by Defendants.

58.    In performing his jobs responsibilities with SKF, Bjerkness participated in the development of and used SKF Confidential Information.

59.    During their employment at SKF Reliability Systems, each Defendant was introduced to customers and potential customers of SKF and PMCI in the Midwest region.

60.    While employed by SKF and PMCI, each Defendant developed knowledge of SKF's business, personnel, products, services, employee certification and testing procedures, know-how, and customers.

61.    Using SKF's Confidential Information and its financial, managerial and information resources, Bjerkness participated in marketing, selling, and serving SKF's customers and prospective customers in the Midwest region.

62.    Using SKF's Confidential Information, Sever, Remick, and Koch participated in serving SKF's customers and prospective customers in the Midwest region and in training and testing SKF employees to perform their jobs.

E.    Bjerkness' Resignation and Competitive Activities

63.    On May 12, 2008, Bjerkness resigned from SKF effective May 23, 2008.

64.    At least a few days before he resigned from SKF, Bjerkness established his own company, Equipment Reliability Services, Inc.

65.    Equipment Reliability Services, Inc. competes directly with SKF and is in the same line of business engaged in by PMCI before it was purchased by SKF.

-13-

66.     On or about May 20, 2008, while still employed by SKF, Bjerkness registered Equipment Reliability Services, Inc. with the Minnesota Secretary of State under §302a of the Minnesota Business Corporation Act.   Equipment Reliability Services, Inc.'s registered office address is listed as Bjerkness' last known home address, 11342 Sorenson Lake lanes, Merrifield, Minnesota  56465.

67.     After announcing his resignation from SKF, Bjerkness told his supervisor, Bart Bartholomew, and others that he was going to spend the Summer fishing.

68.     Following Bjerkness' resignation and possibly before, he actively has sought SKF employees to work with his company.

69.     SKF likely will have evidentiary support after a reasonable opportunity for further investigation or discovery that Bjerkness, in violation of his PMCI Agreement, induced Koch, Remick, and Sever to terminate their employment with SKF and to work for Bjerkness in a business that competes with SKF's Reliability Service business and that is similar to that conducted by PMCI and in locations where PMCI and SKF serviced clients, or locations where PMCI and SKF solicited clients.

70.     SKF invests significant resources, including time and money in training its employees.  For example, SKF puts its Reliability Engineers through an intensive six-month training, which includes mentoring by managers and extensive SKF methodology and safety training.  Reliability Engineers do not begin to service clients independently until they have been with the company for at least 18 months and are fully conversant with SKF Reliability Systems methodology.

71.    SKF likely will have evidentiary support after a reasonable opportunity for further investigation or discovery that the job functions that Koch, Remick and Sever perform for Equipment Reliability Services, Inc. are nearly identical to those they performed for SKF.

72.    In the past few weeks, Bjerkness has continued to contact current employees of SKF.

73.    SKF Reliability Systems has learned that Bjerkness has solicited business from current and long-standing SKF customers, including Wausau Paper; Case Corporation; Liberty Paper; White Earth; and Cleveland Cliffs.

74.    SKF has been informed by two long-term customers, Liberty Paper and Kraft, that each is placing its contract on hold while, upon information and belief, it considers contracting with Bjerkness and Equipment Reliability Services, Inc.

75.    SKF Reliability Systems also has learned that a long-term SKF customer, Ainsworth Lumber Company, has canceled its contract (valued at approximately $85,000) with SKF and has given its business to Bjerkness and Equipment Reliability Services, Inc.

76.    Remick spent several years on-site at Ainsworth while employed by PMCI and SKF.

77.    Bjerkness became known to the customers referenced in paragraphs 72 through 76 through his employment with PMCI and SKF.

78.    Defendants are engaged in the marketing and sales of competitive products and services in the same geographic territory for which they were responsible at SKF Reliability Systems.

79.    In their new business, Defendants have used or inevitably will use SKF's customer information, reporting criteria, database setup, pricing information, and SKF strategies and business plans.

### SKF's Communications with Defendants about their Contractual and Other Violations

80.    On July 1 and July 2, 2008, SKF Reliability Services, through its counsel, wrote to Bjerkness and Koch reminding them of their obligations under their Agreements with SKF. Copies of those letters are attached hereto as Exhibits I and J.

81.    Bjerkness and Koch, through counsel, responded by letter on July 10, 2008. A copy of that letter is attached hereto as Exhibit K. Neither Bjerkness nor Koch denied that they were engaged in competitive activity.

82.    On July 17, 2008 and July 23, 2008, SKF, through its counsel, sent letters to Remick and Sever reminding them of their obligations under their Agreements with SKF. Copies of those letters are attached hereto as Exhibits L and M.

83.    Remick and Sever, through counsel, responded by letters on July 23 and July 30, 2008. Copies of those letters are attached hereto as Exhibits N and O. Neither Remick nor Sever deny that they are engaged in competitive activity.

84.    SKF likely will have evidentiary support after a reasonable opportunity for further investigation or discovery that Bjerkness and Koch still possesses SKF property, including the CD of the Reliability Champions Meeting presentations, an index card file, business cards relating to SKF customers, outstanding customer proposals, customer drawings, customer files and two vibration poles (serial numbers 511 and 542).

85.    SKF likely will have evidentiary support after a reasonable opportunity for further investigation or discovery that Koch possesses CD's, jump drives and external computer

drives, to which it is believed that SKF's confidential and proprietary information and property was transferred for use in the new business.

86.     On July 16, 2008, SKF, through its counsel, wrote to Bjerkness' counsel requesting that Bjerkness immediately return SKF's property.  Bjerkness' counsel responded on July 24, 2008, denying that Bjerkness retained any customer proposals, customer drawing, customer files or vibration poles, but acknowledging that Bjerkness possessed business cards and an index card file.  In the letter, Bjerkness' counsel denied that these items are SKF property, and refused to return them to SKF, but instead states that the items are being held by his counsel. Copies of both letters are attached hereto as Exhibits P and Q.

G.     The Need for an Injunction

87.     Defendants have violated, and continue to violate, the terms of their agreements by soliciting and calling on SKF current employees, customers and potential customers, and by retaining and using SKF's confidential information for their own and Equipment Reliability Services' benefit.

88.     In their agreements, Defendants acknowledged that in the event of a breach, SKF could not adequately be compensated for any such breach by money damages and that any such breach would cause irreparable harm.

89.     Unless they are enjoined by this Court, Defendants will continue to violate the agreements.

90.     SKF invested substantial resources in purchasing PMCI.  The value of that investment has been jeopardized because of Defendants' actions.

91.    SKF invested substantial resources in the development of its confidential information.  The value of that investment has been compromised because of Defendants' actions.

92.    An injunction is necessary to prevent immediate and irreparable harm to SKF that cannot be fully compensated by damages.  Defendants will suffer less harm if an injunction is granted than SKF will suffer if an injunction is not granted.  The injunction sought will restore the parties to the status quo as it existed immediately before Defendants' wrongful and actionable conduct.  Further, the injunction sought is reasonably suited to abate Defendants' wrongful and actionable conduct and to protect SKF's clear legal rights.

## COUNT I
## BREACH OF CONTRACT BY ALL DEFENDANTS

93.    SKF incorporates the preceding paragraphs of this Verified Complaint as if fully set forth herein.

94.    Defendants' agreements, including the non-compete, non-solicitation of customers and employees and confidentiality provisions therein, are valid and enforceable contracts.

95.    The restrictive covenants in Defendants' agreements are necessary to protect SKF's legitimate protectable business interests, and are reasonable in scope and duration.

96.    SKF has performed all of its obligations to Defendants under the agreements.

97.    Bjerkness, in violation of his agreements, solicited and induced Defendants Koch, Sever, and Remick to leave their employment with SKF to work for Bjerkness in a line of business similar to, and that competes with, SKF.

-18-

98.     Defendants have breached their agreements by seeking and obtaining employment with Equipment Reliability Services, a competitor of SKF.

99.     Defendants' activities on behalf of Equipment Reliability Services will require Defendants to use, base judgments upon, and disclose SKF's trade secrets and confidential information.

100.    Defendants have retained and, it is believed, are using SKF's confidential information in violation of Defendants' agreements.

101.    Defendants' activities on behalf of Equipment Reliability Services jeopardize substantial and valuable goodwill that SKF has developed with its customers as well as provide Equipment Reliability Services with an unfair competitive advantage.

102.    As a direct and proximate result of Defendants' breaches of the agreements, SKF has suffered damages, including harm to its customer relationships and other business interests that are not fully compensable by monetary damages.

103.    Unless Defendants are enjoined by this Court, SKF will continue to suffer irreparable harm to its business interests, for which it has no adequate remedy at law, as a result of Defendants breaches of the Agreements.

### COUNT II
### TORTIOUS INTERFERENCE WITH CONTRACT BY BJERKNESS

104.    SKF incorporates the preceding paragraphs of this Verified Complaint as if fully set forth herein.

105.    The agreements held between SKF and Sever, Koch, Remick, and Bjerkness are valid and enforceable contracts.

106.    The non-solicitation of employees provision in those agreements is reasonably necessary to protect SKF's legitimate protectable business interests, and is reasonable in scope and duration.

107.    Bjerkness has hired three employees from SKF in the last 45 days, all of whom are subject to post-employment restrictive covenants, including non-compete provisions.

108.    Bjerkness knew about those agreements, including the restrictive covenants and non-compete provisions.

109.    Bjerkness has intentionally and tortiously interfered with SKF's rights under the Agreements by inducing, aiding and abetting, and causing Sever, Koch, and Remick to breach their agreements with SKF.

110.    Bjerkness continues to attempt to interfere with the employment of other SKF employees.

111.    SKF likely will have evidentiary support after a reasonable opportunity for further investigation or discovery that Bjerkness knew that other Defendants transferred SKF's confidential information to CDs, jump drives and external hard drives for use by Bjerkness' new company.

112.    Defendants' activities on behalf of Equipment Reliability Services jeopardize substantial and valuable goodwill that SKF has developed with its customers as well as provide Equipment Reliability Services with an unfair competitive advantage.

113.    SKF has been harmed and likely will suffer further harm because of Bjerkness' interferences and conduct.

114.    SKF has been and will continue to be injured, irreparably and otherwise in amounts that will be difficult to determine or calculate.  The monetary value of the damages by SKF as a result of Bjerkness' actions will be impossible to determine with any certainty.

115.    Unless an injunction is issued requiring Bjerkness to refrain from tortious interference SKF contractual relations, SKF will suffer irreparable and incalculable harm in the loss of confidential information.

## COUNT III
## VIOLATION OF ILLINOIS UNIFORM TRADE SECRETS ACT BY ALL DEFENDANTS

116.    SKF incorporates the preceding paragraphs of this Verified Complaint as if fully set forth herein.

117.    As set forth above, Defendants were given access to and are in the possession of certain confidential and proprietary information constituting "trade secrets" as defined by the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*, such as SKF Reliability Services' methods of doing business; valuation methods, computer programs, business ideas; billing procedures; pricing and commission data; client names and lists; clients needs and requirements; client servicing methods; prospective clients lists; employee training and testing documents; and confidential client data.

118.    SKF has taken steps to protect the confidentiality of this information.

119.    This information is sufficiently secret to derive economic value from not being generally known to other persons or entities who can obtain economic value from its disclosure or use.

120.    This information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

121.    It is inevitable that Defendants will use or rely on the information that they obtained while working for SKF in connection with their positions with Equipment Reliability Services and SKF likely will have evidentiary support after a reasonable opportunity for further investigation or discovery that Defendants have used, disclosed, or threatened to use or disclose SKF Reliability Services' confidential, proprietary, and trade secret information.

122.    Defendant' unauthorized use or disclosure of SKF trade secret information, actual or threatened, violates the Illinois Uniform Trade Secrets Act, 765 ILCS 1065/1, *et seq.*

123.    Defendants' inevitable use of SKF's trade secrets gives Defendants, and Equipment Reliability Services, an unfair competitive advantage over SKF.

124.    As a result of the foregoing, SKF has suffered and will continue to suffer irreparable harm.

125.    SKF has been damages and will continue to be damaged by the misappropriation and use of its trade secrets by Defendants.

WHEREFORE, SKF requests that the Court grant the following relief:

a.    Preliminarily and permanently enjoin Defendants, until two year from the date that they begin to comply with the Agreements, from directly or indirectly performing services for, calling on, soliciting or catering to any individuals or entities who were customers or potential customers of SKF Reliability Services within one year preceding Defendants' resignation.

b.    Preliminarily and permanently enjoin Defendants, until two year from the date that they begin to comply with the Agreements, from directly or indirectly, soliciting or inducing any employee of SKF to leave SKF's employ for any employment in a line

of business similar to that conducted by SKF in locations where SFK services clients, or locations where SFK has solicited clients within one year preceding Defendants' termination of employment.

        c.     Preliminarily and permanently enjoin Defendants from possessing, using or disclosing any of SKF's trade secrets or confidential or proprietary business information for any purpose whatsoever.

        d.     Order Defendants to return all documents, and return or destroy all electronic media, that contain, reflect or constitute SKF's trade secrets and confidential information.

        e.     Enter judgment in favor of SKF and against Defendants on all counts of this Verified Complaint.

        f.     Award SKF damages, including punitive or exemplary damages where available, on each count of this Verified Complaint in an amount to be established at trial.

        g.     Award SKF its reasonable attorneys' fees and costs.

        h.     Award SKF such other relief as the Court may deem just and proper.

Dated:  August 19, 2008

    _s/ Ernesto R. Palomo_____
Terrence P. Canade (# 06196823)
Ernesto R. Palomo (# 06278186)
Locke Lord Bissell & Liddell LLP
111 South Wacker
Chicago, IL  60606
(312) 443-1862

and

Stephen J. Sundheim
Elizabeth S. Campbell
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

Attorneys for Plaintiff
SKF USA Inc.

## VERIFICATION

Pursuant to 28 U.S.C. §1746, I, Bart G. Bartholomew, Vice President Reliability Systems North America, for SKF USA Inc., declare under penalty of perjury that the allegations in the foregoing complaint are true and correct.

Dated: August 18, 2008

BART G. BARTHOLOMEW

# EXHIBIT A





www.pmcisystems.com

Est. 1970

*Corporate*

2500 Estes Avenue
Elk Grove Village, IL 60007

**Ph: 800-222-PMCI**
Fax: 847-956-8761

*Northern Region*

5224 Heffron Court
Stevens Point, WI 54481

**Ph: 888-444-PMCI**
Fax: 715-342-9053



**ISO 9002**
Certificate #A4053

## AGREEMENT

THIS AGREEMENT is entered into at Elk Grove Village, Illinois this _12_ day of _March_, _2001_, by and between PREVENTIVE MAINTENANCE COMPANY, INC. (hereinafter referred to as "PMCI") and _Dale H. Bjorness II_ (hereinafter referred to as "Employee").

### RECITALS:

WHEREAS, Employee is assuming a position of employment with PMCI as a _Sales Engineer_, which will expose Employee to PMCI's tangible and intangible property, including confidential information, and other proprietary business information and which will expose Employee to proprietary information belonging to PMCI's clients which Employee will be entrusted to maintain as highly confidential; and

WHEREAS, PMCI and Employee hereby acknowledge that the industry in which PMCI competes is extremely competitive, and that PMCI expends substantial money, time, effort and other resources to develop and maintain its client lists and client relationships which, once acquired, are generally of a continuing and permanent nature; and

WHEREAS, PMCI and Employee understand Employee will learn a great deal of information through his/her employment with PMCI, yet PMCI seeks only to preserve the confidentiality of certain property and information, which if used outside the scope of Employee's employment with PMCI would jeopardize PMCI's relationship with existing and newly acquired clients and client prospects; and

WHEREAS, Employee through his/her employment will be exposed to PMCI accounts, client lists, contract terms, prospective client lists and other proprietary information regarding its clients' accounts, and its operations; and

WHEREAS, Employee recognizes the importance of his/her abiding by this Agreement to PMCI's ability to protect its proprietary business information and the proprietary information

---

Predictive Machinery Vibration Programs          Vibration Analysis          Dynamic Balancing          Infrared Inspections

**Predictive Technology Services**

Ultrasound Inspections          Machine Tool & Spindle Analysis          Laser Analysis          Emergency Services

of its clients which is essential to the continued existence of PMCI's business; and

WHEREAS, Employee recognizes PMCI's restrictions on his/her future activity for a stated time are necessary to protect PMCI's interests in its proprietary business information and the proprietary business information of its clients which is essential to the continued existence of PMCI's business; and

WHEREAS, if Employee were to act in violation of this Agreement, PMCI could not be adequately compensated for any such breach by money damages and any such breach of this Agreement will cause irreparable injury to PMCI; and

WHEREAS, Employee and PMCI acknowledge that the restrictions of this Agreement apply regardless of whether Employee voluntarily or involuntarily leaves PMCI's employ (both of which are hereinafter referenced to as "termination of Employee's employment").

NOW, THEREFORE, in consideration of the foregoing recitals and of the provisions set forth herein and other good and valuable consideration, the receipt and sufficiency of which is mutually acknowledged, including without limitations the fact that PMCI will employ, or continue to employ Employee, and will expose or continue to expose Employee to PMCI's proprietary and confidential business information, and Employee will continue service to PMCI, acting in good faith and in PMCI's interests, the parties hereto agree as follows:

1.    PMCI'S PROPERTY

All tangible items furnished to or created by Employee from time to time in connection with the performance of Employee's duties, including but not limited to client lists, procedures manuals, proposal materials, prospective client lists, client reports, and work papers, shall at all times remain the sole property of PMCI. Employee acknowledges that the information contained in the tangible property is a valuable asset of PMCI's business and is highly confidential. Employee shall not duplicate tangible items. They are provided to Employee for the limited purpose of enabling the Employee to perform duties of employment, and Employee hereby covenants not to use or permit any of the same to

be used for any other purpose. When the tangible items are not being used by Employee in furtherance of his employment, they shall be kept under lock and key. Upon the demand of PMCI, at any time or upon the termination of employment under any circumstances, Employee shall promptly tender all such items to PMCI. Employee covenants that he/she will not provide PMCI's tangible property to any competitor of PMCI nor use PMCI's tangible property or the information contained therein in furtherance of the business of any competitor of PMCI.

2. PMCI'S CONFIDENTIAL AND PROPRIETARY INFORMATION

   a. All information imparted to Employee by PMCI, or otherwise obtained by Employee, at any time, relating to PMCI's methods of doing business; valuation methods; computer programs; business ideas; billing procedures; pricing and commission data; client names and lists; client needs and requirements; client servicing methods; prospective client lists; and any other client data, is revealed and entrusted to Employee, in confidence, solely in connection with and for the purpose of employment on behalf of PMCI. Employee shall not, at any time, either during or after employment with PMCI, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of PMCI. Without limiting the generality of the foregoing, upon the termination of employment, under any circumstances, Employee shall promptly tender to PMCI all lists, records, work papers, reports and other documents in Employee's possession or control relating to any clients, prospective clients or the business of PMCI.

   b. Further, Employee promises to maintain as confidential all information Employee may obtain, learn or be entrusted with as an employee of PMCI, regarding any proprietary information belonging to any of PMCI's clients, including but not limited to any client's methods or processes of production,

pricing, marketing, servicing of research and development. Employee shall not, at any time, either during or after the term of employment, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of PMCI.

3.   <u>PROHIBITIONS REGARDING PMCI'S</u>
     <u>PROPRIETARY BUSINESS INFORMATION</u>

   a.   It is understood and agreed by Employee that all business relationships and goodwill now existing with respect to the clients of PMCI, whether or not created by Employee, and all such relationships and goodwill which may hereafter be created or enhanced, at all time remain the sole property of PMCI. Accordingly, Employee agrees that during the term of this Agreement and for a further period of two years beginning on the termination of Employee's employment with PMCI, Employee shall not, under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee or in any other capacity whatsoever, directly or indirectly, solicit business or sell or render services of the sort provided by PMCI to any client for which PMCI or its Employee has rendered services or to any prospective client that Employee has solicited to provide services of the sort provided by PMCI or about whom Employee has learned confidential information during the twelve (12) months preceding Employee's separation from PMCI; nor shall Employee, directly or indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

   b.   Due to the confidential nature of the proprietary information and the considerable amount of money, time and effort expended to develop such proprietary information, and due to PMCI's considerable investment in training employees and allowing them access to confidential and proprietary information, and with the understanding that the Employees' use of such training and

proprietary information outside of PMCI's employment would unduly prejudice PMCI's relationship with existing clients, Employee agrees that during the term of this Agreement and for a further period of two (2) years beginning on the termination of Employee's employment with PMCI, Employee shall not, under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee, or in any capacity whatever, directly or indirectly, solicit or induce any employee of PMCI to leave PMCI's employ for any employment in a line of business similar to that conducted by PMCI in locations where PMCI services clients, or locations where PMCI has solicited clients within the twelve, (12) months preceding Employee's termination; nor will Employee, directly or indirectly, aid or assist any other person, firm or corporation to solicit or induce any employee of PMCI for any employment in a line of business similar to that conducted by PMCI in the aforesaid locations.

c. Due to the confidential nature of the proprietary information and the considerable amount of money, time and effort expended to develop such proprietary information to which Employee will be exposed, and with the understanding that the Employee's use of such proprietary information outside of PMCI's employment would unduly prejudice PMCI's relationship with existing clients, Employee agrees during the term of this Agreement and for a further period of two (2) years beginning on the termination of Employee's employment with PMCI that Employee will not under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee or in any other capacity compete with PMCI by soliciting, selling or rendering services of the sort provided by PMCI to any individual or entity that has a business location in the locations serviced or solicited by PMCI within the twelve (12) months preceding Employee's termination nor will Employee, directly or

indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

d.   The provisions of this Paragraph 3 shall be in addition to, and shall not in any way be deemed limited or restricted by, the provisions of any other Paragraph of this Agreement.

4.   ENTIRE AGREEMENT

These written Restrictive Covenants constitute the entire agreement of the parties with respect to the subject matter hereof and there are no prior or contemporaneous oral or written representations, promises, or agreements not expressed or referred to herein other than the singular exception of Employee's interim agreement to enter into some form of restrictive agreement in consideration of being offered a position with PMCI.

5.   AMENDMENT

This Agreement may be amended only in writing and only if such writing is signed by Employee and by the President of PMCI.

6.   SURVIVAL OF PROVISIONS

Any provision of this Agreement, which by terms or reasonable implication is to be or may be performed or effective after the termination of the Agreement, shall be deemed to survive such termination.

7.   SEPARABILITY AND MODIFICATION

If any provision of this Agreement shall be invalid or unenforceable, in whole or in part, or as applied to any circumstance, under the laws of any jurisdiction which may govern for such purpose, then such provision shall be deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, either generally or as applied to such circumstance, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent

permitted by law, as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

8.   <u>BINDING EFFECT</u>

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, and assigns, provided that this Agreement is not assignable by employee.

9.   <u>PARAGRAPH HEADINGS</u>

Paragraph headings are for convenience of reference only and shall not be deemed part of this Agreement.

10.   <u>GOVERNING LAW AND SUBMISSION TO JURISDICTION</u>

This Agreement shall be governed in all respects by the substantive laws of the State of Illinois without reference to the choice of law provisions of Illinois or any other state. Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Employee hereby consents and submits his or her person to the jurisdiction of any such Court for such purpose.

11.   <u>COUNTERPARTS</u>

This Agreement may be executed in any number of identical counterparts, each of which shall be deemed a duplicate original, and all of which together shall constitute but one and the same agreement.

12.   <u>CONSULTATION WITH COUNSEL</u>

By executing this Agreement, Employee expressly represents that he or she has read it, understands its terms and has had the opportunity (whether exercised or not) to consult with legal counsel regarding it.

IN WITNESS WHEREOF, the parties have set their hands and seals and have caused this Agreement to be executed the day and year first above written.

EMPLOYEE

By: _____

Its: _____

Date: _____


PREVENTIVE MAINTENANCE COMPANY, INC.

By: _____

Its: _____

Date: _____

EXHIBIT B





Est. 1970       ®

# PREVENTIVE MAINTENANCE COMPANY, INC.
### 800-222-PMCI (7624) • FAX 847-956-8761



ISO 9002
CERTIFICATE #A4053

## AGREEMENT

THIS AGREEMENT is entered into at Elk Grove Village, Illinois this 10ᵗʰ day of ~~June~~, 199~~8~~, by and between PREVENTIVE MAINTENANCE COMPANY, INC. (hereinafter referred to as "Preventive") and ~~KEVIN KOCH~~ (hereinafter referred to as "Employee").

## RECITALS:

WHEREAS, Employee is assuming a position of employment with Preventive as a ~~VIBRATION TECHNICIAN~~, which will expose Employee to Preventive's tangible property containing confidential information, and other proprietary business information and which will expose Employee to proprietary information belonging to Preventive's clients which Employee will be entrusted to maintain as highly confidential; and

WHEREAS, Preventive and Employee hereby acknowledge that the industry in which Preventive competes is extremely competitive, and that Preventive expends substantial money, time, effort and other resources to develop and maintain its client lists and client relationships which, once acquired, are generally of a continuing and permanent nature; and

WHEREAS, Preventive and Employee understand Employee will learn a great deal of information through his/her employment with Preventive, yet Preventive seeks only to preserve the confidentiality of certain property and information, which if used outside the scope of Employee's employment with Preventive would jeopardize Preventive's relationship with existing clients; and

WHEREAS, Employee through his/her employment will be exposed to Preventive accounts, client lists, contract terms and other proprietary information regarding its clients' accounts, and its operations; and

WHEREAS, Employee recognizes the importance of his/her abiding by this Agreement to Preventive's ability to protect its proprietary business information and the proprietary information of its clients which is essential to the continued existence of Preventive's business; and

WHEREAS, Employee recognizes Preventive's restrictions on his/her future activity for a stated time are necessary to protect Preventive's interests in its proprietary business information and the proprietary business information of its clients which is essential to the continued existence of Preventive's business; and

Predictive Machinery Vibration Programs • Vibration Analysis • Dynamic Balancing • Infrared Thermography • Oil Analysis

| <u>Corporate</u> | <u>Wisconsin</u> |
|---|---|
| 2500 West Estes Avenue | 5224 Heffron Court |
| Elk Grove Village, Illinois 60007 | Stevens Point, Wisconsin 54481 |

WHEREAS, if Employee were to act in violation of this Agreement, Preventive could not be adequately compensated for any such breach and any such breach of this Agreement will cause irreparable injury to Preventive; and

WHEREAS, Employee and Preventive acknowledge that the restrictions of this Agreement apply regardless of whether Employee voluntarily or involuntarily leaves Preventive's employ (both of which are hereinafter referenced to as "termination of Employee's employment").

NOW, THEREFORE, in consideration of the foregoing recitals and of the provisions set forth herein and other good and valuable consideration, the receipt and sufficiency of which is mutually acknowledged, including without limitations the fact that Preventive will employ, or continue to employ Employee, and will expose or continue to expose Employee to Preventive's proprietary and confidential business information, and Employee will continue service to Preventive, acting in good faith and in Preventive's interests, the parties hereto agree as follows:

1.    **PREVENTIVE'S PROPERTY**

All tangible items furnished to or created by Employee from time to time in connection with the performance of Employee's duties, including but not limited to client lists, procedures manuals, proposal materials, client reports, and work papers, shall at all times remain the sole property of Preventive. Employee acknowledges that the information contained in the tangible property is a valuable asset of Preventive's business and is highly confidential. Employee shall not duplicate tangible items. They are provided to Employee for the limited purpose of enabling the Employee to perform duties of employment, and Employee hereby covenants not to use or permit any of the same to be used for any other purpose. When the tangible items are not being used by Employee in furtherance of his employment, they shall be kept under lock and key. Upon the demand of Preventive, at any time or upon the termination of employment under any circumstances, Employee shall promptly tender all such items to Preventive. Employee covenants that he/she will not provide Preventive's tangible property to any competitor of Preventive nor use Preventive's tangible property in furtherance of the business of any competitor of Preventive.

2.    **PREVENTIVE'S CONFIDENTIAL AND PROPRIETARY INFORMATION**

a.    All information imparted to Employee by Preventive, or otherwise obtained by Employee, at any time, relating to Preventive's methods of doing business; valuation methods; computer programs; business

ideas; billing procedures; pricing and commission data; client names and lists; client needs and requirements; client servicing methods; and any other client data, is revealed and entrusted to Employee, in confidence, solely in connection with and for the purpose of employment on behalf of Preventive. Employee shall not, at any time, either during or after employment with Preventive, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of Preventive. Without limiting the generality of the foregoing, upon the termination of employment, under any circumstances, Employee shall promptly tender to Preventive all lists, records, work papers, reports and other documents in Employee's possession or control relating to any clients or the business of Preventive.

b.  Further, Employee promises to maintain as confidential all information Employee may obtain, learn or be entrusted with as an employee of Preventive, regarding any proprietary information belonging to any of Preventive's clients, including but not limited to any client's methods or processes of production, pricing, marketing, servicing of research and development. Employee shall not, at any time, either during or after the term of employment, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of Preventive.

3.  **PROHIBITIONS REGARDING PREVENTIVE'S PROPRIETARY BUSINESS INFORMATION**

a.  It is understood and agreed by Employee that all business relationships and goodwill now existing with respect to the clients of Preventive, whether or not created by Employee, and all such relationships and goodwill which may hereafter be created or enhanced, at all time remain the sole property of Preventive. Accordingly, Employee agrees that during the term of this Agreement and for a further period of two years beginning on the termination of Employee's employment with Preventive, Employee shall not, under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee or in any other capacity whatsoever, directly or indirectly, solicit business or sell or render services of the sort provided by Preventive to any client for which Preventive or its Employee has rendered services or to any prospective client that Employee

has solicited to provide services of the sort provided by Preventive or about whom Employee has learned confidential information during the twelve (12) months preceding Employee's separation from Preventive; nor shall Employee, directly or indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

b.   Due to the confidential nature of the proprietary information and the considerable amount of money, time and effort expended to develop such proprietary information, and due to Preventive's considerable investment in training employees and allowing them access to confidential and proprietary information, and with the understanding that the Employees' use of such training and proprietary information outside of Preventive's employment would unduly prejudice Preventive's relationship with existing clients, Employee agrees that during the term of this Agreement and for a further period of two (2) years beginning on the termination of Employee's employment with Preventive, Employee shall not, under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee, or in any capacity whatever, directly or indirectly, solicit or induce any employee of Preventive to leave Preventive's employ for any employment in a line of business similar to that conducted by Preventive in locations where Preventive services clients, or locations where Preventive has solicited clients within the twelve, (12) months preceding Employee's termination; nor will Employee, directly or indirectly, aid or assist any other person, firm or corporation to solicit or induce any employee of Preventive for any employment in a line of business similar to that conducted by Preventive in the aforesaid locations.

c.   Due to the confidential nature of the proprietary information and the considerable amount of money, time and effort expended to develop such proprietary information to which Employee will be exposed, and with the understanding that the Employee's use of such proprietary information outside of Preventive's employment would unduly prejudice Preventive's relationship with existing clients, Employee agrees during the term of this Agreement and for a further period of two (2) years beginning on the termination of Employee's employment with Preventive that Employee will not under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee or in any other

capacity compete with Preventive by soliciting, selling or rendering services of the sort provided by Preventive to any individual or entity that has a business location in the locations serviced or solicited by Preventive within the twelve (12) months preceding Employee's termination nor will Employee, directly or indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

d.   The provisions of this Paragraph 3 shall be in addition to, and shall not in any way be deemed limited or restricted by, the provisions of any other Paragraph of this Agreement.

4.    **ENTIRE AGREEMENT**

These written Restrictive Covenants constitute the entire agreement of the parties with respect to the subject matter hereof and there are no prior or contemporaneous oral or written representations, promises, or agreements not expressed or referred to herein other than the singular exception of Employee's interim agreement to enter into some form of restrictive agreement in consideration of being offered a position with Preventive.

5.    **AMENDMENT**

This Agreement may be amended only in writing and only if such writing is signed by Employee and by the President of Preventive.

6.    **SURVIVAL OF PROVISIONS**

Any provision of this Agreement, which by terms or reasonable implication is to be or may be performed or effective after the termination of the Agreement, shall be deemed to survive such termination.

7.    **SEPARABILITY AND MODIFICATION**

If any provision of this Agreement shall be invalid or unenforceable, in whole or in part, or as applied to any circumstance, under the laws of any jurisdiction which may govern for such purpose, then such provision shall be deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, either generally or as applied to such circumstance, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

8.    **BINDING EFFECT**

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, and assigns, provided that this Agreement is not assignable by employee.

9.    **PARAGRAPH HEADINGS**

Paragraph headings are for convenience of reference only and shall not be deemed part of this Agreement.

10.    <u>GOVERNING LAW AND SUBMISSION TO JURISDICTION</u>

This Agreement shall be governed in all respects by the laws of the State of Illinois. Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Employee hereby consents and submits his or her person to the jurisdiction of any such Court for such purpose.

11.    <u>COUNTERPARTS</u>

This Agreement may be executed in any number of identical counterparts, each of which shall be deemed a duplicate original, and all of which together shall constitute but one and the same agreement.

12.    <u>CONSULTATION WITH COUNSEL</u>

By executing this Agreement, Employee expressly represents that he or she has read it, understands its terms and has had the opportunity (whether exercised or not) to consult with legal counsel regarding it.

IN WITNESS WHEREOF, the parties have set their hands and seals and have caused this Agreement to be executed the day and year first above written.

PREVENTIVE MAINTENANCE COMPANY, INC.

By: _STEPHEN L. WAREHAM_ / _Steph L. Wareh_

Its: _DIRECTOR OF OPERATIONS_

Date: _6-10-98_

EMPLOYEE

By: _____

Its: _VIBRATION TECHNICIAN_

Date: _5-10-98_

EXHIBIT C



www.pmcisystems.com

Est. 1970

| Corporate | Northern Region |
|---|---|
| 2500 Estes Avenue | 5224 Heffron Court |
| Elk Grove Village, IL 60007 | Stevens Point, WI 54481 |
| Ph: 800-222-PMCI | Ph: 888-444-PMCI |
| Fax: 847-956-8761 | Fax: 715-342-9053 |



ISO 9002
Certificate #A4053

## AGREEMENT

THIS AGREEMENT is entered into at Elk Grove Village, Illinois this **7** day of **April** , **03** , by and between PREVENTIVE MAINTENANCE COMPANY, INC. (hereinafter referred to as "PMCI") and **Joe Sever** (hereinafter referred to as "Employee").

## RECITALS:

WHEREAS, Employee is assuming a position of employment with PMCI as a **Technician** , which will expose Employee to PMCI's tangible and intangible property, including confidential information, and other proprietary business information and which will expose Employee to proprietary information belonging to PMCI's clients which Employee will be entrusted to maintain as highly confidential; and

WHEREAS, PMCI and Employee hereby acknowledge that the industry in which PMCI competes is extremely competitive, and that PMCI expends substantial money, time, effort and other resources to develop and maintain its client lists and client relationships which, once acquired, are generally of a continuing and permanent nature; and

WHEREAS, PMCI and Employee understand Employee will learn a great deal of information through his/her employment with PMCI, yet PMCI seeks only to preserve the confidentiality of certain property and information, which if used outside the scope of Employee's employment with PMCI would jeopardize PMCI's relationship with existing and newly acquired clients and client prospects; and

WHEREAS, Employee through his/her employment will be exposed to PMCI accounts, client lists, contract terms, prospective client lists and other proprietary information regarding its clients' accounts, and its operations; and

WHEREAS, Employee recognizes the importance of his/her abiding by this Agreement to PMCI's ability to protect its proprietary business information and the proprietary information

---

Predictive Machinery Vibration Programs      Vibration Analysis      Dynamic Balancing      Infrared Inspections

### Predictive Technology Services

Ultrasound Inspections      Machine Tool & Spindle Analysis      Laser Analysis      Emergency Services

of its clients which is essential to the continued existence of PMCI's business; and

WHEREAS, Employee recognizes PMCI's restrictions on his/her future activity for a stated time are necessary to protect PMCI's interests in its proprietary business information and the proprietary business information of its clients which is essential to the continued existence of PMCI's business; and

WHEREAS, if Employee were to act in violation of this Agreement, PMCI could not be adequately compensated for any such breach by money damages and any such breach of this Agreement will cause irreparable injury to PMCI; and

WHEREAS, Employee and PMCI acknowledge that the restrictions of this Agreement apply regardless of whether Employee voluntarily or involuntarily leaves PMCI's employ (both of which are hereinafter referenced to as "termination of Employee's employment").

NOW, THEREFORE, in consideration of the foregoing recitals and of the provisions set forth herein and other good and valuable consideration, the receipt and sufficiency of which is mutually acknowledged, including without limitations the fact that PMCI will employ, or continue to employ Employee, and will expose or continue to expose Employee to PMCI's proprietary and confidential business information, and Employee will continue service to PMCI, acting in good faith and in PMCI's interests, the parties hereto agree as follows:

1.   PMCI'S PROPERTY

All tangible items furnished to or created by Employee from time to time in connection with the performance of Employee's duties, including but not limited to client lists, procedures manuals, proposal materials, prospective client lists, client reports, and work papers, shall at all times remain the sole property of PMCI. Employee acknowledges that the information contained in the tangible property is a valuable asset of PMCI's business and is highly confidential. Employee shall not duplicate tangible items. They are provided to Employee for the limited purpose of enabling the Employee to perform duties of employment, and Employee hereby covenants not to use or permit any of the same to

be used for any other purpose. When the tangible items are not being used by Employee in furtherance of his employment, they shall be kept under lock and key. Upon the demand of PMCI, at any time or upon the termination of employment under any circumstances, Employee shall promptly tender all such items to PMCI. Employee covenants that he/she will not provide PMCI's tangible property to any competitor of PMCI nor use PMCI's tangible property or the information contained therein in furtherance of the business of any competitor of PMCI.

2.   PMCI'S CONFIDENTIAL AND PROPRIETARY INFORMATION

a.   All information imparted to Employee by PMCI, or otherwise obtained by Employee, at any time, relating to PMCI's methods of doing business; valuation methods; computer programs; business ideas; billing procedures; pricing and commission data; client names and lists; client needs and requirements; client servicing methods; prospective client lists; and any other client data, is revealed and entrusted to Employee, in confidence, solely in connection with and for the purpose of employment on behalf of PMCI. Employee shall not, at any time, either during or after employment with PMCI, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of PMCI. Without limiting the generality of the foregoing, upon the termination of employment, under any circumstances, Employee shall promptly tender to PMCI all lists, records, work papers, reports and other documents in Employee's possession or control relating to any clients, prospective clients or the business of PMCI.

b.   Further, Employee promises to maintain as confidential all information Employee may obtain, learn or be entrusted with as an employee of PMCI, regarding any proprietary information belonging to any of PMCI's clients, including but not limited to any client's methods or processes of production,

pricing, marketing, servicing of research and development. Employee shall not, at any time, either during or after the term of employment, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of PMCI.

3.   PROHIBITIONS REGARDING PMCI'S
     PROPRIETARY BUSINESS INFORMATION

a.   It is understood and agreed by Employee that all business relationships and goodwill now existing with respect to the clients of PMCI, whether or not created by Employee, and all such relationships and goodwill which may hereafter be created or enhanced, at all time remain the sole property of PMCI. Accordingly, Employee agrees that during the term of this Agreement and for a further period of two years beginning on the termination of Employee's employment with PMCI, Employee shall not, under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee or in any other capacity whatsoever, directly or indirectly, solicit business or sell or render services of the sort provided by PMCI to any client for which PMCI or its Employee has rendered services or to any prospective client that Employee has solicited to provide services of the sort provided by PMCI or about whom Employee has learned confidential information during the twelve (12) months preceding Employee's separation from PMCI; nor shall Employee, directly or indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

b.   Due to the confidential nature of the proprietary information and the considerable amount of money, time and effort expended to develop such proprietary information, and due to PMCI's considerable investment in training employees and allowing them access to confidential and proprietary information, and with the understanding that the Employees' use of such training and

proprietary information outside of PMCI's
employment would unduly prejudice PMCI's
relationship with existing clients, Employee agrees
that during the term of this Agreement and for a
further period of two (2) years beginning on the
termination of Employee's employment with PMCI,
Employee shall not, under any circumstances, as
proprietor, partner, joint venturer, stockholder,
director, officer, trustee, principal, agent,
servant, employee, or in any capacity whatever,
directly or indirectly, solicit or induce any
employee of PMCI to leave PMCI's employ for any
employment in a line of business similar to that
conducted by PMCI in locations where PMCI services
clients, or locations where PMCI has solicited
clients within the twelve, (12) months preceding
Employee's termination; nor will Employee,
directly or indirectly, aid or assist any other
person, firm or corporation to solicit or induce
any employee of PMCI for any employment in a line
of business similar to that conducted by PMCI in
the aforesaid locations.

c.  Due to the confidential nature of the proprietary
information and the considerable amount of money,
time and effort expended to develop such
proprietary information to which Employee will be
exposed, and with the understanding that the
Employee's use of such proprietary information
outside of PMCI's employment would unduly prejudice
PMCI's relationship with existing clients, Employee
agrees during the term of this Agreement and for a
further period of two (2) years beginning on the
termination of Employee's employment with PMCI that
Employee will not under any circumstances, as
proprietor, partner, joint venturer, stockholder,
director, officer, trustee, principal, agent,
servant, employee or in any other capacity compete
with PMCI by soliciting, selling or rendering
services of the sort provided by PMCI to any
individual or entity that has a business location
in the locations serviced or solicited by PMCI
within the twelve (12) months preceding Employee's
termination nor will Employee, directly or

indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

d.  The provisions of this Paragraph 3 shall be in addition to, and shall not in any way be deemed limited or restricted by, the provisions of any other Paragraph of this Agreement.

4.  ENTIRE AGREEMENT

These written Restrictive Covenants constitute the entire agreement of the parties with respect to the subject matter hereof and there are no prior or contemporaneous oral or written representations, promises, or agreements not expressed or referred to herein other than the singular exception of Employee's interim agreement to enter into some form of restrictive agreement in consideration of being offered a position with PMCI.

5.  AMENDMENT

This Agreement may be amended only in writing and only if such writing is signed by Employee and by the President of PMCI.

6.  SURVIVAL OF PROVISIONS

Any provision of this Agreement, which by terms or reasonable implication is to be or may be performed or effective after the termination of the Agreement, shall be deemed to survive such termination.

7.  SEPARABILITY AND MODIFICATION

If any provision of this Agreement shall be invalid or unenforceable, in whole or in part, or as applied to any circumstance, under the laws of any jurisdiction which may govern for such purpose, then such provision shall be deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, either generally or as applied to such circumstance, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent

permitted by law, as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

8.   BINDING EFFECT

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, and assigns, provided that this Agreement is not assignable by employee.

9.   PARAGRAPH HEADINGS

Paragraph headings are for convenience of reference only and shall not be deemed part of this Agreement.

10.   GOVERNING LAW AND SUBMISSION TO JURISDICTION

This Agreement shall be governed in all respects by the substantive laws of the State of Illinois without reference to the choice of law provisions of Illinois or any other state.   Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Employee hereby consents and submits his or her person to the jurisdiction of any such Court for such purpose.

11.   COUNTERPARTS

This Agreement may be executed in any number of identical counterparts, each of which shall be deemed a duplicate original, and all of which together shall constitute but one and the same agreement.

12.   CONSULTATION WITH COUNSEL

By executing this Agreement, Employee expressly represents that he or she has read it, understands its terms and has had the opportunity (whether exercised or not) to consult with legal counsel regarding it.

Page 8 of 8

IN WITNESS WHEREOF, the parties have set their hands and seals and
have caused this Agreement to be executed the day and year first
above written.

EMPLOYEE

By: _____

Its: _____

Date: _____

PREVENTIVE MAINTENANCE COMPANY, INC.

By: _____

Its: _____

Date: _____

EXHIBIT D



Corporate

2500 Estes Avenue
www.pmcisystems.com     Elk Grove Village, IL 60007

**Ph: 800-222-PMCI**
Fax: 847-956-8761

Northern Region

5224 Heffron Court
Stevens Point, WI 54481

**Ph: 888-444-PMCI**
Fax: 715-342-9053



**ISO 9002**
Certificate #A4053

Est. 1970

## AGREEMENT

THIS AGREEMENT is entered into at Elk Grove Village, Illinois this 16ᵗʰ day of ~~JANUARY~~          , ~~06~~, by and between PREVENTIVE MAINTENANCE COMPANY, INC. (hereinafter referred to as "PMCI") and ~~Walter Romick~~ (hereinafter referred to as "Employee").

## RECITALS:

WHEREAS, Employee is assuming a position of employment with PMCI as a _____, which will expose Employee to PMCI's tangible and intangible property, including confidential information, and other proprietary business information and which will expose Employee to proprietary information belonging to PMCI's clients which Employee will be entrusted to maintain as highly confidential; and

WHEREAS, PMCI and Employee hereby acknowledge that the industry in which PMCI competes is extremely competitive, and that PMCI expends substantial money, time, effort and other resources to develop and maintain its client lists and client relationships which, once acquired, are generally of a continuing and permanent nature; and

WHEREAS, PMCI and Employee understand Employee will learn a great deal of information through his/her employment with PMCI, yet PMCI seeks only to preserve the confidentiality of certain property and information, which if used outside the scope of Employee's employment with PMCI would jeopardize PMCI's relationship with existing and newly acquired clients and client prospects; and

WHEREAS, Employee through his/her employment will be exposed to PMCI accounts, client lists, contract terms, prospective client lists and other proprietary information regarding its clients' accounts, and its operations; and

WHEREAS, Employee recognizes the importance of his/her abiding by this Agreement to PMCI's ability to protect its proprietary business information and the proprietary information of its clients which is essential to the continued existence of PMCI's business; and

WHEREAS, Employee recognizes PMCI's restrictions on his/her future activity for a stated time are necessary to protect PMCI's interests in its proprietary business information and the proprietary business information of its clients which is essential to the continued existence of PMCI's business; and

WHEREAS, if Employee were to act in violation of this Agreement, PMCI could not be adequately compensated for any such breach by money damages and any such breach of this Agreement will cause irreparable injury to PMCI; and

WHEREAS, Employee and PMCI acknowledge that the restrictions of this Agreement apply regardless of whether Employee voluntarily or involuntarily leaves PMCI's employ (both of which are hereinafter referenced to as "termination of Employee's employment").

NOW, THEREFORE, in consideration of the foregoing recitals and of the provisions set forth herein and other good and valuable consideration, the receipt and sufficiency of which is mutually acknowledged, including without limitations the fact that PMCI will employ, or continue to employ Employee, and will expose or continue to expose Employee to PMCI's proprietary and confidential business information, and Employee will continue service to PMCI, acting in good faith and in PMCI's interests, the parties hereto agree as follows:

1. PMCI'S PROPERTY

   All tangible items furnished to or created by Employee from time to time in connection with the performance of Employee's duties, including but not limited to client lists, procedures manuals, proposal materials, prospective client lists, client reports, and work papers, shall at all times remain the sole property of PMCI. Employee acknowledges that the information contained in the tangible property is a valuable asset of PMCI's business and is highly confidential. Employee shall not duplicate tangible items. They are provided to Employee for the limited purpose of enabling the Employee to perform duties of employment, and Employee hereby covenants not to use or

permit any of the same to be used for any other purpose. When the tangible items are not being used by Employee in furtherance of his employment, they shall be kept under lock and key. Upon the demand of PMCI, at any time or upon the termination of employment under any circumstances, Employee shall promptly tender all such items to PMCI. Employee covenants that he/she will not provide PMCI's tangible property to any competitor of PMCI nor use PMCI's tangible property or the information contained therein in furtherance of the business of any competitor of PMCI.

2.  PMCI'S CONFIDENTIAL AND PROPRIETARY INFORMATION

   a.  All information imparted to Employee by PMCI, or otherwise obtained by Employee, at any time, relating to PMCI's methods of doing business; valuation methods; computer programs; business ideas; billing procedures; pricing and commission data; client names and lists; client needs and requirements; client servicing methods; prospective client lists; and any other client data, is revealed and entrusted to Employee, in confidence, solely in connection with and for the purpose of employment on behalf of PMCI. Employee shall not, at any time, either during or after employment with PMCI, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of PMCI. Without limiting the generality of the foregoing, upon the termination of employment, under any circumstances, Employee shall promptly tender to PMCI all lists, records, work papers, reports and other documents in Employee's possession or control relating to any clients, prospective clients or the business of PMCI.

     b.   Further, Employee promises to maintain as confidential all information Employee may obtain, learn or be entrusted with as an employee of PMCI, regarding any proprietary information belonging to any of PMCI's clients, including but not limited to any client's methods or processes of production, pricing, marketing, servicing of research and development. Employee shall not, at any time, either during or after the term of employment, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of PMCI.

3.   <u>PROHIBITIONS REGARDING PMCI'S</u>
<u>PROPRIETARY BUSINESS INFORMATION</u>

     a.   It is understood and agreed by Employee that all business relationships and goodwill now existing with respect to the clients of PMCI, whether or not created by Employee, and all such relationships and goodwill which may hereafter be created or enhanced, at all time remain the sole property of PMCI. Accordingly, Employee agrees that during the term of this Agreement and for a further period of two years beginning on the termination of Employee's employment with PMCI, Employee shall not, under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee or in any other capacity whatsoever, directly or indirectly, solicit business or sell or render services of the sort provided by PMCI to any client for which PMCI or its Employee has rendered services or to any prospective client that Employee has solicited to provide services of the sort provided by PMCI or about whom Employee has learned .confidential information during the twelve (12) months preceding Employee's separation from PMCI; nor shall Employee, directly or indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

      b.    Due to the confidential nature of the proprietary information and the considerable amount of money, time and effort expended to develop such proprietary information, and due to PMCI's considerable investment in training employees and allowing them access to confidential and proprietary information, and with the understanding that the Employees' use of such training and proprietary information outside of PMCI's employment would unduly prejudice PMCI's relationship with existing clients, Employee agrees that during the term of this Agreement and for a further period of two (2) years beginning on the termination of Employee's employment with PMCI, Employee shall not, under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee, or in any capacity whatever, directly or indirectly, solicit or induce any employee of PMCI to leave PMCI's employ for any employment in a line of business similar to that conducted by PMCI in locations where PMCI services clients, or locations where PMCI has solicited clients within the twelve, (12) months preceding Employee's termination; nor will Employee, directly or indirectly, aid or assist any other person, firm or corporation to solicit or induce any employee of PMCI for any employment in a line of business similar to that conducted by PMCI in the aforesaid locations.

      c.    Due to the confidential nature of the proprietary information and the considerable amount of money, time and effort expended to develop such proprietary information to which Employee will be exposed, and with the understanding that the Employee's use of such proprietary information outside of PMCI's employment would unduly prejudice PMCI's relationship with existing clients, Employee agrees during the term of this Agreement and for a further period of two (2) years beginning on the termination of Employee's employment with PMCI that Employee will not under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer,

trustee, principal, agent, servant, employee or in any other capacity compete with PMCI by soliciting, selling or rendering services of the sort provided by PMCI to any individual or entity that has a business location in the locations serviced or solicited by PMCI within the twelve (12) months preceding Employee's termination nor will Employee, directly or indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

d.   The provisions of this Paragraph 3 shall be in addition to, and shall not in any way be deemed limited or restricted by, the provisions of any other Paragraph of this Agreement.

4.   ENTIRE AGREEMENT

These written Restrictive Covenants constitute the entire agreement of the parties with respect to the subject matter hereof and there are no prior or contemporaneous oral or written representations, promises, or agreements not expressed or referred to herein other than the singular exception of Employee's interim agreement to enter into some form of restrictive agreement in consideration of being offered a position with PMCI.

5.   AMENDMENT

This Agreement may be amended only in writing and only if such writing is signed by Employee and by the President of PMCI.

6.   SURVIVAL OF PROVISIONS

Any provision of this Agreement, which by terms or reasonable implication is to be or may be performed or effective after the termination of the Agreement, shall be deemed to survive such termination.

7.   SEPARABILITY AND MODIFICATION

If any provision of this Agreement shall be invalid or unenforceable, in whole or in part, or as applied to any circumstance, under the laws of any jurisdiction which may govern for such purpose, then such provision shall be

deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, either generally or as applied to such circumstance, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

8.  BINDING EFFECT

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, and assigns, provided that this Agreement is not assignable by employee.

9.  PARAGRAPH HEADINGS

Paragraph headings are for convenience of reference only and shall not be deemed part of this Agreement.

10.  GOVERNING LAW AND SUBMISSION TO JURISDICTION

This Agreement shall be governed in all respects by the substantive laws of the State of Illinois without reference to the choice of law provisions of Illinois or any other state. Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Employee hereby consents and submits his or her person to the jurisdiction of any such Court for such purpose.

11.  COUNTERPARTS

This Agreement may be executed in any number of identical counterparts, each of which shall be deemed a duplicate original, and all of which together shall constitute but one and the same agreement.

12.  EMPLOYMENT

Nothing in this Agreement is meant to alter the "at will nature" of employment.

13.   CONSULTATION WITH COUNSEL

By executing this Agreement, Employee expressly represents that he or she has read it, understands its terms and has had the opportunity (whether exercised or not) to consult with legal counsel regarding it.

IN WITNESS WHEREOF, the parties have set their hands and seals and have caused this Agreement to be executed the day and year first above written.

EMPLOYEE

By: _____
Its: _____
Date: 1/18/08

PREVENTIVE MAINTENANCE COMPANY, INC.

By: _____
Its: _____
Date: 1-25-06

EXHIBIT E

**SKF USA Inc.**

SKF

Name _Dale Harold Bierkness II_
(Type or print full name - no initials)

Date of Birth _7-12-61_

Employed by _SKF_
(Division or subsidiary company)

At _Stevens Point WI_
(City and State)

Occupation _Director SKF Reliability Systems_

Date Employed _04-16-2001_

Effective Date of this Agreement _0-1-04-07_
(If employment begins in an occupation requiring this agreement, enter date employed as effective date of this agreement.
Otherwise enter date of transfer to occupation requiring this agreement).

# Employee Invention, Patent and Secrecy Agreement

Agreement made by and between SKF USA Inc. a Corporation of Delaware (hereinafter called SKF) and
_Dale Harold Bierkness II_ of _5224 Hoffren Ct Stevens Point, WI_
Name (hereinafter called the Employee)                Address

Witnesseth:

In consideration of the covenants herein recited, of the Employee's affiliation and activities with SKF and the compensation paid by SKF to Employee, it is agreed that:

1. The Employee will and does assign to SKF all inventions and improvements made or conceived by him while in its employ or with the use of SKF's time, material, equipment or facilities relating to anti-friction bearings, parts or accessories therefor, machines, tools, devices, equipment or processes useful or pertaining to, or connected with anti-friction bearings and any other line of business or business activity in which SKF is engaged together with such patent or patents as may be obtained whereon, in this and all foreign countries; and upon request by SKF, will at any time during his employment with SKF and after its termination for any reason; execute all proper papers for use in applying for, obtaining and maintaining such United States and foreign patents as SKF may desire, and will execute and deliver all proper assignments thereof, when so requested, but at the expense of SKF. Employee will give SKF such assistance as he is capable with respect to the prosecution of such patent applications and in defense of any patents granted, including evidence in any proceeding.

2. SKF recognizes that the patents or ideas listed and explained on the pages attached to this agreement were conceived by the Employee prior to his employment by SKF and as such are the property of the Employee and/or his previous Employers to prosecute, manufacture, use and/or sell as he or they may desire.

3. The Employee recognizes the vital importance of maintaining the secrecy of SKF's trade secrets and confidential business matters. Therefore, Employee agrees that he will not in any way during his employment and at any time thereafter, without SKF's written approval, disclose or publish to any unauthorized person, firm or corporation any technical or proprietary information, trade secrets and confidential business matters, including but not limited to, secret processes, formulae, sequences, equipment, research items and results, drawings, prints, customer lists, costs, technical sales and marketing programs. All documents, memoranda, reports, prints, and drawings, including all copies thereof in respect of the above items, are the sole and entire property of SKF which Employee will surrender to SKF upon any termination of employment with SKF; Employee will certify, upon request, to such surrender.

Wherever SKF or SKF USA Inc. shall appear herein, the same shall include the divisions, subsidiaries, successors and assigns of SKF USA Inc.

IN WITNESS WHEREOF, SKF USA Inc. has caused these presents to be executed and the Employee has hereunto set his hand and seal this _46_ _4_ day of _April/January_ , 20 _07_ .

_____
Employee

SKF USA Inc.

_____
General Counsel

_____
Witness for Employee

_____ (seal)
Attest for General Counsel

EXHIBIT F

**SKF USA Inc.**                                                      SKF

Name *Kevin Blake Koch*          Date of Birth *2/26/67*
      (Type or print full name - no initials)

Employed by *SKF*                 At *Stevens Point . WI*
      (Division or subsidiary company)           (City and State)

Occupation *Term Lenser*          Date Employed *6/10/98*

Effective Date of this Agreement *1/4/07*
      (If employment begins in an occupation requiring this agreement, enter date employed as effective date of this agreement.
      Otherwise enter date of transfer to occupation requiring this agreement.)

# Employee Invention, Patent and Secrecy Agreement

Agreement made by and between SKF USA Inc. a Corporation of Delaware (hereinafter called SKF) and
*Kevin Blake Koch* of *111 S Auburn Ave Endeth MN 55734*
      Name (hereinafter called the Employee)                    Address

Witnesseth:

In consideration of the covenants herein recited, of the Employee's affiliation and activities with SKF and the compensation paid by SKF to Employee, it is agreed that:

1. The Employee will and does assign to SKF all inventions and improvements made or conceived by him while in its employ or with the use of SKF's time, material, equipment or facilities relating to anti-friction bearings, parts or accessories therefor, machines, tools, devices, equipment or processes useful or pertaining to, or connected with anti-friction bearings and any other line of business or business activity in which SKF is engaged together with such patent or patents as may be obtained whereon, in this and all foreign countries; and upon request by SKF, will at any time during his employment with SKF and after its termination for any reason; execute all proper papers for use in applying for, obtaining and maintaining such United States and foreign patents as SKF may desire, and will execute and deliver all proper assignments thereof, when so requested, but at the expense of SKF. Employee will give SKF such assistance as he is capable with respect to the prosecution of such patent applications and in defense of any patents granted, including evidence in any proceeding.

2. SKF recognizes that the patents or ideas listed and explained on the pages attached to this agreement were conceived by the Employee prior to his employment by SKF and as such are the property of the Employee and/or his previous Employers to prosecute, manufacture, use and/or sell as he or they may desire.

3. The Employee recognizes the vital importance of maintaining the secrecy of SKF's trade secrets and confidential business matters. Therefore, Employee agrees that he will not in any way during his employment and at any time thereafter, without SKF's written approval, disclose or publish to any unauthorized person, firm or corporation any technical or proprietary information, trade secrets and confidential business matters, including but not limited to, secret processes, formulae, sequences, equipment, research items and results, drawings, prints, customer lists, costs, technical sales and marketing programs. All documents, memoranda, reports, prints, and drawings, including all copies thereof in respect of the above items, are the sole and entire property of SKF which Employee will surrender to SKF upon any termination of employment with SKF; Employee will certify, upon request, to such surrender.

Wherever SKF or SKF USA Inc. shall appear herein, the same shall include the divisions, subsidiaries, successors and assigns of SKF USA Inc.

IN WITNESS WHEREOF, SKF USA Inc. has caused these presents to be executed and the Employee has hereunto set his hand and seal this_____ day of *January*_____, 20 *07*_____.

                                                      SKF USA Inc.

_____                    *Timothy J. Gifford*
        Employee                                  General Counsel

_____                    _____
   Witness for Employee                      Attest for General Counsel            (seal)

EXHIBIT G

**SKF USA Inc.** SKF

Name _Joseph John Sever_
(Type or print full name - no initials)

Date of Birth _06-19-1979_

Employed by _SKF/Culpsville_
(Division or subsidiary company)

At _Stevens Point, WI_
(City and State)

Occupation _Reliability Engineer_

Date Employed _04-07-2003_

Effective Date of this Agreement _03-06-2008_    _01-04-2008_

(If employment begins in an occupation requiring this agreement, enter date employed as effective date of this agreement.
Otherwise enter date of transfer to occupation requiring this agreement).

# Employee Invention, Patent and Secrecy Agreement

Agreement made by and between SKF USA Inc. a Corporation of Delaware (hereinafter called SKF) and _Joseph Sever_
Name (hereinafter called the Employee)

of _11751 W River Hills Dr_
Address

_Apt 215 Burnsville MN 55337_

Witnesseth:

In consideration of the covenants herein recited, of the Employee's affiliation and activities with SKF and the compensation paid by SKF to Employee, it is agreed that:

1. The Employee will and does assign to SKF all inventions and improvements made or conceived by him while in its employ or with the use of SKF's time, material, equipment or facilities relating to anti-friction bearings, parts or accessories therefor, machines, tools, devices, equipment or processes useful or pertaining to, or connected with anti-friction bearings and any other line of business or business activity in which SKF is engaged together with such patent or patents as may be obtained whereon, in this and all foreign countries; and upon request by SKF, will at any time during his employment with SKF and after its termination for any reason; execute all proper papers for use in applying for, obtaining and maintaining such United States and foreign patents as SKF may desire, and will execute and deliver all proper assignments thereof, when so requested, but at the expense of SKF. Employee will give SKF such assistance as he is capable with respect to the prosecution of such patent applications and in defense of any patents granted, including evidence in any proceeding.

2. SKF recognizes that the patents or ideas listed and explained on the pages attached to this agreement were conceived by the Employee prior to his employment by SKF and as such are the property of the Employee and/or his previous Employers to prosecute, manufacture, use and/or sell as he or they may desire.

3. The Employee recognizes the vital importance of maintaining the secrecy of SKF's trade secrets and confidential business matters. Therefore, Employee agrees that he will not in any way during his employment and at any time thereafter, without SKF's written approval, disclose or publish to any unauthorized person, firm or corporation any technical or proprietary information, trade secrets and confidential business matters, including but not limited to, secret processes, formulae, sequences, equipment, research items and results, drawings, prints, customer lists, costs, technical sales and marketing programs. All documents, memoranda, reports, prints, and drawings, including all copies thereof in respect of the above items, are the sole and entire property of SKF which Employee will surrender to SKF upon any termination of employment with SKF; Employee will certify, upon request, to such surrender.

Wherever SKF or SKF USA Inc. shall appear herein, the same shall include the divisions, subsidiaries, successors and assigns of SKF USA Inc.

IN WITNESS WHEREOF, SKF USA Inc. has caused these presents to be executed and the Employee has hereunto set his hand and seal this _06_ day of _03_, 20 _08_.

SKF USA Inc.

_____
Employee

_Timothy P. Hilfard_
General Counsel

_____
Witness for Employee

_____
Attest for General Counsel                (seal)

EXHIBIT H

**SKF USA Inc.**                                                                 SKF

Name _Walton    George    Komick_
(Type or print full name - no initials)

Date of Birth _7/23/75_

Employed by _Dpt 340_
(Division or subsidiary company)

At _Stevens Point, WI_
(City and State)

Occupation _Reliability Engineer_

Date Employed_1-19-08_

Effective Date of this Agreement _1-04-07_
(If employment begins in an occupation requiring this agreement, enter date employed as effective date of this agreement.
Otherwise enter date of transfer to occupation requiring this agreement).

# Employee Invention, Patent and Secrecy Agreement

Agreement made by and between SKF USA Inc. a Corporation of Delaware (hereinafter called SKF) and
_Walter    George    Komick_ of _1200 August DR NE   Bemidsi, MN_
Name (hereinafter called the Employee)                          Address

Witnesseth:

In consideration of the covenants herein recited, of the Employee's affiliation and activities with SKF and the compensation paid by SKF to Employee, it is agreed that:

1. The Employee will and does assign to SKF all inventions and improvements made or conceived by him while in its employ or with the use of SKF's time, material, equipment or facilities relating to anti-friction bearings, parts or accessories therefor, machines, tools, devices, equipment or processes useful or pertaining to, or connected with anti-friction bearings and any other line of business or business activity in which SKF is engaged together with such patent or patents as may be obtained whereon, in this and all foreign countries; and upon request by SKF, will at any time during his employment with SKF and after its termination for any reason; execute all proper papers for use in applying for, obtaining and maintaining such United States and foreign patents as SKF may desire, and will execute and deliver all proper assignments thereof, when so requested, but at the expense of SKF. Employee will give SKF such assistance as he is capable with respect to the prosecution of such patent applications and in defense of any patents granted, including evidence in any proceeding.

2. SKF recognizes that the patents or ideas listed and explained  on the pages attached to this agreement were conceived by the Employee prior to his employment by SKF and as such are the property of the Employee and/or his previous Employers to prosecute, manufacture, use and/or sell as he or they may desire.

3. The Employee recognizes the vital importance of maintaining the secrecy of SKF's trade secrets and confidential business matters. Therefore, Employee agrees that he will not in any way during his employment and at any time thereafter, without SKF's written approval, disclose or publish to any unauthorized person, firm or corporation any technical or proprietary information, trade secrets and confidential business matters, including but not limited to, secret processes, formulae, sequences, equipment, research items and results, drawings, prints, customer lists, costs, technical sales and marketing programs. All documents, memoranda, reports, prints, and drawings, including all copies thereof in respect of the above items, are the sole and entire property of SKF which Employee will surrender to SKF upon any termination of employment with SKF; Employee will certify, upon request, to such surrender.

Wherever SKF or SKF USA Inc. shall appear herein, the same shall include the divisions, subsidiaries, successors and assigns of SKF USA Inc.

IN WITNESS WHEREOF, SKF USA Inc. has caused these presents to be executed and the Employee has hereunto set his hand and seal this_06_day of _03_, 20_08_.

SKF USA Inc.

_____
Employee

_Timothy P. Gifford_
General Counsel

_____
Witness for Employee

_____
Attest for General Counsel                    (seal)

08CV4709
JUDGE MORAN
MAGISTRATE JUDGE DENLOW
RCC

# EXHIBIT I

**Pepper Hamilton LLP**
Attorneys at Law

3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000
Fax 215.981.4750

Stephen J. Sundheim
direct dial: 215.981.4576
direct fax: 866.738.9612
sundheims@pepperlaw.com

July 1, 2008

*Via Federal Express*

Mr. Dale Bjerkness
11342 Sorenson Lake Lane
Merrifield, MN 56445

Re:    Your Violation of Your SKF and PMCI Agreements

Dear Mr. Bjerkness:

Our firm represents SKF USA Inc. ("SKF") to enforce its rights under the "Employee Invention, Patent and Secrecy Agreement" you executed on January 4, 2007, your Agreement with PMCI that SKF assumed when it purchased PMCI in 2007, and the applicable trade secrets statutes. A copy of the agreements you signed are enclosed.

Among other things, your agreements, including your PMCI Agreement that, according to its terms, was assigned to SKF on the sale of PMCI to SKF in 2007,

1. prohibit you from using or disclosing SKF's trade secrets, proprietary information or confidential business information;

2. require that you return all of SKF's property upon termination of your SKF employment;

3. prohibit you for two years from your termination from soliciting business from customers to whom you have rendered services or from prospective clients that you solicited to provide services during the 12 months preceding your termination;

4. prohibit you for two years from soliciting or inducing any employee to leave employment with SKF (or PMCI) to work in a business similar to that of PMCI (or SKF after the sale of PMCI); and

#9775110v1

| Philadelphia | Boston | Washington, D.C. | Detroit | New York | Pittsburgh |
| Berwyn | Harrisburg | Orange County | Princeton | Wilmington |

www.pepperlaw.com

Pepper Hamilton LLP
Attorneys at Law

Mr. Dale Bjerkness
Page 2
July 1, 2008

     5. prohibit you for two years from competing with SKF by providing services of the type provided by PMCI (or SKF after it purchased PMCI) within 12 months of your termination.

     It has recently come to SKF's attention that you are in the process of establishing, or have established, a business that is or will be similar to the business you engaged in while employed by SKF (and before that, by PMCI) and that will compete with SKF's business that it purchased from PMCI, namely the sale and servicing of monitoring equipment for the industrial sector. Further, SKF has learned that you have called on and solicited business from former SKF/PMCI customers with whom you dealt while at SKF and PMCI, that you have approached at least two SKF technicians to work for your new company, that you have refused, despite requests from Bart Bartholomew, to return SKF property, and that you are breaching your agreements and applicable laws by using Confidential Information, proprietary information and trade secrets that you obtained while working at SKF/PMCI.

     SKF is very concerned about these breaches of your contractual and other legal obligations. SKF will enforce its rights and seek an injunction and money damages to ensure that you are not attempting to do business with its customers or prospective customers, soliciting its employees to join your new company, or using its confidential or proprietary information or trades secrets or otherwise violate the agreements and that you and that you return all of its property.

     This letter is not intended to replace or limit the obligations under the agreements in any way. I am sure that you understand that SKF takes these commitments seriously and will enforce its rights if you do not honor them.

     Please provide this letter to your attorney if you have one. If you do not have an attorney, you may wish to consult one. In any event, please advise me by Tuesday, July 8, whether the information I have described above is incorrect and whether you will honor the terms of your Agreements. If I do not hear from you by then, I will assume that the information is correct, that you are violating the agreements, and that you will continue to do so. In that event, we will pursue all of our legal remedies on behalf of SKF. I would be willing to confer with you or your attorney if you have any questions.

     Very truly yours,

     Stephen J. Sundheim

SJS:skr
Enclosures

SKF USA Inc.

Name _Dale Harold Blenkness II_ (Type or print full name - no initials)   Date of Birth: _7-12-61_

Employed by _SKF_ (Division or subsidiary company)   At _Stevens Point, WI_ (City and State)

Occupation _Director SKF Reliability Systems_   Date Employed _04-16-2001_

Effective Date of this Agreement _05-1-04-07_
(If employment begins in an occupation requiring this agreement, enter date employed as effective date of this agreement
Otherwise enter date of transfer to occupation requiring this agreement.)

## Employee Invention, Patent and Secrecy Agreement

Agreement made by and between SKF USA Inc, a Corporation of Delaware (hereinafter called SKF) and
_Dale Harold Blenkness II_ of _5334 Hoffman Ct Stevens Point, WI_
Name (hereinafter called the Employee)   Address

Witnesseth:

In consideration of the covenants herein recited, of the Employee's affiliation and activities with SKF and the compensation paid by SKF to Employee, it is agreed that:

1. The Employee will and does assign to SKF all inventions and improvements made or conceived by him while in the employ of or with the use of SKF's time, material, equipment or facilities relating to anti-friction bearings, parts or accessories therefor, machines, tools, devices, equipment or processes useful or pertaining to, or connected with anti-friction bearings and any other line of business or business activity in which SKF is engaged together with such patent or patents as may be obtained whereon, in this and all foreign countries; and upon request by SKF, will at any time during his employment with SKF and after its termination for any reason, execute all proper papers for use in applying for, obtaining and maintaining such United States and foreign patents as SKF may desire, and will execute and deliver all proper assignments thereof, when so requested, but at the expense of SKF. Employee will give SKF such assistance as he is capable with respect to the prosecution of such patent applications and in defense of any patents granted, including evidence in any proceeding.

2. SKF recognizes that the patents or ideas listed and explained on the pages attached to this agreement were conceived by the Employee prior to his employment by SKF and as such are the property of the Employee and/or his previous Employers to prosecute, manufacture, use and/or sell as he or they may desire.

3. The Employee recognizes the vital importance of maintaining the secrecy of SKF's trade secrets and confidential business matters. Therefore, Employer agrees that he will not in any way during his employment and at any time thereafter without SKF's written approval, disclose or publish to any unauthorized person, firm or corporation any technical or proprietary information, trade secrets and confidential business matters, including but not limited to, secret processes, formulae, sequences, equipment, research items and results, drawings, prints, customer lists, costs, technical sales and marketing programs. All documents, memoranda, reports, prints, and drawings, including all copies thereof in respect of the above items, are the sole and entire property of SKF which Employee will surrender to SKF upon any termination of employment with SKF. Employee will certify, upon request, to such surrender.

Wherever SKF or SKF USA Inc. shall appear herein, the same shall include the divisions, subsidiaries, successors and assigns of SKF USA Inc.

IN WITNESS WHEREOF, SKF USA Inc. has caused these presents to be executed and the Employee has hereunto set his hand and seal this _1th_ _7_ day of _September_ , 20 _07_ .

SKF USA Inc.

_____   _____
Employee   General Counsel

_____   _____
Witness for Employee   Attest for General Counsel

 

Corporate
2500 Estes Avenue
Elk Grove Village, IL 60007

Northern Region
5224 Hefron Court
Stevens Point, WI 54481

ISO 9002
Certificate #A4053

www.pmcisystems.com

Ph: 800-222-PMCI
Fax: 847-956-6761

Ph: 888-444-PMCI
Fax: 715-342-9053

Est. 1970

## AGREEMENT

THIS AGREEMENT is entered into at Elk Grove Village, Illinois this ___ day of _____, ____, by and between PREVENTIVE MAINTENANCE COMPANY, INC. (hereinafter referred to as "PMCI") and _____ (hereinafter referred to as "Employee").

### RECITALS:

WHEREAS, Employee is assuming a position of employment with PMCI as a _____, which will expose Employee to PMCI's tangible and intangible property, including confidential information, and other proprietary business information and which will expose Employee to proprietary information belonging to PMCI's clients which Employee will be entrusted to maintain as highly confidential; and

WHEREAS, PMCI and Employee hereby acknowledge that the industry in which PMCI competes is extremely competitive, and that PMCI expends substantial money, time, effort and other resources to develop and maintain its client lists and client relationships which, once acquired, are generally of a continuing and permanent nature; and

WHEREAS, PMCI and Employee understand Employee will learn a great deal of information through his/her employment with PMCI, yet PMCI seeks only to preserve the confidentiality of certain property and information, which if used outside the scope of Employee's employment with PMCI would jeopardize PMCI's relationship with existing and newly acquired clients and client prospects; and

WHEREAS, Employee through his/her employment will be exposed to PMCI accounts, client lists, contract terms, prospective client lists and other proprietary information regarding its clients' accounts, and its operations; and

WHEREAS, Employee recognizes the importance of his/her abiding by this Agreement to PMCI's ability to protect its proprietary business information and the proprietary information

---

| Predictive Machinery Vibration Programs | Vibration Analysis | Dynamic Balancing | Infrared Inspections |
|---|---|---|---|
| | **Predictive Technology Services** | | |
| Ultrasound Inspections | Machine Tool & Spindle Analysis | Laser Analysis | Emergency Services |

of its clients which is essential to the continued existence of PMCI's business; and

WHEREAS, Employee recognizes PMCI's restrictions on his/her future activity for a stated time are necessary to protect PMCI's interests in its proprietary business information and the proprietary business information of its clients which is essential to the continued existence of PMCI's business; and

WHEREAS, if Employee were to act in violation of this Agreement, PMCI could not be adequately compensated for any such breach by money damages and any such breach of this Agreement will cause irreparable injury to PMCI; and

WHEREAS, Employee and PMCI acknowledge that the restrictions of this Agreement apply regardless of whether Employee voluntarily or involuntarily leaves PMCI's employ (both of which are hereinafter referenced to as "termination of Employee's employment").

NOW, THEREFORE, in consideration of the foregoing recitals and of the provisions set forth herein and other good and valuable consideration, the receipt and sufficiency of which is mutually acknowledged, including without limitations the fact that PMCI will employ, or continue to employ Employee, and will expose or continue to expose Employee to PMCI's proprietary and confidential business information, and Employee will continue service to PMCI, acting in good faith and in PMCI's interests, the parties hereto agree as follows:

1.    PMCI'S PROPERTY

All tangible items furnished to or created by Employee from time to time in connection with the performance of Employee's duties, including but not limited to client lists, procedures manuals, proposal materials, prospective client lists, client reports, and work papers, shall at all times remain the sole property of PMCI. Employee acknowledges that the information contained in the tangible property is a valuable asset of PMCI's business and is highly confidential. Employee shall not duplicate tangible items. They are provided to Employee for the limited purpose of enabling the Employee to perform duties of employment, and Employee hereby covenants not to use or permit any of the same to

be used for any other purpose. When the tangible items are not being used by Employee in furtherance of his employment, they shall be kept under lock and key. Upon the demand of PMCI, at any time or upon the termination of employment under any circumstances, Employee shall promptly tender all such items to PMCI. Employee covenants that he/she will not provide PMCI's tangible property to any competitor of PMCI nor use PMCI's tangible property or the information contained therein in furtherance of the business of any competitor of PMCI.

2.   PMCI'S CONFIDENTIAL AND PROPRIETARY INFORMATION

a.   All information imparted to Employee by PMCI, or otherwise obtained by Employee, at any time, relating to PMCI's methods of doing business; valuation methods; computer programs; business ideas; billing procedures; pricing and commission data; client names and lists; client needs and requirements; client servicing methods; prospective client lists; and any other client data, is revealed and entrusted to Employee, in confidence, solely in connection with and for the purpose of employment on behalf of PMCI. Employee shall not, at any time, either during or after employment with PMCI, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of PMCI. Without limiting the generality of the foregoing, upon the termination of employment, under any circumstances, Employee shall promptly tender to PMCI all lists, records, work papers, reports and other documents in Employee's possession or control relating to any clients, prospective clients or the business of PMCI.

b.   Further, Employee promises to maintain as confidential all information Employee may obtain, learn or be entrusted with as an employee of PMCI, regarding any proprietary information belonging to any of PMCI's clients, including but not limited to any client's methods or processes of production,

pricing, marketing, servicing of research and development. Employee shall not, at any time, either during or after the term of employment, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of PMCI.

3.  PROHIBITIONS REGARDING PMCI'S
    PROPRIETARY BUSINESS INFORMATION

    a.  It is understood and agreed by Employee that all business relationships and goodwill now existing with respect to the clients of PMCI, whether or not created by Employee, and all such relationships and goodwill which may hereafter be created or enhanced, at all time remain the sole property of PMCI. Accordingly, Employee agrees that during the term of this Agreement and for a further period of two years beginning on the termination of Employee's employment with PMCI, Employee shall not, under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee or in any other capacity whatsoever, directly or indirectly, solicit business or sell or render services of the sort provided by PMCI to any client for which PMCI or its Employee has rendered services or to any prospective client that Employee has solicited to provide services of the sort provided by PMCI or about whom Employee has learned confidential information during the twelve (12) months preceding Employee's separation from PMCI; nor shall Employee, directly or indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

    b.  Due to the confidential nature of the proprietary information and the considerable amount of money, time and effort expended to develop such proprietary information, and due to PMCI's considerable investment in training employees and allowing them access to confidential and proprietary information, and with the understanding that the Employees' use of such training and

proprietary information outside of PMCI's employment would unduly prejudice PMCI's relationship with existing clients, Employee agrees that during the term of this Agreement and for a further period of two (2) years beginning on the termination of Employee's employment with PMCI, Employee shall not, under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee, or in any capacity whatever, directly or indirectly, solicit or induce any employee of PMCI to leave PMCI's employ for any employment in a line of business similar to that conducted by PMCI in locations where PMCI services clients, or locations where PMCI has solicited clients within the twelve, (12) months preceding Employee's termination; nor will Employee, directly or indirectly, aid or assist any other person, firm or corporation to solicit or induce any employee of PMCI for any employment in a line of business similar to that conducted by PMCI in the aforesaid locations.

c.  Due to the confidential nature of the proprietary information and the considerable amount of money, time and effort expended to develop such proprietary information to which Employee will be exposed, and with the understanding that the Employee's use of such proprietary information outside of PMCI's employment would unduly prejudice PMCI's relationship with existing clients, Employee agrees during the term of this Agreement and for a further period of two (2) years beginning on the termination of Employee's employment with PMCI that Employee will not under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee or in any other capacity compete with PMCI by soliciting, selling or rendering services of the sort provided by PMCI to any individual or entity that has a business location in the locations serviced or solicited by PMCI within the twelve (12) months preceding Employee's termination nor will Employee, directly or

indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

d. The provisions of this Paragraph 3 shall be in addition to, and shall not in any way be deemed limited or restricted by, the provisions of any other Paragraph of this Agreement.

4. ENTIRE AGREEMENT

These written Restrictive Covenants constitute the entire agreement of the parties with respect to the subject matter hereof and there are no prior or contemporaneous oral or written representations, promises, or agreements not expressed or referred to herein other than the singular exception of Employee's interim agreement to enter into some form of restrictive agreement in consideration of being offered a position with PMCI.

5. AMENDMENT

This Agreement may be amended only in writing and only if such writing is signed by Employee and by the President of PMCI.

6. SURVIVAL OF PROVISIONS

Any provision of this Agreement, which by terms or reasonable implication is to be or may be performed or effective after the termination of the Agreement, shall be deemed to survive such termination.

7. SEPARABILITY AND MODIFICATION

If any provision of this Agreement shall be invalid or unenforceable, in whole or in part, or as applied to any circumstance, under the laws of any jurisdiction which may govern for such purpose, then such provision shall be deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, either generally or as applied to such circumstance, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent

permitted by law, as if such provision had been originally incorporated herein, as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

8. BINDING EFFECT

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, and assigns, provided that this Agreement is not assignable by employee.

9. PARAGRAPH HEADINGS

Paragraph headings are for convenience of reference only and shall not be deemed part of this Agreement.

10. GOVERNING LAW AND SUBMISSION TO JURISDICTION

This Agreement shall be governed in all respects by the substantive laws of the State of Illinois without reference to the choice of law provisions of Illinois or any other state. Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Employee hereby consents and submits his or her person to the jurisdiction of any such Court for such purpose.

11. COUNTERPARTS

This Agreement may be executed in any number of identical counterparts, each of which shall be deemed a duplicate original, and all of which together shall constitute but one and the same agreement.

12. CONSULTATION WITH COUNSEL

By executing this Agreement, Employee expressly represents that he or she has read it, understands its terms and has had the opportunity (whether exercised or not) to consult with legal counsel regarding it.

Page 8 of 8

IN WITNESS WHEREOF, the parties have set their hands and seals and
have caused this Agreement to be executed the day and year first
above written.

EMPLOYEE

By: _____
Its: _____
Date: _____

PREVENTIVE MAINTENANCE COMPANY, INC.

By: _____
Its: _____
Date: _____

EXHIBIT J

# Pepper Hamilton LLP
#### Attorneys at Law

3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000
Fax 215.981.4750

Stephen J. Sundheim
direct dial: 215.981.4576
direct fax: 866.738.9612
sundheims@pepperlaw.com

July 2, 2008

*Via Federal Express*

Mr. Kevin Koch
713 Bourgin Road
Virginia, MN 55792

> Re:    Your Violation of Your SKF and PMCI Agreements

Dear Mr. Koch:

Our firm represents SKF USA Inc. ("SKF"). SKF has learned that you have accepted employment with Dale Bjerkness or a company operated by Mr. Bjerkness called Equipment Reliability Services, Inc., and that you are engaged in a business that competes with the business that you engaged in for SKF. This letter is to remind you of your obligations to SKF and inform you that SKF will enforce its rights under the "Employee Invention, Patent and Secrecy Agreement" you executed on January 4, 2007, your Agreement with PMCI that SKF assumed when it purchased PMCI in 2007, and the applicable trade secrets statutes. A copy of the agreements you signed are enclosed.

Among other things, your agreements, including your PMCI Agreement that, according to its terms, was assigned to SKF on the sale of PMCI to SKF in 2007,

1. prohibit you from using or disclosing SKF's trade secrets, proprietary information or confidential business information;

2. require that you return all of SKF's property upon termination of your SKF employment;

3. prohibit you for two years from your termination from soliciting business from or providing services to customers to whom you have rendered services or from prospective clients that you solicited to provide services during the 12 months preceding your termination;

#9783124 v1

| Philadelphia | Boston | Washington, D.C. | Detroit | New York | Pittsburgh |
|---|---|---|---|---|---|
| Berwyn | Harrisburg | Orange County | Princeton | Wilmington | |

Pepper Hamilton LLP

Mr. Kevin Koch
Page 2
July 2 2008

     4. prohibit you for two years from soliciting or inducing any employee to leave employment with SKF (or PMCI) to work in a business similar to that of PMCI (or SKF after the sale of PMCI); and

     5. prohibit you for two years from competing with SKF by providing services of the type provided by PMCI (or SKF after it purchased PMCI) within 12 months of your termination.

     SKF is very concerned that you be fully aware of you obligations under these agreements and that you know that SKF will take all steps necessary to address any breaches of your contractual and other legal obligations. If warranted, SKF will seek an injunction and money damages to ensure that you do not attempt to do business with its customers or prospective customers, solicit its employees to join your new employer, or use its confidential or proprietary information or trades secrets or otherwise violate the agreements and that you return all of its property.

     This letter is not intended to replace or limit the obligations under the agreements in any way. I am sure that you understand that SKF takes these commitments seriously and will enforce its rights if you do not honor them.

     Please provide this letter to your attorney if you have one. If you do not have an attorney, you may wish to consult one. In any event, please advise me by Wednesday, July 9, whether the information I have described above is incorrect and whether you will honor the terms of your agreements. If I do not hear from you by then, I will assume that the information is correct, that you are violating the agreements, and that you will continue to do so. In that event, we will pursue all of our legal remedies on behalf of SKF. I would be willing to confer with you or your attorney if you have any questions.

Very truly yours,

Stephen J. Sundheim

SJS:skr
Enclosures

#9783124 v1

**SKF USA Inc.**

Name _Kevin Blake Koch_
(Type or print full name - no initials)

Date of Birth _2/26/67_

Employed by _SKF_
(Division or subsidiary company)

At _Stevens Point . WI_
(City and State)

Occupation _Team Leader_

Date Employed _6/10/98_

Effective Date of this Agreement _1/4/07_
(If employment begins in an occupation requiring this agreement, enter date employed as effective date of this agreement.
Otherwise enter date of transfer to occupation requiring this agreement).

## Employee Invention, Patent and Secrecy Agreement

Agreement made by and between SKF USA Inc. a Corporation of Delaware (hereinafter called SKF) and _Kevin Blake Koch_ of _111 S. Auburn Ave Endeft MN 55734_
Name (hereinafter called the Employee)                                    Address

Witnesseth:

In consideration of the covenants herein recited, of the Employee's affiliation and activities with SKF and the compensation paid by SKF to Employee, it is agreed that:

1. The Employee will and does assign to SKF all inventions and improvements made or conceived by him while in its employ or with the use of SKF's time, material, equipment or facilities relating to anti-friction bearings, parts or accessories therefor, machines, tools, devices, equipment or processes useful or pertaining to, or connected with anti-friction bearings and any other line of business or business activity in which SKF is engaged together with such patent or patents as may be obtained whereon, in this and all foreign countries; and upon request by SKF, will at any time during his employment with SKF and after its termination for any reason; execute all proper papers for use in applying for, obtaining and maintaining such United States and foreign patents as SKF may desire, and will execute and deliver all proper assignments thereof, when so requested, but at the expense of SKF. Employee will give SKF such assistance as he is capable with respect to the prosecution of such patent applications and in defense of any patents granted, including evidence in any proceeding.

2. SKF recognizes that the patents or ideas listed and explained on the pages attached to this agreement were conceived by the Employee prior to his employment by SKF and as such are the property of the Employee and/or his previous Employers to prosecute, manufacture, use and/or sell as he or they may desire.

3. The Employee recognizes the vital importance of maintaining the secrecy of SKF's trade secrets and confidential business matters. Therefore, Employee agrees that he will not in any way during his employment and at any time thereafter, without SKF's written approval, disclose or publish to any unauthorized person, firm or corporation any technical or proprietary information, trade secrets and confidential business matters, including but not limited to, secret processes, formulae, sequences, equipment, research items and results, drawings, prints, customer lists, costs, technical sales and marketing programs. All documents, memoranda, reports, prints, and drawings, including all copies thereof in respect of the above items, are the sole and entire property of SKF which Employee will surrender to SKF upon any termination of employment with SKF; Employee will certify, upon request, to such surrender.

Wherever SKF or SKF USA Inc. shall appear herein, the same shall include the divisions, subsidiaries, successors and assigns of SKF USA Inc.

IN WITNESS WHEREOF, SKF USA Inc. has caused these presents to be executed and the Employee has hereunto set his hand and seal this_____ day of _January_ , 20 _07_ .

SKF USA Inc.

_____
Employee

_Timothy D. Gifford_
General Counsel

_____
Witness for Employee

_____ (seal)
Attest for General Counsel

# PREVENTIVE MAINTENANCE COMPANY, INC.

**800-222-PMCI (7624) • FAX 847-956-8761**

Est. 1970



ISO 9002
CERTIFICATE #A4058

## AGREEMENT

THIS AGREEMENT is entered into at Elk Grove Village, Illinois this _10th_ day of _June_____, 199_8_, by and between PREVENTIVE MAINTENANCE COMPANY, INC. (hereinafter referred to as "Preventive") and _KEVIN KOCH____ (hereinafter referred to as "Employee").

### RECITALS:

WHEREAS, Employee is assuming a position of employment with Preventive as a _VIBRATION TECHNICIAN____, which will expose Employee to Preventive's tangible property containing confidential information, and other proprietary business information and which will expose Employee to proprietary information belonging to Preventive's clients which Employee will be entrusted to maintain as highly confidential; and

WHEREAS, Preventive and Employee hereby acknowledge that the industry in which Preventive competes is extremely competitive, and that Preventive expends substantial money, time, effort and other resources to develop and maintain its client lists and client relationships which, once acquired, are generally of a continuing and permanent nature; and

WHEREAS, Preventive and Employee understand Employee will learn a great deal of information through his/her employment with Preventive, yet Preventive seeks only to preserve the confidentiality of certain property and information, which if used outside the scope of Employee's employment with Preventive would jeopardize Preventive's relationship with existing clients; and

WHEREAS, Employee through his/her employment will be exposed to Preventive accounts, client lists, contract terms and other proprietary information regarding its clients' accounts, and its operations; and

WHEREAS, Employee recognizes the importance of his/her abiding by this Agreement to Preventive's ability to protect its proprietary business information and the proprietary information of its clients which is essential to the continued existence of Preventive's business; and

WHEREAS, Employee recognizes Preventive's restrictions on his/her future activity for a stated time are necessary to protect Preventive's interests in its proprietary business information and the proprietary business information of its clients which is essential to the continued existence of Preventive's business; and

Predictive Machinery Vibration Programs • Vibration Analysis • Dynamic Balancing • Infrared Thermography • Oil Analysis

| Corporate | Wisconsin |
|-----------|-----------|
| 2500 West Estes Avenue | 5224 Heffron Court |
| Elk Grove Village, Illinois 60007 | Stevens Point, Wisconsin 54481 |

WHEREAS, if Employee were to act in violation of this Agreement, Preventive could not be adequately compensated for any such breach and any such breach of this Agreement will cause irreparable injury to Preventive; and

WHEREAS, Employee and Preventive acknowledge that the restrictions of this Agreement apply regardless of whether Employee voluntarily or involuntarily leaves Preventive's employ (both of which are hereinafter referenced to as "termination of Employee's employment").

NOW, THEREFORE, in consideration of the foregoing recitals and of the provisions set forth herein and other good and valuable consideration, the receipt and sufficiency of which is mutually acknowledged, including without limitations the fact that Preventive will employ, or continue to employ Employee, and will expose or continue to expose Employee to Preventive's proprietary and confidential business information, and Employee will continue service to Preventive, acting in good faith and in Preventive's interests, the parties hereto agree as follows:

1.   PREVENTIVE'S PROPERTY

All tangible items furnished to or created by Employee from time to time in connection with the performance of Employee's duties, including but not limited to client lists, procedures manuals, proposal materials, client reports, and work papers, shall at all times remain the sole property of Preventive. Employee acknowledges that the information contained in the tangible property is a valuable asset of Preventive's business and is highly confidential. Employee shall not duplicate tangible items. They are provided to Employee for the limited purpose of enabling the Employee to perform duties of employment, and Employee hereby covenants not to use or permit any of the same to be used for any other purpose. When the tangible items are not being used by Employee in furtherance of his employment, they shall be kept under lock and key. Upon the demand of Preventive, at any time or upon the termination of employment under any circumstances, Employee shall promptly tender all such items to Preventive. Employee covenants that he/she will not provide Preventive's tangible property to any competitor of Preventive nor use Preventive's tangible property in furtherance of the business of any competitor of Preventive.

2.   PREVENTIVE'S CONFIDENTIAL AND PROPRIETARY INFORMATION

a.   All information imparted to Employee by Preventive, or otherwise obtained by Employee, at any time, relating to Preventive's methods of doing business; valuation methods; computer programs; business

ideas; billing procedures; pricing and commission data; client names and lists; client needs and requirements; client servicing methods; and any other client data, is revealed and entrusted to Employee, in confidence, solely in connection with and for the purpose of employment on behalf of Preventive. Employee shall not, at any time, either during or after employment with Preventive, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of Preventive. Without limiting the generality of the foregoing, upon the termination of employment, under any circumstances, Employee shall promptly tender to Preventive all lists, records, work papers, reports and other documents in Employee's possession or control relating to any clients or the business of Preventive.

b. Further, Employee promises to maintain as confidential all information Employee may obtain, learn or be entrusted with as an employee of Preventive, regarding any proprietary information belonging to any of Preventive's clients, including but not limited to any client's methods or processes of production, pricing, marketing, servicing of research and development. Employee shall not, at any time, either during or after the term of employment, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of Preventive.

3. PROHIBITIONS REGARDING PREVENTIVE'S PROPRIETARY BUSINESS INFORMATION

a. It is understood and agreed by Employee that all business relationships and goodwill now existing with respect to the clients of Preventive, whether or not created by Employee, and all such relationships and goodwill which may hereafter be created or enhanced, at all time remain the sole property of Preventive. Accordingly, Employee agrees that during the term of this Agreement and for a further period of two years beginning on the termination of Employee's employment with Preventive, Employee shall not, under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee or in any other capacity whatsoever, directly or indirectly, solicit business or sell or render services of the sort provided by Preventive to any client for which Preventive or its Employee has rendered services or to any prospective client that Employee

has solicited to provide services of the sort provided by Preventive or about whom Employee has learned confidential information during the twelve (12) months preceding Employee's separation from Preventive; nor shall Employee, directly or indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

b.    Due to the confidential nature of the proprietary information and the considerable amount of money, time and effort expended to develop such proprietary information, and due to Preventive's considerable investment in training employees and allowing them access to confidential and proprietary information, and with the understanding that the Employees' use of such training and proprietary information outside of Preventive's employment would unduly prejudice Preventive's relationship with existing clients, Employee agrees that during the term of this Agreement and for a further period of two (2) years beginning on the termination of Employee's employment with Preventive, Employee shall not, under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee, or in any capacity whatever, directly or indirectly, solicit or induce any employee of Preventive to leave Preventive's employ for any employment in a line of business similar to that conducted by Preventive in locations where Preventive services clients, or locations where Preventive has solicited clients within the twelve, (12) months preceding Employee's termination; nor will Employee, directly or indirectly, aid or assist any other person, firm or corporation to solicit or induce any employee of Preventive for any employment in a line of business similar to that conducted by Preventive in the aforesaid locations.

c.    Due to the confidential nature of the proprietary information and the considerable amount of money, time and effort expended to develop such proprietary information to which Employee will be exposed, and with the understanding that the Employee's use of such proprietary information outside of Preventive's employment would unduly prejudice Preventive's relationship with existing clients, Employee agrees during the term of this Agreement and for a further period of two (2) years beginning on the termination of Employee's employment with Preventive that Employee will not under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee or in any other

Page 5 of 7

capacity compete with Preventive by soliciting, selling or rendering services of the sort provided by Preventive to any individual or entity that has a business location in the locations serviced or solicited by Preventive within the twelve (12) months preceding Employee's termination nor will Employee, directly or indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

d.　The provisions of this Paragraph 3 shall be in addition to, and shall not in any way be deemed limited or restricted by, the provisions of any other Paragraph of this Agreement.

4.   ENTIRE AGREEMENT

These written Restrictive Covenants constitute the entire agreement of the parties with respect to the subject matter hereof and there are no prior or contemporaneous oral or written representations, promises, or agreements not expressed or referred to herein other than the singular exception of Employee's interim agreement to enter into some form of restrictive agreement in consideration of being offered a position with Preventive.

5.   AMENDMENT

This Agreement may be amended only in writing and only if such writing is signed by Employee and by the President of Preventive.

6.   SURVIVAL OF PROVISIONS

Any provision of this Agreement, which by terms or reasonable implication is to be or may be performed or effective after the termination of the Agreement, shall be deemed to survive such termination.

7.   SEPARABILITY AND MODIFICATION

If any provision of this Agreement shall be invalid or unenforceable, in whole or in part, or as applied to any circumstance, under the laws of any jurisdiction which may govern for such purpose, then such provision shall be deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, either generally or as applied to such circumstance, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

8.   BINDING EFFECT

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, and assigns, provided that this Agreement is not assignable by employee.

9.   PARAGRAPH HEADINGS

Paragraph headings are for convenience of reference only and shall not be deemed part of this Agreement.

10. GOVERNING LAW AND SUBMISSION TO JURISDICTION

This Agreement shall be governed in all respects by the laws of the State of Illinois. Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Employee hereby consents and submits his or her person to the jurisdiction of any such Court for such purpose.

11. COUNTERPARTS

This Agreement may be executed in any number of identical counterparts, each of which shall be deemed a duplicate original, and all of which together shall constitute but one and the same agreement.

12. CONSULTATION WITH COUNSEL

By executing this Agreement, Employee expressly represents that he or she has read it, understands its terms and has had the opportunity (whether exercised or not) to consult with legal counsel regarding it.

IN WITNESS WHEREOF, the parties have set their hands and seals and have caused this Agreement to be executed the day and year first above written.

PREVENTIVE MAINTENANCE COMPANY, INC.

By: _STEPHEN L. WACKHAM_
Its: _DIRECTOR OF OPERATIONS_
Date: _6-10-98_

EMPLOYEE

By: _____
Its: _VIBRATION TECHNICIAN_
Date: _6-10-98_

EXHIBIT K



## WINTHROP WEINSTINE

ATTORNEYS AND COUNSELORS AT LAW

July 10, 2008

Megan M. Ruwe
Direct Dial: (612) 604-6711
Direct Fax: (612) 604-6911
mruwe@winthrop.com

Mr. Stephen J. Sundheim                                    **VIA FACSIMILE AND U.S. MAIL**
Pepper Hamilton LLP
3000 Two Logan Square
Philadelphia, Pennsylvania 19103-2799

RE:    Dale Bjerkness and Kevin Koch

Dear Mr. Sundheim:

As you are aware, Winthrop & Weinstine, P.A. represents Dale Bjerkness ("Mr. Bjerkness") and
Kevin Koch ("Mr. Koch"). This letter is in response to your letters to Messrs. Bjerkness and
Koch regarding their Agreements with Preventative Maintenance Company, Inc. ("PMCI") (the
"PMCI Agreements") and their Employee Invention, Patent and Secrecy Agreements (the "SKF
Agreements") with SKF USA, Inc. ("SKF") (collectively, the PMCI and SKF Agreements shall
be referred to as the "Agreements"). As will be further set forth herein, Messrs. Bjerkness and
Koch are: (i) not bound by the PMCI Agreements; (ii) not in violation of any non-competition,
non-solicitation, or non-recruitment provisions of the PMCI Agreements; and (iii) not in
violation of any other duties or obligations due to SKF.

Among other things, based upon the conduct of SKF representatives, the PMCI Agreements are
not enforceable against either Mr. Bjerkness or Mr. Koch. Specifically, when Mr. Bjerkness was
asked to enter into the SKF Agreement, Human Resources at SKF advised him that the SKF
Agreement superseded the PMCI Agreement and that the PMCI Agreement was no longer in
effect. This was later confirmed by Mr. Bjerkness's supervisor, Bart Bartholomew ("Mr.
Bartholomew"), Vice President of SKF USA North America Operations, who affirmed to Mr.
Bjerkness that the SKF Agreements superseded the PMCI Agreements. We are also aware that
there may be internal SKF communications which advise that the PMCI Agreements supersede
the SKF Agreements and further direct SKF Human Resources that new hires should no longer
be asked to sign agreements that contain restrictive covenants. In line with this correspondence,
we have credible evidence that SKF does not currently require new hires to sign non-competition
agreements even though such individuals have access to the same confidential information as
those who signed the PMCI Agreements that SKF now wishes to enforce.

In addition, Mr. Bartholomew's actions following Mr. Bjerkness's resignation from SKF further
establish that SKF knew the PMCI agreements were no longer enforceable. After Mr.
Bjerkness's resignation from SKF, Mr. Bartholomew asked Mr. Bjerkness whether he would
sign a one-year non-competition agreement if Mr. Bartholomew offered cash as consideration.

Suite 3500 ; 225 South Sixth Street ; Minneapolis, MN 55402-4629 ; MAIN: (612)604-6400 ; FAX: (612)604-6800 ; www.winthrop.com ; A Professional Association

Mr. Stephen J. Sundheim
July 10, 2008
Page 2

When Mr. Bjerkness declined, Mr. Bartholomew again asked if Mr. Bjerkness would sign a non-competition agreement if Mr. Bartholomew would continue to pay Mr. Bjerkenss his salary for one year. In doing so, Mr. Bartholomew recognized that Mr. Bjerkness was not, at that time, bound by the non-competition provision (or any other provisions) in the PMCI Agreement. Mr. Bartholomew further told Mr. Bjerkness that if he was going to start a new business to let him know, as he was interested in joining Mr. Bjerkness. Moreover, when Messrs. Bjerkness or Koch left SKF, no one at SKF, including Mr. Bartholomew, ever reminded them of any continuing obligations to SKF. In sum, for these and other reasons, based on SKF's representations to Messrs. Bjerkness and Koch, we believe the PMCI Agreements are no longer effective, and neither Mr. Bjerkness nor Mr. Koch are bound by the PMCI Agreements' restrictive covenants.

Assuming, *arguendo*, that the PMCI Agreements were not superseded by the SKF Agreements, Messrs. Bjerkness and Koch still are not bound by the non-competition, non-solicitation, and non-recruitment provisions in the PMCI Agreements because those terms of the PMCI Agreements merged into the SKF Agreements, which do not contain any restrictive covenants. The PMCI and SKF Agreements contemplate the same subject matter (post-employment obligations regarding confidentiality during and after the term of his employment), but unlike the PMCI Agreements, the SKF Agreements do not contain any restrictive covenants. Because the PMCI Agreements include restrictive covenants along with the confidentiality provisions, it makes sense that if SKF had intended for Mr. Bjerkness and Mr. Koch to continue to be bound by the restrictive covenants, it would have included such provisions in the SKF Agreements or, at a minimum, reminded Messrs. Bjerkness and Koch of their continued obligations under the restrictive covenants at the time they signed the SKF Agreements. No such language appears in the SKF Agreements, and no one at SKF reminded Messrs. Bjerkness or Koch of those obligations at any time during their SKF employment or upon their resignations from SKF. To be sure, quite the opposite is true. SKF told Messrs. Bjerkness and Koch that their PMCI Agreements were superseded by the SKF Agreements (which do not contain restrictive covenants) and, consequently, were no longer in effect.

Based on representations made by SKF, when Messrs. Bjerkness and Koch resigned from SKF, they believed they were bound only by the language of the SKF Agreements. In addition, Mssrs. Bjerkness and Koch ended their employment with SKF only when their employment situations at SKF deteriorated to the point at which they believed they had no other options. By way of example, SKF repeatedly failed to honor promises to solidify a compensation plan for Mr. Bjerkness and then consistently failed to pay commissions promised to him. To date, SKF still owes Mr. Bjerkness approximately $12,000.00 in earned but unpaid commissions.[1] During his employment with SKF, Mr. Bjerkness made every effort to work with SKF so his tenure with SKF could be long and successful. However, when SKF consistently failed over a period of

---

[1] Additionally, Mr. Bjerkness still has not received payment for approximately six (6) days of accrued but unused vacation that is owed to him, which we value at approximately $2900.00. With this letter, Mr. Bjerkness formally reiterates his previous demands for payment of all accrued but unused vacation and all earned and unpaid commissions. You should know that failure to pay accrued but unused vacation and earned but unpaid commissions can subject employers to significant penalties under Minnesota law.

Mr. Stephen J. Sundheim
July 10, 2008
Page 3

more than one year to provide him with a compensation plan or pay commissions owed to him, Mr. Bjerkness determined SKF would not pay him the money owed to him, felt that he had to pursue avenues that would allow him to earn a living, and decided to end his SKF employment. Based on representations made by SKF, he believed he was bound by only the terms of his SKF Agreement. He was, and continues to be, mindful of the terms of the SKF Agreement; he has not and will not divulge any confidential, proprietary, or trade secret information of SKF.

Finally, you have requested that Mr. Bjerkness return all SKF property in his possession. Mr. Bjerkness does not currently have any SKF property in his possession. During a conversation last week between Mr. Bjerkness and SKF Human Resources Representative Steve Wareham ("Mr. Wareham"), Mr. Wareham confirmed that Mr. Bjerkness had returned all SKF property to SKF since his resignation and that Mr. Bjerkness does not need to return any additional property to SKF. If you believe that Mr. Bjerkness is still in possession of certain SKF property, please specify the SKF property you claim is in Bjerkness's possession.

In sum, we do not believe that Messrs. Bjerkness or Koch have violated any contractual or other legal obligations to SKF. Messrs. Bjerkness and Koch are bound only by the terms of the SKF Agreements, and they have complied with the terms of the SKF Agreements. Neither has disclosed or used any confidential, proprietary, or trade secret information of SKF in an unauthorized manner, and they shall continue to keep that information confidential. I trust that this letter adequately addresses SKF's concerns regarding Messrs. Bjerkness. Please do not hesitate to contact me if you wish to discuss this matter further.

Very truly yours,

WINTHROP & WEINSTINE, P.A.

Megan M. Ruwe

cc:    Dale Bjerkness
       Kevin Koch
       Laura A. Pfeiffer, Esq.

3914872v4

EXHIBIT L

**Pepper Hamilton LLP**
—————Attorneys at Law—————

3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000
Fax 215.981.4750

Stephen J. Sundheim
direct dial: 215.981.4576
direct fax: 866.738.9612
sundheims@pepperlaw.com

July 17, 2008

*Via Federal Express*

Mr. Walter G. Remick, Jr.
1200 Augusta Drive NE
Bemidji, MN 56601

Re:    Your Violation of Your SKF and PMCI Agreements

Dear Mr. Remick:

Our firm represents SKF USA Inc. ("SKF"). SKF has learned that you have accepted employment with Dale Bjerkness or a company operated by Mr. Bjerkness called Equipment Reliability Services, Inc., and that you are engaged in a business that competes with the business that you engaged in for SKF. This letter is to remind you of your obligations to SKF and inform you that SKF will enforce its rights under the "Employee Invention, Patent and Secrecy Agreement" you executed on January 4, 2007, your Agreement with PMCI that SKF assumed when it purchased PMCI in 2007, and the applicable trade secrets statutes. A copy of the agreements you signed are enclosed.

Among other things, your agreements, including your PMCI Agreement that, according to its terms, was assigned to SKF on the sale of PMCI to SKF in 2007,

1. prohibit you from using or disclosing SKF's trade secrets, proprietary information or confidential business information;

2. require that you return all of SKF's property upon termination of your SKF employment;

3. prohibit you for two years from your termination from soliciting business from or providing services to customers to whom you have rendered services or from prospective clients that you solicited to provide services during the 12 months preceding your termination;

#9848785 v1

| Philadelphia | Boston | Washington, D.C. | Detroit | New York | Pittsburgh |
|---|---|---|---|---|---|
| Berwyn | Harrisburg | Orange County | Princeton | Wilmington | |

www.pepperlaw.com

**Pepper Hamilton LLP**
Attorneys at Law

Mr. Walter G. Remick, Jr.
Page 2
July 17, 2008

    4. prohibit you for two years from soliciting or inducing any employee to leave employment with SKF (or PMCI) to work in a business similar to that of PMCI (or SKF after the sale of PMCI); and

    5. prohibit you for two years from competing with SKF by providing services of the type provided by PMCI (or SKF after it purchased PMCI) within 12 months of your termination.

    SKF is very concerned that you be fully aware of you obligations under these agreements and that you know that SKF will take all steps necessary to address any breaches of your contractual and other legal obligations. If warranted, SKF will seek an injunction and money damages to ensure that you do not attempt to do business with its customers or prospective customers, solicit its employees to join your new employer, or use its confidential or proprietary information or trades secrets or otherwise violate the agreements and that you return all of its property.

    This letter is not intended to replace or limit the obligations under the agreements in any way. I am sure that you understand that SKF takes these commitments seriously and will enforce its rights if you do not honor them.

    Please provide this letter to your attorney if you have one. If you do not have an attorney, you may wish to consult one. In any event, please advise me by Wednesday, July 23, whether the information I have described above is incorrect and whether you will honor the terms of your agreements. If I do not hear from you by then, I will assume that the information is correct, that you are violating the agreements, and that you will continue to do so. In that event, we will pursue all of our legal remedies on behalf of SKF. I would be willing to confer with you or your attorney if you have any questions.

    Very truly yours,

    Stephen J. Sundheim

SJS:skr
Enclosures

#9848785 v1

**SKF USA Inc.**

SKF

Name _Wlson   George   Komick_
(Type or print full name - no initials)

Date of Birth ___7/23/75___

Employed by ___Pgt  340___
(Division or subsidiary company)

At ___Stevens Point, WI___
(City and State)

Occupation ___Reliability Engineer___

Date Employed___1-19-08___

Effective Date of this Agreement ___1-04-07___
(If employment begins in an occupation requiring this agreement, enter date employed as effective date of this agreement.
Otherwise enter date of transfer to occupation requiring this agreement).

# Employee Invention, Patent and Secrecy Agreement

Agreement made by and between SKF USA Inc. a Corporation of Delaware (hereinafter called SKF) and
___Walter   George   Komick___ of ___1200 August DR NE   Bemidsi, MN___
Name (hereinafter called the Employee)                     Address

Witnesseth:

In consideration of the covenants herein recited, of the Employee's affiliation and activities with SKF and the compensation paid by SKF to Employee, it is agreed that:

1. The Employee will and does assign to SKF all inventions and improvements made or conceived by him while in its employ or with the use of SKF's time, material, equipment or facilities relating to anti-friction bearings, parts or accessories therefor, machines, tools, devices, equipment or processes useful or pertaining to, or connected with anti-friction bearings and any other line of business or business activity in which SKF is engaged together with such patent or patents as may be obtained whereon, in this and all foreign countries; and upon request by SKF, will at any time during his employment with SKF and after its termination for any reason; execute all proper papers for use in applying for, obtaining and maintaining such United States and foreign patents as SKF may desire, and will execute and deliver all proper assignments thereof, when so requested, but at the expense of SKF. Employee will give SKF such assistance as he is capable with respect to the prosecution of such patent applications and in defense of any patents granted, including evidence in any proceeding.

2. SKF recognizes that the patents or ideas listed and explained  on the pages attached to this agreement were conceived by the Employee prior to his employment by SKF and as such are the property of the Employee and/or his previous Employers to prosecute, manufacture, use and/or sell as he or they may desire.

3. The Employee recognizes the vital importance of maintaining the secrecy of SKF's trade secrets and confidential business matters. Therefore, Employee agrees that he will not in any way during his employment and at any time thereafter, without SKF's written approval, disclose or publish to any unauthorized person, firm or corporation any technical or proprietary information, trade secrets and confidential business matters, including but not limited to, secret processes, formulae, sequences, equipment, research items and results, drawings, prints, customer lists, costs, technical sales and marketing programs. All documents, memoranda, reports, prints, and drawings, including all copies thereof in respect of the above items, are the sole and entire property of SKF which Employee will surrender to SKF upon any termination of employment with SKF; Employee will certify, upon request, to such surrender.

Wherever SKF or SKF USA Inc. shall appear herein, the same shall include the divisions, subsidiaries, successors and assigns of SKF USA Inc.

IN WITNESS WHEREOF, SKF USA Inc. has caused these presents to be executed and the Employee has hereunto set his hand and seal this___06___day of___03___, 20_08_.

SKF USA Inc.

_____
Employee

___Timothy D. Gifford___
General Counsel

_____
Witness for Employee

_____
Attest for General Counsel

(seal)

 

**Corporate**
2500 Estes Avenue
Elk Grove Village, IL 60007

**Ph: 800-222-PMCI**
Fax: 847-956-8761

**Northern Region**
5224 Heffron Court
Stevens Point, WI 54481

**Ph: 888-444-PMCI**
Fax: 715-342-9053



**ISO 9002**
Certificate #A4053

www.pmcisystems.com

Est. 1970

### AGREEMENT

THIS AGREEMENT is entered into at Elk Grove Village, Illinois this 16ᵗʰ day of January , 06 , by and between PREVENTIVE MAINTENANCE COMPANY, INC. (hereinafter referred to as "PMCI") and Walter Romuk (hereinafter referred to as "Employee").

### RECITALS:

WHEREAS, Employee is assuming a position of employment with PMCI as a _____, which will expose Employee to PMCI's tangible and intangible property, including confidential information, and other proprietary business information and which will expose Employee to proprietary information belonging to PMCI's clients which Employee will be entrusted to maintain as highly confidential; and

WHEREAS, PMCI and Employee hereby acknowledge that the industry in which PMCI competes is extremely competitive, and that PMCI expends substantial money, time, effort and other resources to develop and maintain its client lists and client relationships which, once acquired, are generally of a continuing and permanent nature; and

WHEREAS, PMCI and Employee understand Employee will learn a great deal of information through his/her employment with PMCI, yet PMCI seeks only to preserve the confidentiality of certain property and information, which if used outside the scope of Employee's employment with PMCI would jeopardize PMCI's relationship with existing and newly acquired clients and client prospects; and

WHEREAS, Employee through his/her employment will be exposed to PMCI accounts, client lists, contract terms, prospective client lists and other proprietary information regarding its clients' accounts, and its operations; and

---

Predictive Machinery Vibration Programs        Vibration Analysis        Dynamic Balancing        Infrared Inspections

### Predictive Technology Services

Ultrasound Inspections        Machine Tool & Spindle Analysis        Laser Analysis        Emergency Services

WHEREAS, Employee recognizes the importance of his/her abiding by this Agreement to PMCI's ability to protect its proprietary business information and the proprietary information of its clients which is essential to the continued existence of PMCI's business; and

WHEREAS, Employee recognizes PMCI's restrictions on his/her future activity for a stated time are necessary to protect PMCI's interests in its proprietary business information and the proprietary business information of its clients which is essential to the continued existence of PMCI's business; and

WHEREAS, if Employee were to act in violation of this Agreement, PMCI could not be adequately compensated for any such breach by money damages and any such breach of this Agreement will cause irreparable injury to PMCI; and

WHEREAS, Employee and PMCI acknowledge that the restrictions of this Agreement apply regardless of whether Employee voluntarily or involuntarily leaves PMCI's employ (both of which are hereinafter referenced to as "termination of Employee's employment").

NOW, THEREFORE, in consideration of the foregoing recitals and of the provisions set forth herein and other good and valuable consideration, the receipt and sufficiency of which is mutually acknowledged, including without limitations the fact that PMCI will employ, or continue to employ Employee, and will expose or continue to expose Employee to PMCI's proprietary and confidential business information, and Employee will continue service to PMCI, acting in good faith and in PMCI's interests, the parties hereto agree as follows:

1.   <u>PMCI'S PROPERTY</u>

All tangible items furnished to or created by Employee from time to time in connection with the performance of Employee's duties, including but not limited to client lists, procedures manuals, proposal materials, prospective client lists, client reports, and work papers, shall at all times remain the sole property of PMCI.   Employee acknowledges that the information contained in the tangible property is a valuable asset of PMCI's business and is highly confidential.  Employee shall not duplicate tangible items.   They are provided to Employee for the limited purpose of enabling the Employee to perform duties of employment, and Employee hereby covenants not to use or

permit any of the same to be used for any other purpose. When the tangible items are not being used by Employee in furtherance of his employment, they shall be kept under lock and key. Upon the demand of PMCI, at any time or upon the termination of employment under any circumstances, Employee shall promptly tender all such items to PMCI. Employee covenants that he/she will not provide PMCI's tangible property to any competitor of PMCI nor use PMCI's tangible property or the information contained therein in furtherance of the business of any competitor of PMCI.

2. <u>PMCI'S CONFIDENTIAL AND PROPRIETARY INFORMATION</u>

    a. All information imparted to Employee by PMCI, or otherwise obtained by Employee, at any time, relating to PMCI's methods of doing business; valuation methods; computer programs; business ideas; billing procedures; pricing and commission data; client names and lists; client needs and requirements; client servicing methods; prospective client lists; and any other client data, is revealed and entrusted to Employee, in confidence, solely in connection with and for the purpose of employment on behalf of PMCI. Employee shall not, at any time, either during or after employment with PMCI, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of PMCI. Without limiting the generality of the foregoing, upon the termination of employment, under any circumstances, Employee shall promptly tender to PMCI all lists, records, work papers, reports and other documents in Employee's possession or control relating to any clients, prospective clients or the business of PMCI.

    b.   Further, Employee promises to maintain as confidential all information Employee may obtain, learn or be entrusted with as an employee of PMCI, regarding any proprietary information belonging to any of PMCI's clients, including but not limited to any client's methods or processes of production, pricing, marketing, servicing of research and development. Employee shall not, at any time, either during or after the term of employment, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of PMCI.

3.   <u>PROHIBITIONS REGARDING PMCI'S</u>
<u>PROPRIETARY BUSINESS INFORMATION</u>

    a.   It is understood and agreed by Employee that all business relationships and goodwill now existing with respect to the clients of PMCI, whether or not created by Employee, and all such relationships and goodwill which may hereafter be created or enhanced, at all time remain the sole property of PMCI. Accordingly, Employee agrees that during the term of this Agreement and for a further period of two years beginning on the termination of Employee's employment with PMCI, Employee shall not, under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee or in any other capacity whatsoever, directly or indirectly, solicit business or sell or render services of the sort provided by PMCI to any client for which PMCI or its Employee has rendered services or to any prospective client that Employee has solicited to provide services of the sort provided by PMCI or about whom Employee has learned confidential information during the twelve (12) months preceding Employee's separation from PMCI; nor shall Employee, directly or indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

b.  Due to the confidential nature of the proprietary information and the considerable amount of money, time and effort expended to develop such proprietary information, and due to PMCI's considerable investment in training employees and allowing them access to confidential and proprietary information, and with the understanding that the Employees' use of such training and proprietary information outside of PMCI's employment would unduly prejudice PMCI's relationship with existing clients, Employee agrees that during the term of this Agreement and for a further period of two (2) years beginning on the termination of Employee's employment with PMCI, Employee shall not, under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee, or in any capacity whatever, directly or indirectly, solicit or induce any employee of PMCI to leave PMCI's employ for any employment in a line of business similar to that conducted by PMCI in locations where PMCI services clients, or locations where PMCI has solicited clients within the twelve, (12) months preceding Employee's termination; nor will Employee, directly or indirectly, aid or assist any other person, firm or corporation to solicit or induce any employee of PMCI for any employment in a line of business similar to that conducted by PMCI in the aforesaid locations.

c.  Due to the confidential nature of the proprietary information and the considerable amount of money, time and effort expended to develop such proprietary information to which Employee will be exposed, and with the understanding that the Employee's use of such proprietary information outside of PMCI's employment would unduly prejudice PMCI's relationship with existing clients, Employee agrees during the term of this Agreement and for a further period of two (2) years beginning on the termination of Employee's employment with PMCI that Employee will not under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer,

trustee, principal, agent, servant, employee or in any other capacity compete with PMCI by soliciting, selling or rendering services of the sort provided by PMCI to any individual or entity that has a business location in the locations serviced or solicited by PMCI within the twelve (12) months preceding Employee's termination nor will Employee, directly or indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

d.  The provisions of this Paragraph 3 shall be in addition to, and shall not in any way be deemed limited or restricted by, the provisions of any other Paragraph of this Agreement.

4.  <u>ENTIRE AGREEMENT</u>

These written Restrictive Covenants constitute the entire agreement of the parties with respect to the subject matter hereof and there are no prior or contemporaneous oral or written representations, promises, or agreements not expressed or referred to herein other than the singular exception of Employee's interim agreement to enter into some form of restrictive agreement in consideration of being offered a position with PMCI.

5.  <u>AMENDMENT</u>

This Agreement may be amended only in writing and only if such writing is signed by Employee and by the President of PMCI.

6.  <u>SURVIVAL OF PROVISIONS</u>

Any provision of this Agreement, which by terms or reasonable implication is to be or may be performed or effective after the termination of the Agreement, shall be deemed to survive such termination.

7.  <u>SEPARABILITY AND MODIFICATION</u>

If any provision of this Agreement shall be invalid or unenforceable, in whole or in part, or as applied to any circumstance, under the laws of any jurisdiction which may govern for such purpose, then such provision shall be

deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, either generally or as applied to such circumstance, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

8.   BINDING EFFECT

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, and assigns, provided that this Agreement is not assignable by employee.

9.   PARAGRAPH HEADINGS

Paragraph headings are for convenience of reference only and shall not be deemed part of this Agreement.

10.  GOVERNING LAW AND SUBMISSION TO JURISDICTION

This Agreement shall be governed in all respects by the substantive laws of the State of Illinois without reference to the choice of law provisions of Illinois or any other state. Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Employee hereby consents and submits his or her person to the jurisdiction of any such Court for such purpose.

11.  COUNTERPARTS

This Agreement may be executed in any number of identical counterparts, each of which shall be deemed a duplicate original, and all of which together shall constitute but one and the same agreement.

12.  EMPLOYMENT

Nothing in this Agreement is meant to alter the "at will nature" of employment.

Page 8 of 8

13.   <u>CONSULTATION WITH COUNSEL</u>

By executing this Agreement, Employee expressly represents
that he or she has read it, understands its terms and has
had the opportunity (whether exercised or not) to consult
with legal counsel regarding it.

IN WITNESS WHEREOF, the parties have set their hands and seals and
have caused this Agreement to be executed the day and year first
above written.

EMPLOYEE

By: _____

Its: _____

Date: _____

PREVENTIVE MAINTENANCE COMPANY, INC.

By: _____

Its: _____

Date: _____

"Precise Machinery Condition Intelligence"  **800-222-PMCI**  FAX 847-956-8761

EXHIBIT M

# Pepper Hamilton LLP
#### Attorneys at Law

3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000
Fax 215.981.4750

Stephen J. Sundheim
direct dial: 215.981.4576
direct fax: 866.738.9612
sundheims@pepperlaw.com

July 23 2008

*Via Federal Express*

Joseph J. Sever
11751 W. River Hills Drive
Burnsville, MN 55337

Re:     Your Violation of Your SKF and PMCI Agreements

Dear Mr. Sever:

Our firm represents SKF USA Inc. ("SKF"). SKF has learned that you have
accepted employment with Dale Bjerkness or a company operated by Mr. Bjerkness called
Equipment Reliability Services, Inc., and that you are engaged in a business that competes with
the business that you engaged in for SKF. This letter is to remind you of your obligations to
SKF and inform you that SKF will enforce its rights under the "Employee Invention, Patent and
Secrecy Agreement" you executed on January 4, 2007; your Agreement with PMCI that SKF
assumed when it purchased PMCI in 2007; and the applicable trade secrets statutes. A copy of
the agreements you signed are enclosed.

Among other things, your agreements, including your PMCI Agreement that,
according to its terms, was assigned to SKF on the sale of PMCI to SKF in 2007,

1.  prohibit you from using or disclosing SKF's trade secrets, proprietary
information or confidential business information;

2.  require that you return all of SKF's property upon termination of your SKF
employment;

3.  prohibit you for two years from your termination from soliciting business from
or providing services to customers to whom you have rendered services or from prospective
clients that you solicited to provide services during the 12 months preceding your termination;

#9848900 v1

| Philadelphia | Boston | Washington, D.C. | Detroit | New York | Pittsburgh |
|---|---|---|---|---|---|
| Berwyn | Harrisburg | Orange County | Princeton | Wilmington | |

www.pepperlaw.com

Pepper Hamilton LLP
<sub>Attorneys at Law</sub>

Joseph J. Sever
Page 2
July 23, 2008

      4. prohibit you for two years from soliciting or inducing any employee to leave employment with SKF (or PMCI) to work in a business similar to that of PMCI (or SKF after the sale of PMCI); and

      5. prohibit you for two years from competing with SKF by providing services of the type provided by PMCI (or SKF after it purchased PMCI) within 12 months of your termination.

      SKF is very concerned that you be fully aware of you obligations under these agreements and that you know that SKF will take all steps necessary to address any breaches of your contractual and other legal obligations. If warranted, SKF will seek an injunction and money damages to ensure that you do not attempt to do business with its customers or prospective customers, solicit its employees to join your new employer, or use its confidential or proprietary information or trades secrets or otherwise violate the agreements and that you return all of its property.

      This letter is not intended to replace or limit the obligations under the agreements in any way. I am sure that you understand that SKF takes these commitments seriously and will enforce its rights if you do not honor them.

      Please provide this letter to your attorney if you have one. If you do not have an attorney, you may wish to consult one. In any event, please advise me by Wednesday, July 29, whether the information I have described above is incorrect and whether you will honor the terms of your agreements. If I do not hear from you by then, I will assume that the information is correct, that you are violating the agreements, and that you will continue to do so. In that event, we will pursue all of our legal remedies on behalf of SKF. I would be willing to confer with you or your attorney if you have any questions.

                    Very truly yours,

                    Stephen J. Sundheim

SJS:skr
Enclosures

#9848900 v1

**SKF USA Inc.**　　　　　　　　　　　　　　　　　　　SKF

Name _JOSEPH JOHN SEVER_　　　　　Date of Birth _06-9-1979_
　　　　(Type or print full name - no initials)

Employed by _SKF CULPEVILLE_　　　　　At _STEVENS POINT, WI_
　　　　(Division or subsidiary company)　　　　　　　(City and State)

Occupation _RELIABILITY ENGINEER_　　Date Employed _04-07-2003_

Effective Date of this Agreement _03-06-2008_　　　　　_01-04-2008_
　　　　(If employment begins in an occupation requiring this agreement, enter date employed as effective date of this agreement.
　　　　Otherwise enter date of transfer to occupation requiring this agreement).

# Employee Invention, Patent and Secrecy Agreement

Agreement made by and between SKF USA Inc. a Corporation of Delaware (hereinafter called SKF) and
_JOSEPH SEVER_　　　　　of _1151 W RIVER HILLS DR_
Name (hereinafter called the Employee)　　　　　_APT 215 BURNSVILLE MN_　Address
Witnesseth:　　　　　_55337_

In consideration of the covenants herein recited, of the Employee's affiliation and activities with SKF and the compensation paid by SKF to Employee, it is agreed that:

1. The Employee will and does assign to SKF all inventions and improvements made or conceived by him while in its employ or with the use of SKF's time, material, equipment or facilities relating to anti-friction bearings, parts or accessories therefor, machines, tools, devices, equipment or processes useful or pertaining to, or connected with anti-friction bearings and any other line of business or business activity in which SKF is engaged together with such patent or patents as may be obtained whereon, in this and all foreign countries; and upon request by SKF, will at any time during his employment with SKF and after its termination for any reason; execute all proper papers for use in applying for, obtaining and maintaining such United States and foreign patents as SKF may desire, and will execute and deliver all proper assignments thereof, when so requested, but at the expense of SKF. Employee will give SKF such assistance as he is capable with respect to the prosecution of such patent applications and in defense of any patents granted, including evidence in any proceeding.

2. SKF recognizes that the patents or ideas listed and explained on the pages attached to this agreement were conceived by the Employee prior to his employment by SKF and as such are the property of the Employee and/or his previous Employers to prosecute, manufacture, use and/or sell as he or they may desire.

3. The Employee recognizes the vital importance of maintaining the secrecy of SKF's trade secrets and confidential business matters. Therefore, Employee agrees that he will not in any way during his employment and at any time thereafter, without SKF's written approval, disclose or publish to any unauthorized person, firm or corporation any technical or proprietary information, trade secrets and confidential business matters, including but not limited to, secret processes, formulae, sequences, equipment, research items and results, drawings, prints, customer lists, costs, technical sales and marketing programs. All documents, memoranda, reports, prints, and drawings, including all copies thereof in respect of the above items, are the sole and entire property of SKF which Employee will surrender to SKF upon any termination of employment with SKF; Employee will certify, upon request, to such surrender.

Wherever SKF or SKF USA Inc. shall appear herein, the same shall include the divisions, subsidiaries, successors and assigns of SKF USA Inc.

IN WITNESS WHEREOF, SKF USA Inc. has caused these presents to be executed and the Employee has hereunto set his hand and seal this _06_ day of _03_, 20 _08_.

　　　　　　　　　　　　　　　　　　　SKF USA Inc.

_____　　　　_Timothy B. Stafford_
　　　Employee　　　　　　　　　　　General Counsel

_____　　　　_____
　Witness for Employee　　　　　　Attest for General Counsel　　(seal)



| Corporate | Northern Region | |
| --- | --- | --- |
| 2500 Estes Avenue | 5224 Heffron Court | |
| www.pmcisystems.com  Elk Grove Village, IL 60007 | Stevens Point, WI 54481 |  |
| **Ph: 800-222-PMCI** | **Ph: 888-444-PMCI** | **ISO 9002** |
| Fax: 847-956-8761 | Fax: 715-342-9053 | Certificate #A4053 |

Est. 1970

## AGREEMENT

THIS AGREEMENT is entered into at Elk Grove Village, Illinois this **7** day of **April**, **03**, by and between PREVENTIVE MAINTENANCE COMPANY, INC. (hereinafter referred to as "PMCI") and **Joe Sever** (hereinafter referred to as "Employee").

### RECITALS:

WHEREAS, Employee is assuming a position of employment with PMCI as a **Technician**, which will expose Employee to PMCI's tangible and intangible property, including confidential information, and other proprietary business information and which will expose Employee to proprietary information belonging to PMCI's clients which Employee will be entrusted to maintain as highly confidential; and

WHEREAS, PMCI and Employee hereby acknowledge that the industry in which PMCI competes is extremely competitive, and that PMCI expends substantial money, time, effort and other resources to develop and maintain its client lists and client relationships which, once acquired, are generally of a continuing and permanent nature; and

WHEREAS, PMCI and Employee understand Employee will learn a great deal of information through his/her employment with PMCI, yet PMCI seeks only to preserve the confidentiality of certain property and information, which if used outside the scope of Employee's employment with PMCI would jeopardize PMCI's relationship with existing and newly acquired clients and client prospects; and

WHEREAS, Employee through his/her employment will be exposed to PMCI accounts, client lists, contract terms, prospective client lists and other proprietary information regarding its clients' accounts, and its operations; and

WHEREAS, Employee recognizes the importance of his/her abiding by this Agreement to PMCI's ability to protect its proprietary business information and the proprietary information

---

| Predictive Machinery Vibration Programs | Vibration Analysis | Dynamic Balancing | Infrared Inspections |
| --- | --- | --- | --- |

### Predictive Technology Services

| Ultrasound Inspections | Machine Tool & Spindle Analysis | Laser Analysis | Emergency Services |
| --- | --- | --- | --- |

of its clients which is essential to the continued existence of PMCI's business; and

WHEREAS, Employee recognizes PMCI's restrictions on his/her future activity for a stated time are necessary to protect PMCI's interests in its proprietary business information and the proprietary business information of its clients which is essential to the continued existence of PMCI's business; and

WHEREAS, if Employee were to act in violation of this Agreement, PMCI could not be adequately compensated for any such breach by money damages and any such breach of this Agreement will cause irreparable injury to PMCI; and

WHEREAS, Employee and PMCI acknowledge that the restrictions of this Agreement apply regardless of whether Employee voluntarily or involuntarily leaves PMCI's employ (both of which are hereinafter referenced to as "termination of Employee's employment").

NOW, THEREFORE, in consideration of the foregoing recitals and of the provisions set forth herein and other good and valuable consideration, the receipt and sufficiency of which is mutually acknowledged, including without limitations the fact that PMCI will employ, or continue to employ Employee, and will expose or continue to expose Employee to PMCI's proprietary and confidential business information, and Employee will continue service to PMCI, acting in good faith and in PMCI's interests, the parties hereto agree as follows:

1.   PMCI'S PROPERTY

All tangible items furnished to or created by Employee from time to time in connection with the performance of Employee's duties, including but not limited to client lists, procedures manuals, proposal materials, prospective client lists, client reports, and work papers, shall at all times remain the sole property of PMCI.   Employee acknowledges that the information contained in the tangible property is a valuable asset of PMCI's business and is highly confidential.   Employee shall not duplicate tangible items.   They are provided to Employee for the limited purpose of enabling the Employee to perform duties of employment, and Employee hereby covenants not to use or permit any of the same to

be used for any other purpose. When the tangible items are not being used by Employee in furtherance of his employment, they shall be kept under lock and key. Upon the demand of PMCI, at any time or upon the termination of employment under any circumstances, Employee shall promptly tender all such items to PMCI. Employee covenants that he/she will not provide PMCI's tangible property to any competitor of PMCI nor use PMCI's tangible property or the information contained therein in furtherance of the business of any competitor of PMCI.

2. PMCI'S CONFIDENTIAL AND PROPRIETARY INFORMATION

    a. All information imparted to Employee by PMCI, or otherwise obtained by Employee, at any time, relating to PMCI's methods of doing business; valuation methods; computer programs; business ideas; billing procedures; pricing and commission data; client names and lists; client needs and requirements; client servicing methods; prospective client lists; and any other client data, is revealed and entrusted to Employee, in confidence, solely in connection with and for the purpose of employment on behalf of PMCI. Employee shall not, at any time, either during or after employment with PMCI, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of PMCI. Without limiting the generality of the foregoing, upon the termination of employment, under any circumstances, Employee shall promptly tender to PMCI all lists, records, work papers, reports and other documents in Employee's possession or control relating to any clients, prospective clients or the business of PMCI.

    b. Further, Employee promises to maintain as confidential all information Employee may obtain, learn or be entrusted with as an employee of PMCI, regarding any proprietary information belonging to any of PMCI's clients, including but not limited to any client's methods or processes of production,

pricing, marketing, servicing of research and development. Employee shall not, at any time, either during or after the term of employment, divulge any of this information to any other person, firm, or entity, nor use or permit the use of any of it, other than pursuant to Employee's employment on behalf of PMCI.

3.  PROHIBITIONS REGARDING PMCI'S
    PROPRIETARY BUSINESS INFORMATION

   a.  It is understood and agreed by Employee that all business relationships and goodwill now existing with respect to the clients of PMCI, whether or not created by Employee, and all such relationships and goodwill which may hereafter be created or enhanced, at all time remain the sole property of PMCI. Accordingly, Employee agrees that during the term of this Agreement and for a further period of two years beginning on the termination of Employee's employment with PMCI, Employee shall not, under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee or in any other capacity whatsoever, directly or indirectly, solicit business or sell or render services of the sort provided by PMCI to any client for which PMCI or its Employee has rendered services or to any prospective client that Employee has solicited to provide services of the sort provided by PMCI or about whom Employee has learned confidential information during the twelve (12) months preceding Employee's separation from PMCI; nor shall Employee, directly or indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

   b.  Due to the confidential nature of the proprietary information and the considerable amount of money, time and effort expended to develop such proprietary information, and due to PMCI's considerable investment in training employees and allowing them access to confidential and proprietary information, and with the understanding that the Employees' use of such training and

proprietary information outside of PMCI's employment would unduly prejudice PMCI's relationship with existing clients, Employee agrees that during the term of this Agreement and for a further period of two (2) years beginning on the termination of Employee's employment with PMCI, Employee shall not, under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee, or in any capacity whatever, directly or indirectly, solicit or induce any employee of PMCI to leave PMCI's employ for any employment in a line of business similar to that conducted by PMCI in locations where PMCI services clients, or locations where PMCI has solicited clients within the twelve, (12) months preceding Employee's termination; nor will Employee, directly or indirectly, aid or assist any other person, firm or corporation to solicit or induce any employee of PMCI for any employment in a line of business similar to that conducted by PMCI in the aforesaid locations.

c. Due to the confidential nature of the proprietary information and the considerable amount of money, time and effort expended to develop such proprietary information to which Employee will be exposed, and with the understanding that the Employee's use of such proprietary information outside of PMCI's employment would unduly prejudice PMCI's relationship with existing clients, Employee agrees during the term of this Agreement and for a further period of two (2) years beginning on the termination of Employee's employment with PMCI that Employee will not under any circumstances, as proprietor, partner, joint venturer, stockholder, director, officer, trustee, principal, agent, servant, employee or in any other capacity compete with PMCI by soliciting, selling or rendering services of the sort provided by PMCI to any individual or entity that has a business location in the locations serviced or solicited by PMCI within the twelve (12) months preceding Employee's termination nor will Employee, directly or

indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

d.   The provisions of this Paragraph 3 shall be in addition to, and shall not in any way be deemed limited or restricted by, the provisions of any other Paragraph of this Agreement.

4.   ENTIRE AGREEMENT

These written Restrictive Covenants constitute the entire agreement of the parties with respect to the subject matter hereof and there are no prior or contemporaneous oral or written representations, promises, or agreements not expressed or referred to herein other than the singular exception of Employee's interim agreement to enter into some form of restrictive agreement in consideration of being offered a position with PMCI.

5.   AMENDMENT

This Agreement may be amended only in writing and only if such writing is signed by Employee and by the President of PMCI.

6.   SURVIVAL OF PROVISIONS

Any provision of this Agreement, which by terms or reasonable implication is to be or may be performed or effective after the termination of the Agreement, shall be deemed to survive such termination.

7.   SEPARABILITY AND MODIFICATION

If any provision of this Agreement shall be invalid or unenforceable, in whole or in part, or as applied to any circumstance, under the laws of any jurisdiction which may govern for such purpose, then such provision shall be deemed to be modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, either generally or as applied to such circumstance, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent

permitted by law, as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.

8.   <u>BINDING EFFECT</u>

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, and assigns, provided that this Agreement is not assignable by employee.

9.   <u>PARAGRAPH HEADINGS</u>

Paragraph headings are for convenience of reference only and shall not be deemed part of this Agreement.

10.   <u>GOVERNING LAW AND SUBMISSION TO JURISDICTION</u>

This Agreement shall be governed in all respects by the substantive laws of the State of Illinois without reference to the choice of law provisions of Illinois or any other state. Any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Employee hereby consents and submits his or her person to the jurisdiction of any such Court for such purpose.

11.   <u>COUNTERPARTS</u>

This Agreement may be executed in any number of identical counterparts, each of which shall be deemed a duplicate original, and all of which together shall constitute but one and the same agreement.

12.   <u>CONSULTATION WITH COUNSEL</u>

By executing this Agreement, Employee expressly represents that he or she has read it, understands its terms and has had the opportunity (whether exercised or not) to consult with legal counsel regarding it.

Page 8 of 8

IN WITNESS WHEREOF, the parties have set their hands and seals and have caused this Agreement to be executed the day and year first above written.

EMPLOYEE

By: _____

Its: _____

Date: _____

PREVENTIVE MAINTENANCE COMPANY, INC.

By: _____

Its: _____

Date: _____

EXHIBIT N

# W

## WINTHROP ( WEINSTINE

ATTORNEYS AND COUNSELORS AT LAW

July 23, 2008

Megan M. Ruwe
Direct Dial: (612) 604-6711
Direct Fax: (612) 604-6911
mruwe@winthrop.com

Mr. Stephen J. Sundheim                                    **VIA FACSIMILE AND U.S. MAIL**
Pepper Hamilton LLP
3000 Two Logan Square
Philadelphia, Pennsylvania 19103-2799

RE:     Walter G. Remick, Jr.

Dear Mr. Sundheim:

Winthrop & Weinstine, P.A. represents Walter G. Remick, Jr. ("Mr. Remick"). This letter is in
response to your letter to Mr. Remick regarding the Agreements with Preventative Maintenance
Company, Inc. ("PMCI") (the "PMCI Agreement") and the Employee Invention, Patent and
Secrecy Agreements (the "SKF Agreements") with SKF USA, Inc. ("SKF") (collectively, the
PMCI and SKF Agreements shall be referred to as the "Agreements"). As will further be set
forth in this correspondence, Mr. Remick is (i) not bound by the PMCI Agreement; (ii) not in
violation of any non-competition, non-solicitation, or non-recruitment provisions of the PMCI
Agreement; and (iii) not in violation of any other duties or obligations due to SKF.

Among other things, based upon the conduct of SKF representatives, the PMCI Agreement is not
enforceable against Mr. Remick. Specifically, when Mr. Remick was asked to enter into the
SKF Agreement, his supervisor at that time, Jeff Hall, advised him that the SKF Agreement
superseded the PMCI Agreement and that the PMCI Agreement was no longer in effect. As I
have previously advised, SKF also advised other individuals that the SKF Agreements
superseded the PMCI Agreements. We are also aware that there may be internal SKF
communications which advise that the PMCI Agreement supersedes the SKF Agreement and
further direct SKF Human Resources that new hires should no longer be asked to sign
agreements that contain restrictive covenants. In line with this correspondence, we have credible
evidence that SKF does not currently require new hires to sign non-competition agreements even
though such individuals have access to the same confidential information as those who signed
the PMCI Agreements that SKF now wishes to enforce.

Assuming, *arguendo*, that the PMCI Agreement was not superseded by the SKF Agreement, Mr.
Remick still is not bound by the non-competition, non-solicitation, and non-recruitment
provisions in the PMCI Agreement because those terms of the PMCI Agreement merged into the
SKF Agreement, which does not contain any restrictive covenants. The Agreements contemplate
the same subject matter (post-employment obligations regarding confidentiality during and after
the term of his employment), but unlike the PMCI Agreement, the SKF Agreement does not

**RECEIVED** JUL 2 8 2008

Mr. Stephen J. Sundheim
·July 23, 2008
Page 2

contain any restrictive covenants. Because the PMCI Agreement includes restrictive covenants along with the confidentiality provisions, it makes sense that if SKF had intended for Mr. Remick to continue to be bound by the restrictive covenants, it would have included such provisions in the SKF Agreement or, at a minimum, reminded Mr. Remick of his continued obligations under the restrictive covenants at the time they signed the SKF Agreements. No such language appears in the SKF Agreement, and no one at SKF reminded Mr. Remick of those obligations at any time during his SKF employment or upon his resignations from SKF. To be sure, quite the opposite is true. SKF told Mr. Remick that the PMCI Agreement was superseded by the SKF Agreement (which does not contain restrictive covenants) and, consequently, was no longer in effect.

Based on representations made by SKF, when Mr. Remick resigned from SKF, he believed he was bound only by the language of the SKF Agreement. He was, and continues to be, mindful of the terms of the SKF Agreement; he has not and will not divulge any confidential, proprietary, or trade secret information of SKF.

I trust that this letter adequately addresses SKF's concerns regarding Mr. Remick. Please do not hesitate to contact me if you wish to discuss this matter further.

Very truly yours,

WINTHROP & WEINSTINE, P.A.

Megan M. Ruwe

cc:    Walter G. Remick, Jr.

3944765v1

EXHIBIT O



**WINTHROP & WEINSTINE**

ATTORNEYS AND COUNSELORS AT LAW

July 30, 2008

Megan M. Ruwe
Direct Dial: (612) 604-6711
Direct Fax: (612) 604-6911
mruwe@winthrop.com

Mr. Stephen J. Sundheim                                    **VIA FACSIMILE AND U.S. MAIL**
Pepper Hamilton LLP
3000 Two Logan Square
Philadelphia, Pennsylvania 19103-2799

RE:    Joseph J. Sever

Dear Mr. Sundheim:

Winthrop & Weinstine, P.A. represents Joseph J. Sever ("Mr. Sever"). This letter is in response to your letter to Mr. Sever regarding the Agreements with Preventative Maintenance Company, Inc. ("PMCI") (the "PMCI Agreement") and the Employee Invention, Patent and Secrecy Agreements (the "SKF Agreements") with SKF USA, Inc. ("SKF") (collectively, the PMCI and SKF Agreements shall be referred to as the "Agreements"). As will further be set forth in this correspondence, Mr. Sever is (i) not bound by the PMCI Agreement; (ii) not in violation of any non-competition, non-solicitation, or non-recruitment provisions of the PMCI Agreement; and (iii) not in violation of any other duties or obligations due to SKF.

Among other things, based upon the conduct of SKF representatives, the PMCI Agreement is not enforceable against Mr. Sever. Specifically, when Mr. Sever was asked to enter into the SKF Agreement, his supervisor at that time, Jeff Hall, advised him that the SKF Agreement superseded the PMCI Agreement and that the PMCI Agreement was no longer in effect. As I have previously advised, SKF also advised other individuals that the SKF Agreements superseded the PMCI Agreements. We are also aware that there may be internal SKF communications which advise that the PMCI Agreement supersedes the SKF Agreement and further direct SKF Human Resources that new hires should no longer be asked to sign agreements that contain restrictive covenants. In line with this correspondence, we have credible evidence that SKF does not currently require new hires to sign non-competition agreements even though such individuals have access to the same confidential information as those who signed the PMCI Agreements that SKF now wishes to enforce.

Assuming, *arguendo*, that the PMCI Agreement was not superseded by the SKF Agreement, Mr. Sever still is not bound by the non-competition, non-solicitation, and non-recruitment provisions in the PMCI Agreement because those terms of the PMCI Agreement merged into the SKF Agreement, which does not contain any restrictive covenants. The Agreements contemplate the same subject matter (post-employment obligations regarding confidentiality during and after the term of his employment), but unlike the PMCI Agreement, the SKF Agreement does not contain

RECEIVED AUG 0 4 2008

Mr. Stephen J. Sundheim
July 30, 2008
Page 2

any restrictive covenants. Because the PMCI Agreement includes restrictive covenants along with the confidentiality provisions, it makes sense that if SKF had intended for Mr. Sever to continue to be bound by the restrictive covenants, it would have included such provisions in the SKF Agreement or, at a minimum, reminded Mr. Sever of his continued obligations under the restrictive covenants at the time they signed the SKF Agreements. No such language appears in the SKF Agreement, and no one at SKF reminded Mr. Sever of those obligations at any time during his SKF employment or upon his resignation from SKF. To be sure, quite the opposite is true. SKF told Mr. Sever that the PMCI Agreement was superseded by the SKF Agreement (which does not contain restrictive covenants) and, consequently, was no longer in effect.

Based on representations made by SKF, when Mr. Sever resigned from SKF, he believed he was bound only by the language of the SKF Agreement. He was, and continues to be, mindful of the terms of the SKF Agreement; he has not and will not divulge any confidential, proprietary, or trade secret information of SKF.

I trust that this letter adequately addresses SKF's concerns regarding Mr. Sever. Please do not hesitate to contact me if you wish to discuss this matter further.

Very truly yours,

WINTHROP & WEINSTINE, P.A.

Megan M. Ruwe

cc:    Joseph J. Sever

3955031v1

EXHIBIT P

**Pepper Hamilton LLP**
Attorneys at Law

3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000
Fax 215.981.4750

Stephen J. Sundheim
direct dial: 215.981.4576
direct fax: 866.738.9612
sundheims@pepperlaw.com

July 16, 2008

*Via Facsimile ~ 612.604.6800*

Megan M. Ruwe, Esquire
Winthrop & Weinstine, P.A.
Suite 3500
225 South Sixth Street
Minneaplis, MN 55402-4629

Dear Ms. Ruwe:

Thank you for your recent letter regarding Mr. Koch and Mr. Bjerkness. I don't intend to address here what SKF considers to be an incorrect recitation of the facts involving these former employees, except to say that SKF maintains that there exists a valid non-compete and no-solicitation agreement that it will seek to enforce. However, I am informed that Mr. Bjerkness still has SKF property -- among other things, an index card file, business cards relating to SKF customers, outstanding customer proposals, customer drawings, customer files and two vibration poles (serial numbers 511 and 542). Those should be returned immediately without any copies being made or retained.

Also, it has come to our attention, that Mr. Bjerkness currently is contacting SKF customers with whom he knows SKF has contractual relationships and that he therefore may be tortuously interfering with those relationships. If this is the case, we request that you advise him about the impropriety of doing this.

Very truly yours,

Stephen J. Sundheim

SJS:skr

| Philadelphia | Boston | Washington, D.C. | Detroit | New York | Pittsburgh |
| Berwyn | Harrisburg | Orange County | Princeton | Wilmington |

www.pepperlaw.com

EXHIBIT Q



**WINTHROP WEINSTINE**

ATTORNEYS AND COUNSELORS AT LAW

July 24, 2008

Megan M. Ruwe
Direct Dial: (612) 604-6711
Direct Fax: (612) 604-6911
mruwe@winthrop.com

Mr. Stephen J. Sundheim                    **VIA FACSIMILE AND U.S. MAIL**
Pepper Hamilton LLP
3000 Two Logan Square
Philadelphia, Pennsylvania 19103-2799

RE:    Dale Bjerkness and Kevin Koch

Dear Mr. Sundheim:

I am writing in response to your letter to me dated July 16, 2008. Just as you have elected to do, I also will not reiterate our July 10, 2008 letter to you in which we made clear that Messrs. Koch and Bjerkness do not have a valid non-compete or non-solicitation agreement.

With respect to the other statements in your letter I can advise you as follows: Mr. Bjerkness does not have any outstanding customer proposals, customer drawings, customer files or vibration poles. Mr. Bjerkness does have a group of business cards that he has collected over the last twenty years (which far predates his employment with SKF or PMCI) and an index card file, both of which he has not reviewed for a very long time, and that he has not reviewed since leaving SKF. We do not agree that these two items are the property of SKF, or that they contain any information that is confidential or proprietary to SKF. Mr. Bjerkness further advises that there is nothing in either of these items that SKF does not already have in its possession. Nonetheless, to avoid any argument that Mr. Bjerkness is using any information in either of these two items, both the business cards and the index card file are now in my possession.

Finally, Mr. Bjerkness denies that he is engaging in any conduct that would give rise to a claim for tortious interference with contract.

Very truly yours,

WINTHROP & WEINSTINE, P.A.

Megan M. Ruwe

Suite 3500 | 225 South Sixth Street | Minneapolis, MN 55402-4629 | Main: (612)604-6400 | Fax: (612)604-6800 | www.winthrop.com | A Professional Association