**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| SKF USA INC. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Plaintiff, | : | Case No. 08 CV 4709 |
| | : | |
| v. | : | Judge Moran |
| | : | |
| DALE H. BJERKNESS, KEVIN KOCH, | : | Magistrate Judge Denlow |
| JOSEPH J. SEVER, and WALTER | : | |
| REMICK, JR. | : | |
| | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION FOR PRELIMINARY INJUNCTION**

**I.      INTRODUCTION**

Plaintiff SKF USA Inc. ("SKF") brings this action against Dale H. Bjerkness ("Bjerkness"), Kevin Koch ("Koch"), Joseph J. Sever ("Sever"), and Walter Remick, Jr. ("Remick") to enjoin Defendants' ongoing violations of their non-competition, non-disclosure, and non-solicitation agreements with SKF in its Reliability Systems business area ("SKF Reliability Systems").

All four Defendants resigned their employment with SKF to begin working for Equipment Reliability Services, Inc. ("ERS"), a company just created by Bjerkness, which directly competes with SKF.  SKF already has lost one important customer to ERS, with two more customers now considering moving to ERS.  SKF faces an immediate threat that Defendants wrongfully will sap SKF's goodwill by using their inside knowledge of SKF to drain SKF of important customers, key employees, and confidential information.   Therefore, SKF

now seeks a preliminary injunction prohibiting Defendants from soliciting business from or
doing business with SKF's customers, potential customers, and employees, and from disclosing
or using SKF's trade secrets and confidential information, as well as an order mandating the
return of all of SKF's confidential and proprietary information.

## II.    STATEMENT OF FACTS[1]

### A.    SKF's Business and Defendants' Resignations

In January 2007, SKF purchased 100% of the stock of Preventive Maintenance
Company, Inc. ("PMCI") for approximately $22 million.  SKF's Reliability Systems business, as
did its predecessor, PMCI, offers unique and highly effective methods for its industrial
customers to manage and improve the functioning of their equipment and machinery by
providing equipment monitoring and problem detection services to avoid unexpected equipment
shutdowns and to provide for scheduled maintenance.

Until recently, all Defendants were employed by SKF  and were employed by
PMCI before that.  Bjerkness' last position with SKF was Director, Reliability Services.  Koch's
last position with SKF was Reliability Engineer Manager.  Sever and Remick were Reliability
Engineers who worked at SKF's customer sites performing testing and monitoring.  Bjerkness
resigned from SKF effective May 23, 2008.  Soon after, the other three Defendants resigned
from SKF in rapid succession to work for ERS, with Koch's resignation effective June 27, 2008,
Remick's resignation effect effective July 7, 2008, and Sever's resignation effective July 15,
2008.  On May 20, 2008, while still at SKF, Bjerkness created and registered ERS as a
Minnesota corporation.

_____

[1] Plaintiff incorporates by reference all of the facts alleged in the Verified Complaint.

**B.     Defendants' Employment with SKF**

All Defendants became employees of SKF after the sale of PMCI's stock to SKF and then the merger of PMCI into SKF. In Bjerkness' high level management position, he was responsible for developing and growing sales, resources, and customer relationships in the Midwest territory with primary responsibilities to manage and develop regional key accounts, manage account profitability, and manage and sell SKF Reliability Systems products and services in the Midwest. In addition to establishing new business, Bjerkness also maintained current business, managed the SKF employees in his territory, and developed the strategic plan and regional budgets. Bjerkness also had direct responsibility for approximately 30 to 40 existing customer relationships and for more than $5 million in revenue.

The other three defendants reported to Bjerkness at SKF. Koch worked as an SKF Reliability Engineer Manager, with responsibilities including overseeing mechanical services for customers, understanding the safety requirements, equipments needs, and guidelines of each customer, ensuring efficient operation of accounts (including setting up new accounts), preparing reports and reviews of customer accounts, and identifying opportunities to expand SKF business. Remick and Sever both held Reliability Engineer positions for SKF Reliability Systems. Remick and Sever worked at clients' facilities and directly serviced clients, including Cleveland Cliffs, Northshore Mining, Liberty Paper, and Ainsworth Lumber.

**C.     Defendants' Agreements with SKF**

As a condition for their employment with PMCI, each Defendant signed an agreement containing non-compete, non-solicitation, and confidentiality provisions. (See

Exhibits A through D to Plaintiff's Verified Complaint).[2]  Among other things, after their

termination, the Agreements prohibited Defendants from (1) using or disclosing PMCI's

confidential information; (2) for two years, soliciting business or rendering services of the type

Defendants provided for PMCI to PMCI clients or prospective clients: (3) for two years,

soliciting PMCI employees to leave PMCI for a competitor; and (4) for two years, soliciting,

selling, or rendering services of the sort provided by PMCI.

      After SKF purchased PMCI, each Defendant also executed SKF's "Employee

Invention, Patent and Secrecy Agreement" ("Secrecy Agreement") that assured that Defendants

would maintain the confidentiality of SKF's trade secrets and confidential business matters, and

that Defendants would not disclose or publish SKF's trade secrets or proprietary or confidential

information.  (See Exhibits E through H to Plaintiff's Verified Complaint).

### D.    Defendants' Access to Confidential Information

      SKF purchased, in part, the confidential and proprietary information of PMCI.

PMCI, and now SKF, had and has developed confidential and proprietary methods of doing

business, valuation methods, computer programs, business ideas, billing procedures, pricing and

commission data, client names and lists, client needs and requirements, client servicing methods,

prospective clients lists, and client data.  SKF's Reliability Systems business area, products,

---

[2] By their terms, the Agreements are enforceable by SKF as corporate acquirer of PMCI.  (Id. at ¶8).  Even without this contract provision, the Agreements are enforceable by SKF, for example, under the of the Stock Purchase Agreement and Plan of Merger between SKF and PMCI, and under Illinois law, which holds that non competes in employment contracts may be enforceable by a corporate acquirer even if the employment agreement is silent on the subject.  See AutoMed Technologies, Inc. v. Eller, 160 F. Supp. 2d 915, 924 (N.D. Ill. 2001) (even when an employment contract is silent on this issue, courts often find that an acquiring corporation can enforce the acquired company's restrictive covenant).

services and business operations incorporate and are based on the Confidential Information, all
of which PMCI and SKF developed and acquired through great time, effort, and cost.

       Defendants had access to, and frequently used, SKF's Confidential Information.
Defendants were introduced to customers and potential customers of SKF and PMCI in the
Midwest region and, with their employer's assistance and resources, developed and nurtured
those customers. All Defendants also developed knowledge of SKF's business, personnel,
products, services, know-how, and customers. Bjerkness participated in the development of
SKF's Confidential Information through marketing and sales meetings and by serving SKF's
customers and prospective customers. As recently as February and April 2008, Bjerkness
attended meetings with international and national SKF leaders where global and national
business strategies, hiring strategies, sales strategies, specific needs of prospective customers,
and current and future business were discussed and analyzed.

       **E.**    **Bjerkness' Competing Business and Defendants' Competitive Activities**

       Shortly before resigning, Bjerkness registered ERS, which directly competes with
SKF. Nevertheless, he lied to his supervisors before leaving SKF and told them that he was
taking the Summer off to go fishing. SKF has learned that Defendants Koch, Sever, and Remick
are working for Bjerkness with job responsibilities almost identical to those they held with PMCI
and SKF.[3] In addition to the three employees he already has taken from SKF in recent weeks,
Bjerkness has continued to contact other SKF employees and actively is seeking other employees
for his company.

---

    [3] In response to pre-litigation correspondence from SKF's counsel, none of the defendants
have denied that they are engaged in such activity. See Exhibits K, N, and O to Plaintiff's Verified
Complaint.

Beside soliciting – and successfully inducing – SKF employees to leave SKF, Bjerkness also has solicited business from current and long-standing SKF customers, including Wausau Paper; Case Corporation; Liberty Paper; White Earth; and Cleveland Cliffs. Several of Bjerkness' efforts to date have been successful. SKF has been informed by two long-term customers, Liberty Paper and Kraft, that each is placing its contract on hold, apparently to consider contracting with Bjerkness and ERS. And a long-term SKF customer, Ainsworth Lumber Company, has canceled its contract (valued at approximately $85,000 per year) with SKF and has given its business to Bjerkenss and ERS. Defendants are intimately familiar with Ainsworth because Remick spent several years on-site at Ainsworth while with PMCI and SKF.

Defendants Bjerkness and Koch still possess SKF property and SKF believes that they will use it to compete with SKF. For example, Bjerkness has not returned at least one CD containing confidential meeting presentations, and still possesses an index card file, business cards relating to SKF customers, outstanding customer proposals, customer drawings, customer files and two vibration poles (serial numbers 511 and 542). In addition, analysis of Koch's computer revealed an unusual frequent use of USB storage devices, including a hard drive, in the days leading up to his resignation. Until SKF examines the USB devices, SKF cannot know for certain whether Defendants have downloaded SKF trade secret information. Despite a request, Mr. Koch has not returned those devices. SKF reasonably believes it faces an immediate threat of disclosure and misuse of SKF trade secret information that was copied to Mr. Koch's USB devices and this transfer of information likely occurred in the days leading up to his resignation.

## III.    ARGUMENT

Defendants' Agreements are "governed in all respects by the substantive laws of the State of Illinois without reference to the choice of law provisions of Illinois or any other

state" and "any disputes arising under this Agreement shall be tried in the Courts sitting within the State of Illinois, and Employee hereby consents and submits his or her person to the jurisdiction of any such Court for such purpose." (Exhibits A through D to Plaintiff's Verified Complaint, Agreements ¶ 10). Therefore, Illinois law applies;[4] there is personal jurisdiction over each Defendant in Illinois;[5] and venue in Illinois is proper.

As set forth in Defendants' Agreements, SKF cannot be adequately compensated by money damages for breaches of the provisions outlined above. Unless enjoined, Defendants will continue to violate the Agreements and SKF will suffer irreparable harm. Thus, SKF is entitled to preliminary injunctive relief pending resolution of this lawsuit.[6]

### A.    SKF is Likely to Succeed on the Merits

#### 1.  Defendants' Agreements are Enforceable

Under Illinois law, restrictive covenants are enforceable and relief by injunction is proper where they (1) are ancillary to valid contracts supported by adequate consideration; (2) are reasonable as to time and territory; and (3) are reasonable and necessary to protect an employer's legitimate business interest. Diamond Blade Warehouse, Inc. v. Paramount Diamond

---

[4] See Labor Ready, Inc. v. Williams Staffing, LLC, 149 F. Supp. 2d 398, 405 (N.D. Ill. 2001) ("under Illinois law, a court will enforce a contractual choice of law provision unless the law to be applied is 'repugnant to a strong and fundamental policy of Illinois' or there is no relationship between the parties and the state whose law is to be applied.").

[5] It is well settled that forum selection clauses are "prima facie valid and should be enforced absent a showing that enforcement would be unjust or unreasonable." IFC Credit Corp. v. Aliano Brothers General Contractors, Inc., 437 F.3d 606, 611 (7th Cir. 2006) (citing Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972)).

[6] A plaintiff is entitled to preliminary injunctive relief when it establishes that: (1) it has a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm absent injunctive relief; (4) the harm to the plaintiff outweighs the harm that the defendant will suffer if the injunction is granted; and (5) the injunction will not harm the public interest. Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006).

Tools, 420 F. Supp. 2d 866, 870 (N.D. Ill. 2006). The restrictive covenants in Defendants'
Agreements satisfy all three of these requirements.

First, each Defendant entered into his Agreement with PMCI before and as a
condition of his employment. See Lawrence & Allen v. Cambridge Human Resource Group,
Inc., 292 Ill. App. 3d 131, 137, 685 N.E. 2d 434, 442 (Ill. App. 2nd Dist. 1997). Second, the
Agreements are reasonable as to time and territory. Two-year restrictions often are upheld under
Illinois law, as are geographic restrictions, such as here, that cover areas "coextensive with the
area in which [SKF] is doing business." Id. (citing cases holding that two-year time restriction in
a covenant not to compete was reasonable "since it took the employer 'a great deal of time' to
acquire and maintain clients" and noting "the underlying policy behind this doctrine in Illinois
law is that the employee should only be excluded from doing business in the territorial zone in
which relationships with the employer's customers could have been established in ways that
could be detrimental in the hands of a competitor") (citations omitted).

Third, the restrictions imposed by the covenant – that Defendants not use for their
own benefit SKF's trade secrets and confidential information; that Defendants not solicit SKF
employees to leave to work for a competitor; and that Defendants not solicit SKF customers –
are reasonably necessary to protect SKF's legitimate business interests. A legitimate business
interest exists where: (1) the employee gained confidential information through his employment
that he attempted to use for his own benefit; or (2) because of the nature of the business, the
customers' relationships with the employer are near-permanent and the employee would not have
had contact with the customers absent the employee's employment. Id. at 443. SKF has legally
protectible interests both in its confidential information and in relationships with its clients.

As described, PMCI and SKF provided confidential information to Defendants during their employment, and Defendants' intent to use this information interferes with SKF's protectible interests. SKF's trade secrets and confidential information include its methods of doing business; valuation methods, computer programs, business ideas; billing procedures; pricing and commission data; client names and lists; clients needs and requirements; client servicing methods; prospective clients lists; and compilations of client data, to which Defendants had access. Illinois law recognizes that "trade or business secrets and other confidential information" are legitimate business interests. See Lawrence & Allen, Inc., 685 N.E. 2d at 443.

"[W]hile an employee, at the termination of his employment, can take with him general skills and knowledge acquired during the course of his employment, he may not take confidential particularized information disclosed to him during the time the employer-employee relationship existed which are unknown to others in the industry and which give the employer advantage over his competitors." Burt Dickens & Co. v. Bodi, 144 Ill.App.3d 875, 879, 494 N.E. 2d 817, 819 (Ill. App. 1st Dist. 1986). Here, the information that SKF seeks to protect (i.e., SKF's clients needs and requirements, client servicing methods, employee testing and certification procedures, prospective clients lists, and compilations of client data) is precisely the type of information that gives SKF an advantage over its competitors and that is known by Defendants only because of their employment with PMCI and SKF. See Tower Oil & Technology Co. v. Buckley, 99 Ill. App. 3d 637,643, 425 N.E. 2d 1060, 1066 (Ill. App. 1st Dist. 1981) ("prior knowledge of the needs of a prospect, the type of products which would satisfy these needs, and the proper application of these products would certainly assist a salesman in persuading the prospect to change its supplier"); Donald McElroy, Inc. v. Delaney, 72 Ill. App. 3d 285, 291, 389 N.E. 2d 1300, 1306 (Ill. App. 1st Dist. 1979) ("access to information about

equipment, recovery capabilities, yield figures, bidding procedures and suppliers' requirements"
coupled with "close personal involvement with the defendant's suppliers" was "inside
information [that] could possibly give defendant an unfair advantage in bidding against plaintiff
[for competing work]"). Here, too, highly confidential information about SKF's customers'
requirements, servicing methods, employee certification and testing procedures, equipment, and
safety procedures gives Defendants, and their employer ERS, an unfair competitive advantage in
winning over SKF customers. It is clear from SKF's recent loss of one customer, and the
possible loss of two others, that Defendants have used this information for their own benefit.

      SKF also has a protectible and recognizable interest in its long-standing customer
relationships. Several factors are considered in determining whether a near-permanent
relationship exists between an employer and its customers: the time, cost, and difficulty
involved in developing and maintaining the clients; the parties' intention to remain affiliated
indefinitely; and the continuity as well as the duration of the relationship. See McRand, Inc. v.
Van Beelen, 138 Ill. App. 3d 1045, 486 N.E. 2d 1306 (Ill. App. 1st Dist. 1985).

      SKF's customers are near-permanent, as they have been with SKF and PMCI for
many years. SKF's success depends upon the relationships it fosters and substantial goodwill
with its long-term customers. SKF Reliability Systems typically provides services to its
customers pursuant to purchase orders for service, many of which renew automatically.[7] SKF
Reliability Systems also enters into long-term contracts for service with many large customers,
with three to five year commitments as the average length of those contracts. For the majority of
its customers, a full time SKF employee is on the customer's site to provide continuous

---

[7] The average annual purchase order for SKF Reliability Systems services is approximately
$175,000 to $200,000, with some purchase orders in excess of $1 million per year.

oversight, management, analysis, and customer service. As a result, SKF personnel become intimately familiar with the customers' business, equipment, safety standards, and needs. But for their employment with SKF, Defendants would not know this information and, without Defendants' inside knowledge, it would be difficult for them to know SKF's customers and the locations of the customers for whom SKF provides services.

SKF's relationship with its customers, particularly those in the Midwest, is extremely strong and it is apparent that many of the customers' intentions is to do business indefinitely. Approximately 90% of SKF Reliability Systems customers renew their agreements with SKF. Of those customers that do not renew their SKF agreements, the cause generally is plant shut downs or other facility-related issues, not because the customer has gone to an SKF competitor. In fact, in 2007, only one customer (out of $9 million of business) in the Midwest did not renew its SKF Reliability Systems agreement. It thus is evident that SKF's customer relationships and goodwill are of paramount importance to SKF.

### 2. Defendants Have Breached their Agreements

Each Defendant has breached his SKF/PMCI Agreements in multiple ways. First, Bjerkness, in violation of paragraph 3 of the Agreement, induced Koch, Remick, and Sever to terminate their employment to work for ERS. Apparently still actively seeking employees for his ERS, Bjerkness continues to call SKF employees and to attempt to induce SKF employees to quit their employment to work for ERS. Second, Bjerkness has breached paragraph 3 of his Agreement by establishing ERS, a business that directly competes with SKF, in the same territory and for the same customers he serviced at SKF. Third, each Defendant has breached paragraph 3 of this Agreement by working for ERS. Finally, Bjerkness and Koch have breached their Agreements by failing to return SKF property.

### 3. Bjerkness Tortiously Interfered With the Other Defendants' Contracts

SKF also is likely to succeed on the merits of its tortious interference with contract claim against Bjerkness. To establish tortious interference with a contract, SKF must prove: (1) a valid contract between SKF and a third party; (2) that Bjerkness was aware of the contract; (3) that Bjerkness intentionally induced the third party to breach the contract; (4) in doing so, Bjerkness acted without justification; and (5) Bjerkness caused harm to the plaintiff. Poulos v. Lutheran Social Services of Illinois, Inc., 312 Ill. App. 3d 731, 742, 728 N.E. 2d 547, 557 (Ill. App. 1st Dist. 2000).

Each of these elements is satisfied. As discussed above, Defendants' Agreements are valid. Bjerkness knew about the other Defendants' contracts with PMCI and SKF, as he was their supervisor and had an identical contract. Bjerkness hired all three of the other defendants away from SKF to work for ERS, which has caused and will continue to cause harm to SKF, as SKF risks losing substantial business and information to Bjerkness' new company.

### 4. SKF is Likely to Succeed on its Trade Secrets Claim

Defendants possess and inevitably will disclose SKF's trade secrets during their ERS employment. To state a claim under the Illinois Trade Secrets Act ("ITSA"), SKF must show that the information was: "(1) a trade secret; (2) misappropriated; and (3) used in the defendant's business." Strata Mktg. Inc. v. Murphy, 317 Ill. App. 3d 1054, 1068, 740 N.E. 2d 1166, 1176 (Ill. App. 1st Dist. 2000). All three of these elements are present.

#### a.     Defendants Possess SKF's Trade Secrets

ITSA defines "trade secrets" as "information" that "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are

reasonable under the circumstances to maintain its secrecy or confidentiality." 765 Ill. Comp. Stat. 1065/2(d) (2006).

As discussed above, SKF has significant Confidential Information, including confidential and proprietary methods of doing business, valuation methods, computer programs, business ideas, billing procedures, pricing and commission data, client names and lists, clients needs and requirements, client servicing methods, prospective clients lists, client data and information about employee testing and certification procedures. SKF has invested significant resources into developing its confidential information and derives substantial economic value from keeping secret the information known by Defendants.

**b.    Defendants Inevitably Will Disclose SKF's Trade Secrets in Their New Employment with ERS**

Defendants' actions threaten to misappropriate SKF's trade secrets, which would inevitably be disclosed and used at ERS. Misappropriation occurs when an employee acquires a trade secret through "improper means," such as theft, bribery, and breach of a confidential relationship, or an employee discloses a trade secret without express or implied consent. 765 Ill. Comp. Stat. 1065/2 (2006). Under the plain language of the Act, "[a]ctual or threatened misappropriation may be enjoined." Id. at 1065/3.

Computer analysis shows that SKF's Confidential Information was copied or transferred to CD's, jump drives and external computer drives and that this may be used in Defendants' new business. And, Defendants already have begun their work with ERS, thereby threatening to misappropriate SKF's trade secrets. Illinois has adopted the "inevitable disclosure" doctrine. See Strata Mktg., 740 N.E. 2d at 1177-78. Under this doctrine, "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on plaintiff's trade secrets." Id. (quoting PepsiCo

Inc. v. Redmond, 54 F.3d 1262, 1269 (7th Cir. 1995)). When an employee takes a job requiring

a similar knowledge base at a new company, the risk of inevitable disclosure is "acute." See

PepsiCo, 54 F.3d at 1270-71 (holding that employee would inevitably disclose trade secrets

when new job required similar duties and covered similar areas as old job). Such a risk exists

here, as Defendants possess SKF's confidential information and nonetheless took (or in

Bjerkness' case *created*) jobs very similar, if not identical, to their former SKF positions. They

will need and inevitably will use, among other things, SKF's confidential equipment testing

protocols and employee certification material in their new employment.

### B.    SKF Will Suffer Irreparable Harm and Has No Adequate Remedy

SKF will suffer irreparable harm if Defendants continue to violate the

Agreements. Where, as here, trade secrets are involved, the threat is significant that the harm

experienced will be irreparable. See IDS Fin. Servs., Inc. v. Smithson, 843 F. Supp. 415, 418

(N.D. Ill. 1994) (competitive injuries and loss of goodwill difficult to quantify). When SKF

purchased PMCI, it purchased the Confidential Information that was developed by PMCI. The

value of SKF's purchase of PMCI is jeopardized by Defendants' conduct and will continue to be

jeopardized if Defendants are not enjoined.

Additionally, loss of business relationships with customers and vendors can

constitute irreparable harm because such relationships are difficult or impossible to rebuild.

Diamond Blade Warehouse v. Paramount Diamond Tools, 420 F. Supp. 2d 866, 872 (N.D. Ill.

2006). SKF's customer relationships, goodwill and competitive position already have been

irreparably harmed by Defendants' conduct, and they will suffer further irreparable injury if

Defendants' unlawful activities are not enjoined.

### C.    The Balance of Harms Favors Granting a Temporary Restraining Order

Refusing the requested injunction would allow Defendants to continue breaching freely executed contracts and violating their legal duties to SKF, resulting in continued irreparable injury to SKF, while granting the injunction would merely restrain unlawful conduct by Defendants.  The immediate grant of injunctive relief will merely restore the parties to the status quo existing prior to Defendants' breaches of the Agreements and other illegal conduct.

### IV.    CONCLUSION

For the foregoing reasons, SKF requests that the Court grant its Motion and issue a preliminary injunction in the form submitted.  SKF also requests that the Court schedule a prompt hearing on its Motion for Preliminary Injunction and, thereafter, continue the injunction pending a trial on the merits.

Dated:  August 19, 2008

Respectfully submitted,

_s/ Ernesto R. Palomo_____
Terrence P. Canade (# 06196823)
Ernesto R. Palomo (# 06278186)
Locke Lord Bissell & Liddell LLP
111 South Wacker
Chicago, IL  60606
(312) 443-1862 (T.P. Canade)

Stephen J. Sundheim
Elizabeth S. Campbell
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

Attorneys for Plaintiff
SKF USA Inc.

-15-

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 19, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the following:

**Terrence Patrick Canade**
tcanade@lockelord.com

**Ernesto R. Palomo**
epalomo@lockelord.com

The undersigned hereby certifies that, on August 20, 2008, I caused a true and correct copy of the foregoing to be served via hand delivery on the following non-CM/ECF participants:

Stephen J. Sundheim
Elizabeth S. Campbell
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4000

Kevin Koch
713 Bourgin Road
Virginia, MN 55792

Walter Remick, Jr.
1200 Augusta Drive NE
Bemidji, MN 56601

Dale H. Bjerkness
11342 Sorenson Lake Lane
Merrifield, MN 56465

Joseph J. Sever
11751 West River Hills Drive, Apt. 215
Burnsville, MN 55337

   s/ Ernesto R. Palomo
Ernesto R. Palomo