**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SKF USA, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 08 C 4709** |
| | ) | |
| **DALE H. BJERKNESS, KEVIN KOCH,** | ) | **Judge Rebecca R. Pallmeyer** |
| **JOSEPH J. SEVER and** | ) | |
| **WALTER REMICK, JR.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM OPINION AND ORDER

For over thirty years, Preventive Maintenance Company, Inc. ("PMCI") provided so-called "reliability services"—essentially, the monitoring and maintenance of factory machines and equipment—for its customers. In January 2007, Plaintiff SKF USA ("SKF") purchased PMCI's stock and merged PMCI's business operations into SKF's Reliability Systems division. Defendants Dale Bjerkness, Kevin Koch, Joseph Sever, and Walter Remick all worked for PMCI prior to the merger and continued to work for SKF for approximately a year and a half after the merger. In May 2008, Bjerkness left SKF and started his own reliability services firm, Equipment Reliability Services, Inc. ("ERSI"). In the following months, the other Defendants also left SKF to work with Bjerkness at ERSI. In August 2008, SKF filed a complaint in this court, alleging that Defendants breached employment agreements with SKF, violated the Illinois Trade Secrets Act ("ITSA"), and committed various other torts. SKF moved for a preliminary injunction, and Defendants in turn moved to dismiss part of the Amended Complaint. The court now addresses both motions; for the reasons explained here, each is granted in part and denied in part.

## FACTUAL BACKGROUND[1]

SKF's Reliability Systems, as did its predecessor, PMCI, performs various services, generally called "reliability services," for industrial customers. Through a program of monitoring the performance of the customer's machinery, SKF is able to provide basic maintenance for the equipment, suggest ways to improve its functioning, and detect problems to avoid unexpected equipment failures. Dale Bjerkness began working for PMCI in 2001 as a sales engineer in Minnesota. (Am. Compl. ¶ 19.) After several promotions, the last role Bjerkness held was as Director for SKF Reliability Systems, a role in which he was responsible for increasing sales and managing customer relationships in the Midwest. (*Id.* ¶¶19-20.) Kevin Koch was hired by PMCI in 1998, and was working as a Reliability Engineer Manager at the time he resigned, overseeing the mechanical services for customers and supervising engineers who were out at customers' job sites. (*Id.* ¶¶ 26-27.) Joseph Sever and Walter Remick, who began working for PMCI in 2003 and 2006, respectively, both worked as Reliability Engineers at the time of their resignations, and were responsible for actually performing the work at their customers' sites. (*Id.* ¶¶ 30, 32, 33.)

At PMCI, each Defendant signed an employment agreement (the "PMCI Agreement") which restricted them from competing with PMCI or soliciting PMCI's customers. (Pl.'s Ex. 11.) In pertinent part, the PMCI Agreement provided:

> [A]ll business relationships and goodwill now existing with respect to the clients of PMCI, whether or not created by Employee, and all such relationships and goodwill which may hereafter be created or enhanced, at all time [sic] remain the sole

---

[1] A motion for preliminary injunction and a motion to dismiss take into account different facts. While a court deciding a motion to dismiss is limited to the facts presented in the complaint and must accept those facts as true, *see Sprint Spectrum L.P. v . City of Carmel*, 361 F.3d 998, 1001 (7th Cir. 2004), a court considering a preliminary injunction is permitted to conduct an evidentiary hearing and make determinations based on the evidence. *See* Fed. R. Civ. P. 65(a); *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). In recounting the facts in this section and in analyzing the motion for a preliminary injunction, the court does not limit itself to the facts as alleged in the Amended Complaint, but does so limit itself in its analysis of the motion to dismiss.

property of PMCI. Accordingly, Employee agrees that during the term of this Agreement and for a further period of two years beginning on the termination of Employee's employment with PMCI, Employee shall not, under any circumstances . . . solicit business or sell or render services of the sort provided by PMCI to any client for which PMCI or its Employee has rendered services or to any prospective client that Employee has solicited to provide services of the sort provided by PMCI or about whom Employee has learned confidential information during the twelve (12) months preceding Employee's separation from PMCI; nor shall Employee, directly or indirectly, aid or assist any other person, firm or corporation to do any of the aforesaid acts.

(PMCI Agreement at 3(a), SKF Ex. 34.) Similar provisions prohibited PMCI employees from "solicit[ing] or induc[ing] any employee of PMCI to leave PMCI's employ for any employment in a line of business similar to that conducted by PMCI." (*Id.* at 3(b).) The PMCI Agreement also states that it "shall be binding upon and shall inure to the benefit of the parties hereto and their respective . . . successors, and assigns." (*Id.* at 8.) Finally, the Agreement also provides that it "may be amended only in writing." (*Id.* at 5.)

After SKF purchased 100% of PMCI's stock and merged PMCI into SKF's Reliability Systems, Defendants were asked to (and did) sign a new agreement, the Employee Invention, Patent, and Secrecy Agreement ("SKF Agreement"). (Am. Compl. ¶ 8.) Although the SKF Agreements were not signed until 2008, they were all backdated to reflect an effective date of January 4, 2007, the date of the merger. The SKF Agreement provides:

Employee agrees that he will not in any way during his employment and at any time thereafter, without SKF's written approval, disclose or publish to any unauthorized person, firm or corporation any technical or proprietary information, trade secrets and confidential business matters, including but not limited to, secret processes, formulae, sequences, equipment, research items and results, drawings, prints, customer lists, costs, technical sales and marketing programs. All documents, memoranda, reports, prints, and drawings, including all copies thereof in respect of the above items, are the sole and entire property of SKF which Employee will surrender to SKF upon any termination of employment with SKF . . . .

(Pl.'s Ex. 36.) The SKF Agreement makes no reference to the PMCI Agreement, nor does it explain what effect, if any, it may have on any other agreements then in effect. Kathy Comp, a former

PMCI official and the human resources contact at the Elk Grove Village, Illinois branch of SKF, told Bjerkness and others that the SKF Agreement superseded or replaced the PMCI Agreements.

The events at issue here occurred in the spring and summer of 2008, after the signing of the SKF Agreements. Bjerkness was particularly dissatisfied with his new employer, feeling that SKF was reneging on promises both to himself and to the employees who reported to him (including the other Defendants) regarding promotions and pay increases. On May 12, 2008, Bjerkness tendered his resignation to SKF, effective May 23, 2008. Over the next two months, Koch (June 27), Remick (June 7), and Sever (July 15) all resigned from SKF as well.

Before Defendants left SKF, they transferred thousands of documents from their SKF computers to their own storage devices.[2] Although Defendants transferred some files to external hard drives that can be plugged directly into a computer's USB port, they mostly used other USB devices known as "thumb drives." These thumb drives—so called because they are about the size of a thumb—can be plugged into almost any computer and used to store or transfer gigabytes of information. Defendants claim that much of what they intended to transfer was simply personal information that was stored on their work computers; it is undisputed, however, that they also transferred some work documents that, according to SKF, constitute confidential information and/or trade secrets. Defendants claim that they could easily have generated all the information that they transferred on their own, and that copying that information provided simply a "shortcut." (*E.g.*, Tr. 182.) Defendants concede, however, that they were not authorized by anyone at SKF to make these transfers, nor did they inform anyone at SKF that they were doing so. The evidence shows that the transferred material includes, among other things, customer pricing information, customer databases, machine and equipment reports, and training materials. Defendants were able to

---

[2]    According to Plaintiff's expert, Bjerkness transferred approximately 1,700 files to a thumb drive on May 23, his last day, and Koch similarly transferred 7,000 files on June 19. Remick and Sever also copied files to personal hardware after announcing their resignations.

retrieve this material from the SKF computers assigned to them. In addition many of the transferred documents had been occasionally "docked" on SKF's File Transfer Protocol website ("FTP"), a password-protected website that SKF employees use to share documents. The FTP allowed users who had the password—a password which, SKF concedes, it did not change when employees left SKF—to post documents, reports, and databases on the website so that other employees could access the information. Documents generally did not remain on the FTP for more than a few days.

Although Bjerkness's resignation was not effective until May 23, Bjerkness filed the necessary paperwork to establish ERSI on May 20. When Bart Bartholomew, who succeeded Kathy Comp as head of HR at the Elk Grove Village facility, asked Bjerkness what he was planning to do after leaving SKF, Bjerkness responded by saying that he planned to take some time to go fishing. Bartholomew nevertheless offered to pay Bjerkness one year's salary in exchange for Bjerkness's signing a one-year non-compete agreement, but Bjerkness declined. The other three Defendants were not asked to sign non-competes, but did, like Bjerkness, begin working for ERSI immediately after their resignations at SKF became effective. In its first few months of operation, ERSI signed at least four customers in Minnesota and Iowa who were, up until that point, SKF customers. Plaintiff considers these customers "stolen"; Defendants, on the other hand, maintain that they were attracted by Bjerkness's salesmanship and determination and ERSI's overall skill level.

On August 19, 2008, SKF filed its complaint in this court,[3] and shortly thereafter moved for entry of a preliminary injunction enjoining ERSI from, among other things, competing with SKF for two years. On December 9, 2008, just before the conclusion of the preliminary injunction proceedings, Defendants filed a motion to dismiss, seeking dismissal of Counts IV through VI of

---

[3] This case was originally filed before Judge Moran, who heard several of the early days of testimony during the preliminary injunction hearing. By Executive Order dated November 5, 2008 [61], the case was transferred to this court, and the injunction hearing was concluded in the ensuing weeks.

Plaintiff's Amended Complaint. For the reasons that follow, both motions are granted in part and denied in part.

**DISCUSSION**

*Preliminary Injunction*

A party moving for a preliminary injunction must demonstrate "(1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) [that] an irreparable harm will result if the injunction is not granted." *Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007) (quoting *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003)). If these criteria are established, the court then must weigh the irreparable harm the plaintiff is likely to suffer against the harm the defendants will suffer if the injunction is granted. *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005).

Plaintiff seeks an injunction against several different activities by Defendants. First, and most significantly, SKF asks the court to enjoin Defendants from performing services for any entity or individual that was a client or potential client of SKF immediately preceding Defendants' resignations. Second, Plaintiff requests that the court prohibit Defendants from soliciting or inducing any current SKF employee to leave SKF and go to work for ERSI. Third, SKF seeks to enjoin the Defendants from using or disclosing any SKF trade secrets or proprietary information. Finally, Plaintiff seeks an order requiring Defendants to return any documents or electronic media that contain trade secrets or proprietary information. SKF argues that it is entitled to injunctive relief based on the provisions of the PMCI Agreement, the SKF Agreement, and the Illinois Trade Secrets Act ("ITSA"). The court considers each of Plaintiff's legal theories in turn before considering what relief, if any, is appropriate.

**I.    PMCI Agreement**

The non-compete clause in the PMCI Agreement is the primary source for SKF's contention that Defendants are barred from competing with SKF in the upper Midwest. Whether the court can

6

enter an injunction prohibiting Defendants from running their business in this part of the country thus depends upon the validity of that contract.

As noted above, the PMCI Agreements contain provisions stating that it is enforceable by successors and assigns, and that any amendment to the Agreements must be made in writing. (PMCI Agreement at 5, 8, Pl.'s Ex. 34.) Defendants nevertheless contend that the Agreement is not binding because SKF officials waived any right they had to enforce the non-competition provisions of the PMCI Agreements by representing to Defendants that the provisions no longer applied after Defendants signed the Employee Invention, Patent and Secrecy Agreement with SKF. In Illinois,[4] courts may imply waiver of a contract provision "if a party indicates by its conduct that compliance with a particular provision is not required." *Midwest Builder Distrib., Inc. v. Lord & Essex, Inc.*, 383 Ill. App.3d 645, 674, 891 N.E.2d 1, 28 (1st Dist. 2007); *see also LaSalle Bank Nat'l Ass'n v. Paramont Props.*, 588 F. Supp. 2d 840, 854 (N.D. Ill. 2008) ("The law is clear that a party to a contract is free to waive conditions precedent which are solely for its benefit."). In order for a court to find a waiver of a contractual right, "the facts must indicate that the party knowingly relinquished that right." *C-B Realty & Trading Corp. v. Chicago and North Western Ry. Co.*, 289 Ill. App. 3d 892, 899, 682 N.E.2d 1136, 1142 (1st Dist. 1997). When the contract in question contains a clause requiring all amendments to be in writing, as the PMCI Agreement does, waiver is still possible, but the waiver must be proved by clear and convincing evidence. *Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 78 F.3d 266, 277 (7th Cir. 1996).

---

[4]     The PMCI Agreement states that it "shall be governed in all respects by the substantive laws of the State of Illinois." (PMCI Agreement at 10, SKF Ex. 34.) Illinois law therefore clearly applies to the interpretation of this contract. *See Labor Ready, Inc. v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 405 (N.D. Ill. 2001). The parties also briefed their motions under the assumption, without discussion, that Illinois law applies to the other claims, under both the SKF Agreement and state law. Given the parties' apparent agreement and the substantial contacts they have with the state of Illinois, including the fact that SKF Reliability Systems is based in Illinois, the court applies Illinois law throughout. *See Gramercy Mills, Inc. v. Wolens*, 63 F.3d 569, 572-73 (7th Cir. 1995) (concluding Illinois has most significant contacts where former employee rendered services in Illinois and the midwest).

7

Both the Defendants and current SKF employees testified that they believed the SKF Agreement superseded the PMCI Agreement, at least in regard to the non-compete provision. Koch testified at the hearing that Bjerkness told him the SKF Agreement superseded the PMCI Agreement, and later Kathy Comp confirmed that the SKF secrecy agreement replaced the PMCI non-compete, at least in the context of new hires. (Tr. 197.) Sever and Remick both testified that Jeff Hall, their supervisor at SKF, told them that the SKF Agreement superseded or replaced the PMCI Agreement. (Tr. at 664, 1066.) As for Bjerkness, both Bart Bartholomew, a Vice-President at SKF, and Comp told him that the SKF Agreement superseded the PMCI Agreement. (Tr. at 843.) Steven Wareham, a human resources manager with SKF who rejoined SKF in 2008 after leaving PMCI in 2005, verified that Comp was telling people that the SKF secrecy agreements were replacing the PMCI non-competes. (Tr. at 440.) Bartholomew's own conduct suggested that there was no non-compete in place at the time of Defendants' resignations; he testified that he asked Bjerkness to consider signing a non-compete—a request that would make little sense if the PMCI Agreement remained operative. (Tr. 543.) James Miller, who was the former president and majority shareholder of PMCI before selling all of his stock to SKF and becoming a Vice President of SKF, claims that Kathy Comp, who is his sister, told him that Wierling advised her that the SKF Agreement superseded the PMCI Agreement. (Tr. 968.)

Comp herself verified this account. On February 29, 2008, Comp e-mailed Christoph Wierling, stating, "I am assuming that [the SKF Agreement] is superseding the one that PMCI used, so the PMCI's is null and void? Some employees in the field are asking." (Defs.' Ex. 1.) Comp testified that based on Wierling's response to that e-mail, she understood that the PMCI Agreement was no longer operative once the employees signed the SKF Agreement. (Tr. at 1012.) Comp also said that she showed Bjerkness an e-mail message from Wierling confirming that the PMCI Agreement was null and void. (Tr. at 1016.) The e-mail itself was never produced, however, either in Comp's files or SKF's files, and Wierling initially testified that he never talked to Comp about

8

whether the SKF Agreement superseded the PMCI Agreement. (Wierling Dep. at 98.) Wierling later acknowledged that, though he does not remember discussing the effect of the existing PMCI Agreements with her on the telephone, he did frequently communicate with Comp by telephone, so it was not unusual for him not to respond to an e-mail from her. (*Id.* at 108-09.)

The court concludes, by clear and convincing evidence, that SKF knowingly relinquished its rights in the PMCI Agreements. Defendants were told by several parties—including Comp, Hall, and Bartholomew—that the PMCI non-compete agreements were no longer in effect after they signed the SKF Agreements. Plaintiff insists that this does not constitute a waiver because Comp was neither authorized to communicate this nor were her representations capable of effecting a waiver. While conflicting testimony clouds the question of whether Wierling told Comp that the SKF Agreement superseded the PMCI non-compete, the court is comfortable in concluding that Comp's statements to Defendants and others did constitute a waiver by SKF. In Illinois, an employee may bind her employer by her words and actions if she has either actual or apparent authority. *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 672 (7th Cir. 2004) (citing *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 326 Ill. App. 3d 126, 134, 759 N.E.2d 174, 181 (2d Dist. 2001)). As noted, it is unclear whether Comp had actual authority, as Comp and Wierling (her supervisor) dispute whether Wierling informed her that the PMCI Agreements were no longer valid. Comp did, however, possess apparent authority to inform Defendants and others that the PMCI Agreements had been superseded by the SKF Agreements. An agent will be found to possess apparent authority if:

> (1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) the third person reasonably concluded, based on the actions of the principal and agent, that the party was an agent of the principal; and (3) the third person justifiably relied on the agent's apparent authority to his detriment.

*Grillo v. Yeager Const.*, 387 Ill. App. 3d 577, 590, 900 N.E.2d 1249, 1263 (1st Dist. 2008) (citing *Career Concepts, Inc. v. Synergy, Inc.*, 372 Ill. App. 3d 395, 404, 865 N.E.2d 385, 393 (1st Dist.

2007)).  Comp handled bookkeeping matters for PMCI for over thirty years, and assumed human resources responsibilities approximately one year prior to the merger with SKF.  After the merger, she continued to handle human resources issues for SKF at the Elk Grove Village and Stevens Point, Wisconsin facilities.  Although SKF asserts that she was subordinate to Wierling, Wierling was stationed at a Pennsylvania facility and SKF has not identified another individual at the Elk Grove and Stevens Point facilities who handled human resources issues.  Thus, it appears that SKF consented to, or at least acquiesced in, Comp's exercise of authority over human resource matters at the Elk Grove Village and Stevens Point facilities.  At a minimum, Defendants could reasonably conclude that Comp was so authorized—as Koch testified, Comp was the human resources "contact" at Elk Grove.  (Tr. at 198.)  Indeed, Wierling appears to have had little contact with the employees at the Midwestern facilities; Koch testified that he did not even know that Wierling was the manager of human resources.  (Tr. at 133.)  Defendants also all appear to have reasonably relied upon this authority in signing the SKF Agreement.  Finally, to the extent that Koch, Sever, and Remick may have relied on representations made by Hall or Bjerkness, rather than Comp, concerning the SKF Agreement, the court has little trouble concluding that Hall, as Sever's and Remick's immediate supervisor, and Bjerkness, as the Director of SKF Reliability Services, possessed apparent authority to communicate the meaning of the contract to their employees.[5]

Defendants all reasonably relied on representations made by agents of SKF empowered with at least apparent authority to bind SKF that the SKF Agreement superseded the PMCI Agreement.  Hence, the court denies Plaintiff's request for an order enforcing the PMCI

---

[5]     The conclusion that Bjerkness, who is now a Defendant, possessed apparent authority to waive the PMCI Agreement while he was an SKF employee is potentially troubling.  The court has found that Comp told Bjerkness that the PMCI Agreement was superseded, however, and concludes that Bjerkness honestly believed that the PMCI Agreement was in fact superseded when he communicated that to others.

Agreement's provision barring Defendants from competing with Plaintiff for the next two years. The court also denies Plaintiff's request for an order barring Defendants from inducing current SKF employees to leave their employment and go to work for ERSI.

## II.    SKF Agreement

SKF argues that it remains entitled to an injunction preventing Defendant from competing with its customers and from using its trade secrets by virtue of the SKF Agreement signed by each Defendant. Restrictive covenants in employment agreements, such as the one in the SKF Agreement, are carefully scrutinized in Illinois "to ensure that their intended effect is not to prevent competition *per se*." *Lifetec, Inc. v. Edwards*, 377 Ill. App. 3d 260, 268, 880 N.E.2d 188, 195 (4th Dist. 2007). For a restrictive covenant to be enforceable, it must be (a) ancillary to a valid contract; (b) supported by adequate consideration; and (c) reasonable and necessary to protect the employer's legitimate business interests.[6] *See Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 870 (N.D. Ill. 2006).

### A.    Ancillarity

As a preliminary matter, the court must determine whether "the restrictive covenant is ancillary to the valid contract and subordinate to the contract's main purpose . . . [and] whether there is adequate consideration to support the restrictive covenant." *Diamond Blade Warehouse*, 420 F. Supp. 2d at 870 (quoting *Lawrence & Allen v. Cambridge Human Res. Group*, 292 Ill. App. 3d 131, 137, 685 N.E.2d 434, 440 (2d Dist. 1997)). At first glance, it appears that the SKF

---

[6]    Illinois courts also generally require that restrictive covenants in employment agreements be reasonable in time and geographical scope. The SKF Agreement, which provides for no such limits, arguably violates that requirement. *See, e.g.*, *Brown & Brown, Inc. v. Mudron*, 379 Ill. App. 3d 724, 728, 887 N.E.2d 437, 440 (3d Dist. 2008) (citing *Abel v. Fox*, 274 Ill. App.3d 811, 813, 654 N.E.2d 591, 593 (4th Dist. 1995)). The Illinois Trade Secrets Act specifically overrules this requirement in the context of trade secrets, however, stating "that a contractual . . . duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographical limitation on the duty." 765 ILCS 1065/8(b)(1).

Agreement does not meet this standard, as the Employee Invention, Patent and Secrecy Agreement is a stand-alone agreement and Plaintiffs have not produced any other employment agreement (other than the PMCI Agreement, which, as noted above, is no longer valid) to which the SKF Agreement could be subordinate. The Illinois courts have interpreted the ancillary requirement more broadly, however, and have held that a restrictive covenant is enforceable if it is ancillary to either a valid contract "*or* a valid relationship," including an at-will employment agreement. *Abel*, 274 Ill. App.3d at 820, 654 N.E.2d at 597. As various commentators have observed, the requirement of ancillarity is intended to prevent a transaction in which one merchant pays another not to compete with him, but is not meant to establish a requirement that individuals in an employment relationship erect a formalistic contract structure that clearly establishes the restrictive covenant as ancillary. *Id.* at 816-17, 654 N.E.2d at 595 (citing II E. Farnsworth, Contracts § 5.3, at 18 (1990); RESTATEMENT (SECOND) OF CONTRACTS §§ 187-88 (1981)). The SKF Agreement, made pursuant to the ongoing employment of the Defendants, easily satisfies this broader understanding of the ancillarity requirement.

### B. Consideration

The SKF Agreement also meets the requirement that adequate consideration support the restrictive covenant. The Agreement recites that the parties entered into it "[i]n consideration of the covenants herein recited, of the Employee's affiliation and activities with SKF and the compensation paid by SKF to Employee." (Pl.'s Ex. 22.) Additionally, Defendants understood that they had to sign the Agreement to continue working at SKF. (*E.g.* Tr. at 1065.) "Continued employment for a substantial period of time" meets the requirement that a restrictive covenant be supported by adequate consideration. *Lawrence & Allen*, 292 Ill. App. 3d at 138, 685 N.E.2d at 441 (two years of continued employment sufficient). Here, Defendants were not employed for a substantial period of time after they signed the agreements; Remick, for example, resigned just three weeks after signing the SKF Agreement. This cannot undermine the validity of the Agreement, however,

because the short period of employment was the result of Defendants resignations, not any action taken on the part of SKF. Nothing in the record suggests that SKF had any intention of forcing Defendants to resign prior to the passing of a "substantial period of time." Essentially, Defendants declined to accept the full consideration that they were offered for signing the restrictive covenant—namely, continued employment for a reasonable length of time. This cannot be considered a failure of consideration attributable to the employer. *See* RESTATEMENT (SECOND) OF CONTRACTS § 75 (1981) ("a promise which is bargained for is consideration if, but only if, the promised performance would be consideration"). The SKF Agreement therefore meets the requirement of adequate consideration.

## C. Legitimate Business Interest

Illinois recognizes two kinds of legitimate business interests: preservation of confidential information acquired by the employee during his employment that the employee later attempts to use for his own gain; and customer relationships that, by the nature of the employer's business, are "near permanent and the employee would not have had contact with the customer absent his employment."[7] *Lifetec*, 377 Ill. App. 3d at 269, 880 N.E.2d at 196. The court concludes that substantially all of the information at issue is confidential, and so the court declines to consider the status of the customer relationships.

### 1. Confidential Information

The heart of the case revolves around the question of whether Defendants improperly took

---

[7] At least one justice on the Appellate Court of Illinois believes that the legitimate business interest test no longer applies in Illinois based on an ambiguous recent Illinois Supreme Court case. *Lifetec*, 377 Ill. App. 3d at 275-65, 880 N.E.2d at 200-01. (Steigmann, P.J., concurring). Every appellate district in the state continues to use the test, however, and the court concludes that the test still applies in Illinois state courts. *Accord Giffney Perret, Inc. v. Matthews*, No. 07 C 869, 2009 WL 792484, at *6 (N.D. Ill. Mar. 24, 2009); *AMFM Broadcasting, Inc. v. Osowiec*, No. 08 C 1519, 2008 WL 4542969, at *1 n.2 (N.D. Ill. Apr. 11, 2008) ("I hesitate to predict that the Supreme Court of Illinois would abandon the test used by every district of the appellate court in Illinois for decades.").

and used confidential information from SKF. SKF maintains that Defendants downloaded proprietary information from SKF's system onto hard drives and thumb drives and improperly used that information to "jump start" their own competing business. Defendants argue both that the information they took was not confidential and that to the extent any of it might have been confidential, they did not actually use the information in their business.

The SKF Agreement applies to "SKF's trade secrets *and* confidential business matters." (Pl.'s Ex. 22 (emphasis added).) In their filings in this court, however, Defendants devote a substantial amount of argument to rebutting Plaintiff's claim that the information constitutes trade secrets, without addressing whether the information is covered by the SKF Agreement. While there may be substantial overlap between confidential information and trade secrets, "an enforceable restrictive covenant may protect material not properly characterized as a trade secret" and thus affords broader protection than trade secret law does. *Smith Oil Corp. v. Viking Chem. Co.*, 127 Ill. App. 3d 423, 427, 468 N.E.2d 797, 800 (2d Dist. 1984); *see also AMP, Inc. v. Fleischhacker*, 823 F.2d 1199, 1201 (7th Cir. 1987).[8] In Illinois, confidential information is "particularized information disclosed to [the employee] during the time the employer-employee relationship existed which [is] unknown to others in the industry and which give[s] the employer advantage over his competitors." *Lifetec*, 377 Ill. App. 3d at 270, 880 N.E.2d at 196 (quoting *Burt Dickens & Co. v. Bodi*, 144 Ill. App. 3d 875, 879, 494 N.E.2d 817, 819 (1st Dist. 1986)). A trade secret, by contrast, is information that "is sufficiently secret to derive economic value . . . from not being generally known . . . [and] is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 765 ILCS 1065/2(d). Confidential information, then, does not necessarily require positive steps by the employer to maintain the secrecy of the information, though such efforts may be relevant in the

---

[8] Although both of these cases were decided before the enactment of the ITSA, that statute did not disrupt the distinction between confidential information and trade secrets. *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) ("The ITSA does not, however, represent a major deviation from the Illinois common law of unfair trade practices.").

court's consideration of whether the information is truly confidential.

Defendants copied thousands of files from their SKF computers onto thumb drives, and attempting to catalogue all of the files would serve no purpose. Instead, the court finds useful the generic categorical breakdown made by Wareham, who sorted the copied files into the general categories of "price quotes," "databases," and "reports." (Pl.'s Ex. 4.) In this context, the court considers whether the various files constitute confidential information.

The SKF Agreement specifically includes in its definition of "trade secrets or confidential business matters" material such as "customer lists, costs, technical sales and marketing items." (Pl.'s Ex. 22.) Of the files Defendants copied, Plaintiff identified forty-six that contained price quotes. Other documents that Defendants copied are relevant for the inquiry into confidential pricing information, as well, including documents that disclose the cost per month that SKF charged a customer to service various factories and a description of the services it provided at each factory. (Pl.'s Ex. 6.1 at 8-9.) Similarly, Defendants took a copy of a document entitled "Proposal to Provide Services for Condition-Based Maintenance," a fifteen-page document which included price quotes, a list of services that SKF was offering to provide that particular customer, and other details of the proposed agreement. (Pl.'s Ex. 6.2.) Defendants also copied a document that tracked SKF's sales by customer and reveals the amounts each customer paid SKF for its reliability services in the first part of 2008. (Pl.'s Ex. 6.4.) Another document identified the prevailing rates charged to a customer, as well as the frequency with which SKF conducted inspections of the customer's various machinery. (Pl.'s Ex. 6.8.) This information readily meets the definition of confidential information. First, the information is not widely known in the industry. *See Unisource Worldwide, Inc. v. Carrara*, 244 F. Supp. 2d 977, 986 (C.D. Ill. 2003). These quotes are not generic rate information, but rather constitute customer-specific information generated by the development of some relationship with that customer, including the rates paid for specific services provided for specific factories and machines. Second, there can be no doubt that this information would provide a competitive

advantage to Defendants—knowing the prices offered by a competitor to a specific customer for a specific set of services certainly would enable a competitor to make a more attractive bid in an attempt to displace the current provider. This pricing information, then, is clearly confidential information covered by the SKF Agreement.

The databases also constitute confidential information within the meaning of the SKF Agreement. The databases (also known as .rbm files) are specific to each customer and contain a list of the equipment tested; the data points that are tested; the "routing information" that determines the order in which the machines are to be tested; the alarm levels and parameters specific to each machine to alert the technician when there is a critical variance from the machine's past performance measures. (Tr. 110-11.) As Defendant Koch admitted, gathering all the necessary historical data into this database to monitor trends and establish alarm levels may require weeks of inputting and gathering thousands of data points. (Tr. at 143.) Although he claims that it only saved about eight hours of effort, Koch acknowledged that copying the database relating to Ainsworth-Bemidji—a former SKF client that became an ERSI client—was a "shortcut." (Tr. at 183-84.) The alarm levels and parameters are especially important, as they were custom-programmed at SKF to alert the technicians and the customer to any problems in the machinery. (Tr. at 1039-40.) Even though the other information regarding performance trends was often turned over to customers, this information generally was not. (Tr. at 227.) On the only occasion either party could identify in which a customer received a copy of the database that included the parameters and alarm levels, PMCI required the customer to sign a non-disclosure agreement that, although consisting largely of boilerplate, almost certainly covered the alarms and parameters. (Def.'s Ex. 34.) Again, this information meets the criteria for confidential information: the databases are not widely known in the industry, as Bjerkness himself testified they are not available to competitors (Tr. 692); and the databases provide a competitive advantage by allowing a new company to meet a customer with full knowledge of the past performance of its machines, as well

16

as alarms and parameters.

The final category of information taken by Defendants consists of a broad range of reports that, generally speaking, provide data regarding how various machines are performing. Much of this information is contained in the databases or can be generated from the databases. The biggest difference between these reports and the databases themselves is that while the databases, and especially the alarms and parameters, were generally not shared with the customers—and when they were shared, they were accompanied by a non-disclosure agreement—the reports were frequently provided to customers without any non-disclosure agreement. In fact, one of the main purposes of the reports appears to be providing the customer with a general summary of the inspection results and how the customer's machines are operating. As a result, customers were presumably free to share this information with potential SKF competitors. The court nevertheless concludes that these reports are confidential information within the contemplation of both the SKF Agreement and Illinois law. Defendants' argument, that the ability of customers to share the information means it is not confidential, has been explicitly rejected by Illinois courts. As one court stated: "whatever the ease with which the public may acquire the information . . . [from] clients, the preeminent advantage of [the reports] is that they gather the information in one place." *The Agency, Inc. v. Grove*, 362 Ill. App. 3d 206, 219, 839 N.E.2d 606, 617-18 (2d Dist. 2005) (citing *Lyle R. Jager Agency, Inc. v. Steward*, 253 Ill. App.3d 631, 625 N.E.2d 397 (3d Dist. 1993)); *see also Lifetec*, 377 Ill. App. 3d at 270-71, 880 N.E.2d at 196-97. The fact that a company shares information with a customer does not mean the vendor does not attach importance to that information; rather, it reflects a reality of the business environment that some confidential information must sometimes be shared with the client who pays for it without making the necessary effort to arrange a non-disclosure agreement. So long as the information meets the requirements of confidential information—which, as discussed above, all the information here does—then the

17

information may be treated as confidential regardless of what the customer ultimately does with the information.[9]

Defendants generally object to labeling any of the above categories of information as a trade secret or as confidential information, noting the availability of the information through SKF's File Transfer Protocol website. According to Defendants, since SKF never changed its password to the FTP, former employees were readily able to access this information. Defendants contend that SKF's failure to guard the information more carefully demonstrates that the information was not confidential. The court is not persuaded that SKF's failure to guard against post-resignation access to the FTP means that SKF was comfortable with public dissemination of the data. The circumstances here are arguably akin to a small company's keeping a key to its warehouse underneath a potted plant and failing to move it or to re-key the locks when employees, who know about the key and can use it to access files in the warehouse, leave the company. Although SKF perhaps should have changed its FTP password every time an employee left, its failure to do so does not mean either that employees were still entitled to access information on that website or that the information that would appear on the website—information that was not shared with competitors or even clients—was not classified.

In addition to these three categories of information that is largely customer-specific, Defendants also took with them a substantial amount of information that can generally be considered training materials. These materials include things such as certification tests (Pl.'s Exs. 7.1, 7.7); tips on how to balance a rotor (Pl.'s Ex. 7.4 ("Balancing a rotor in one run is fun and

---

[9]     This applies only to the content of the reports—that is, the data—and not the format of the reports. Although the court agrees with Plaintiff that the format of ERSI's reports is substantially similar to the format of SKF's reports, the format appears to be driven by practical concerns. Were the court to enjoin its use, it would not take Defendants long to come up with new forms, and those new forms would likely look substantially similar to the SKF forms based on the sort of data the forms must reflect. (*See* Bjerkness Testimony, Tr. at 885 ("PMCI had developed [the asset health report], but . . . there's other companies that have [forms] very similar, I mean, almost identical to the asset health report.").)

easy."")); an outline entitled "Data Analysis Basics and Procedures" that provides step-by-step instructions (Pl.'s Ex. 7.5); and a seven-chapter manual (with four appendices) that covers everything from "Basics of Condition Monitoring" (Chapter 1) to "Why Bearings Fail" (Appendix C) (Pl.'s Ex. 66). As with the other information described above, these training materials could provide Defendants a jump start in the business, as they can use these materials rather than generate their own. As for the second requirement of confidentiality, that the materials not be widely known in the industry, it is not clear to the court whether the manuals represent best practices of SKF (which would almost certainly be unknown to the industry), but even if they are just compilations of otherwise readily known facts, the compilations themselves are not available to competitors and presumably have some value by gathering the materials into one place. *See The Agency, Inc.*, 362 Ill. App. 3d at 219, 839 N.E.2d at 617-18. Defendants have presented virtually no argument contesting that these training materials are confidential, and the court is satisfied by SKF's showing that they are.

Defendants undeniably also downloaded personal files from their SKF computers that concern neither Plaintiff nor this court. Nor does all of the information downloaded from the SKF computers fall into the above categories—price information, databases, reports, and training materials. All the downloaded information in those categories is, however, confidential information. Plaintiff has met its burden on this issue.

### 2. Reasonable and Necessary

Having determined that the three categories of information outlined above are legitimate business interests, to enforce the restrictive covenant in the SKF Agreement it must also be reasonable and necessary to meet these legitimate interests. "In determining whether a restraint is reasonable it is necessary to consider whether enforcement will be injurious to the public or cause undue hardship to the promissor, and whether the restraint imposed is greater than is necessary to protect the promisee." *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 76, 866

19

N.E.2d 85,98-99 (2006) (quoting *House of Vision, Inc. v. Hiyane*, 37 Ill. 2d 32, 37, 225 N.E.2d 21, 24 (1967)). The court therefore examines the potential injury to the public, hardship to the Defendants, and the breadth of the restriction in determining whether the covenant is reasonable and enforceable.

First, the covenant preventing Defendants from disclosing confidential business matters does not cause any injury to the public or to Defendants. Public injury is most commonly shown when the covenant has an anti-competitive effect on the industry. *See, e.g.*, *Agrimerica, Inc. v. Mathes*, 170 Ill. App. 3d 1025, 1034, 557 N.E.2d 947, 952 (1st Dist. 1988). The non-disclosure covenant in the SKF Agreement does not limit the ability of Defendants to compete with SKF in the reliability services industry. In addition, unlike a non-compete agreement, the non-disclosure agreement does not hinder the ability of Defendants to continue to work in the same field, utilizing many of the same skills they developed at SKF. Furthermore, Bjerkness himself testified that there is ample competition in the industry, including with other competitors and with firms taking their reliability services programs in-house. (Tr. at 880 ("If [customers] don't feel they're getting the service that they need, there's competitors out there.").) In fact, the Agreement does not even directly affect the ability of Defendants to compete with SKF for SKF's customers. All the Agreement purports to do is to protect SKF's confidential information, an interest which does not adversely affect competition within the industry. Accordingly, the Agreement poses no threat of injury to the public or to Defendants.

Nor does the SKF Agreement impose a greater restraint than is necessary to protect SKF's interests. In *North American Paper Co. v. Unterberger*, 172 Ill. App. 3d 410, 526 N.E.2d 621 (1st Dist. 1988), the court struck, as overbroad, a provision that prohibited disclosure of "all items of whatever nature or kind which the Employee has learned of, acquired or obtained knowledge of, conceived, developed, originated, discovered, invented or otherwise become aware of during the period of his employment." *Id.* at 415, 526 N.E.2d at 624. By contrast, the SKF Agreement by its

20

terms is aimed only at "maintaining the secrecy of SKF's trade secrets and confidential business matters." (Pl.'s Ex. 22.) The difference in the language employed by the two agreements is striking: the SKF Agreement is clearly much narrower and is focused upon the protection of matters that SKF is entitled to protect, without sweeping in vaguely-defined data that the company is not entitled to restrict. Thus, there is no overbreadth problem that renders the SKF Agreement unreasonable or unenforceable.

The court concludes that SKF has a reasonable likelihood of success on the merits of proving that the SKF Agreement was valid and enforceable, and that Defendants breached the Agreement by disclosing SKF information to ERSI.

## III. Trade Secrets

SKF also contends that it is entitled to a preliminary injunction on the grounds that Defendants violated the ITSA. The trade secrets claim is independent of SKF's claims under the various contracts; the ITSA analysis is not affected by the existence of a written contract governing the protection of confidential information. *Strata Marketing, Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1066, 740 N.E.2d 1166, 1175 (1st Dist. 2000) ("a confidentiality agreement is not a prerequisite to recovery under the [ITSA]"). Nevertheless, because the court has concluded that SKF has demonstrated a reasonable likelihood of success on their claim that Defendants breached the enforceable SKF Agreement—which, as noted above, protects a broader range of information than does the ITSA—and may be entitled to some form of injunctive relief, there is no need at this time to conduct an independent analysis of the trade secrets claim. Such an analysis would be mere dicta, as the remedy would be duplicative of whatever remedy SKF is entitled to based on violations of the SKF Agreement.

## IV. Remedy

Turning to the question of remedy, the court considers Plaintiff's request in the context of the evidence of violation of the confidentiality provisions of the SKF Agreement. Having established

a reasonable likelihood of success on the merits, SKF must next show that there is no adequate remedy at law and it will therefore suffer irreparable harm if no injunction is issued. *See FoodComm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). Disclosure of confidential information or trade secrets can constitute irreparable harm. *IDS Fin. Servs., Inc. v. Smithson*, 843 F. Supp. 415, 418 (N.D. Ill. 1994) (citing *Medtronic, Inc. v. Gibbons*, 527 F. Supp. 1085 (D.C. Minn. 1981) ("[U]nder Minnesota law, a threat of irreparable harm can be inferred from the breach of a valid and enforceable restrictive covenant.")). Additionally, some of the information Defendants took relates directly to current SKF customers, and the endangerment of those relationships can also constitute irreparable harm. *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006) (loss of goodwill, competitive position, and customer relationships constitute irreparable harm with no adequate remedy at law).

In fashioning the injunction, the court must balance this threat of irreparable injury that Plaintiff faces against any irreparable harm the injunction might cause to Defendants if the injunction is issued. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). Additionally, the court should take into consideration any effect the injunction might have on nonparties, including customers and the public at large. *Id.* With these considerations in mind, it is clear that Plaintiff's proposed injunction barring Defendants from soliciting or performing services for any of SKF's actual or potential customers for two years sweeps far too broadly. First, the court's conclusion that the non-competition provisions of the PMCI Agreements are not applicable disfavors barring competition as a remedy. Second, the hardship such a restriction would cause on Defendants would be substantial, as the proposed injunction would cover a large portion of potential ERSI customers. Finally, such an injunction would be injurious to the public. An injunction that would prevent ERSI from performing services for the customers who have already switched over to ERSI would be unjust to the customers, both because they chose to conduct business with ERSI and because they would then likely be forced

to go back to a reliability services provider (SKF) with whom their relationship may now be precarious. Genuine competition within an industry is generally viewed as beneficial to the public as a whole, provided that competition can be achieved through legitimate means and without the violation of trade secret law or the improper use of confidential information. *See Agrimerica*, 170 Ill. App. 3d at 1034, 524 N.E.2d at 952. On the whole, then, balancing the equities strongly disfavors such a broad injunction here.

SKF cites three cases in support of issuing the broad injunction it seeks, but all are readily distinguishable.[10] In two of the cases, *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859 (N.D. Ill. 2001) and *Phillips v. Frey*, 20 F.3d 623 (5th Cir. 1994), a court issued an injunction forbidding former employees from competing with their former employer, but only upon a showing that the employees had actually used the confidential information. SKF has presented virtually no evidence of actual use, so this court must limit the relief ordered to remedying the violation of the non-disclosure covenant. The third case identified by SKF, *Doubleclick, Inc. v. Henderson*, No. 116914/97, 1997 WL 731413 (N.Y. Sup. Nov. 7, 1997), is a New York state case that turns not on actual use, but on the inevitable disclosure doctrine. Although that doctrine applies in Illinois as well as New York, *see Strata Mktg.*, 317 Ill. App. 3d at 1070, 740 N.E.2d at 1177-78, it does not apply on these facts. Under the inevitable disclosure doctrine, courts can find trade secret misappropriation when the defendant's new employment "will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo, Inc.*, 54 F.3d at 1269. Inevitable disclosure is thus something of a misnomer; inevitable use is more apt. Here, it is not inevitable that Defendants will rely on SKF's trade secrets and confidential information, as there was evidence that each Defendant possesses the knowledge to perform reliability services without reliance upon SKF materials. None of the cases cited by SKF

---

[10]    All three cases are also based on trade secret misappropriation rather than violation of a restrictive covenant. Because the court declined to conduct a trade secret analysis, the court assumes, for purposes of the ensuing discussion, that SKF proved a violation of ITSA as well as the restrictive covenant.

persuade the court that a broad injunction preventing Defendants from competing with SKF is appropriate.

Defendants' apparent violations of the non-disclosure provisions do warrant an injunction against use of that information in their business. Such an injunction more directly addresses the potential for harm at play here, namely, the ability of ERSI to use SKF customer information to gain an improper competitive advantage. Without the use of that information, ERSI becomes simply a competitor in the provision of reliability services. Not only does such an injunction prevent irreparable harm to Plaintiff, it would have little deleterious impact on Defendants; Bjerkness insists Defendants do not need the information they brought over from SKF and that an injunction preventing them from using that information would not alter the way ERSI conducts business. (Tr. at 892.) To the extent SKF claims it was harmed by Defendants' past use of SKF information in reaching agreements with SKF clients, SKF possesses an adequate remedy at law because it can claim damages for the harm caused in the past. Because a preliminary injunction is focused upon preventing future irreparable harm to the plaintiff, an injunction here that prevents ERSI from using any SKF information it may possess adequately addresses the potential harm.

Accordingly, the court will order Defendants to destroy any and all proprietary information Defendants brought over from SKF, including: customer databases; customer reports; pricing information, including proposals; training materials; and other comparable information that originated at SKF. Defendants are not enjoined from generating or using reports with a format similar to the reports generated at SKF, provided that they obtain the data contained in those reports through their own efforts or through other legal means, including communications with actual or potential customers. Furthermore, the court will direct that an independent expert examine ERSI's computers and determine whether Defendants have complied with this order. The expert shall also determine whether Defendants have in their possession any hard drives or thumb drives that Plaintiff claims are missing and contain SKF files. Any drives that are found shall be

either returned to Plaintiff (if they belong to Plaintiff) or their contents shall be erased (if they are owned by Defendants but still contain confidential SKF materials).[11] The expert will be retained at Defendants' expense.

*Motion to Dismiss*

Pursuant to Rule 12(b)(6), Defendants moved to dismiss Counts IV (Breach of Fiduciary Duty), V (Unfair Competition), and VI (Computer Fraud and Abuse Act ("CFAA")). In deciding a motion to dismiss, the court accepts the well-pleaded allegations of the complaint as true, and does not consider matters not contained in the pleadings. FED. R. CIV. P. 12(b)(6); *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002). Defendants claim that Counts IV and V are preempted by the ITSA, and that Plaintiff has failed to state a claim under the CFAA because SKF has not alleged damage.

**I.      Counts IV and V**

Defendants contend that the ITSA preempts SKF's common law claims of breach of fiduciary duty and unfair competition. By its own terms, the ITSA "is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret." 765 ILCS 1065/8(a). The Act preempts only those claims that are based upon misappropriation of a trade secret, however, and not "other civil remedies that are not based upon misappropriation of a trade secret." *Id.* at 1065/8(b)(2); *Hecny Transport., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005). Whether Counts IV and V are preempted by the ITSA thus turns on whether those counts are "based upon misappropriation of a trade secret."

Plaintiff's Amended Complaint alleges that Defendants copied to their thumb drives SKF's

---

[11]      Throughout the preliminary injunction hearing, the parties vehemently disputed which devices were missing and which were accounted for; some devices were apparently given to prior counsel retained by Defendants, and others were returned to SKF during the course of the hearing. The court fully expects the parties to cooperate with the independent expert in accounting  for all the devices.

databases, training materials, and other documents. (Am. Compl. ¶ 143.) While some of these materials may be trade secrets, the court recognizes that not everything Defendants took was so sensitive as to constitute a trade secret. As the Seventh Circuit noted, however, "it is unimaginable that someone who steals property, business opportunities, and the labor of the firm's staff would get a free pass just because none of what he filched is a trade secret." *Hecny*, 430 F.3d at 404. Here, even if some of what Defendants "filched" constituted a trade secret, the court is satisfied that the alleged breach of the duty of loyalty aims at a different harm than does the trade secrets claim: whereas the ITSA claim is meant to protect information "sufficiently secret to derive economic value" and that "is the subject of efforts . . . to maintain its secrecy," 765 ILCS 1065/2(d), the breach of fiduciary duty claim more generally addresses the harm caused by the transfer of information not rising to the level of trade secrets that nevertheless caused injury to SKF.

This rationale applies with even greater force to SKF's unfair competition claim. "In Illinois, the common law tort of unfair competition encompasses a 'broad spectrum of law.'" *Integrated Genomics, Inc. v. Kyrpides*, No. 06 C 6706, 2008 WL 630605, at *13 (N.D. Ill. Mar. 4, 2008) (quoting *Zenith Elec. Corp. v. Exzec, Inc.*, No. 93 C 5041, 1997 WL 223067, at *6 (N.D. Ill. Mar. 27, 1997)). If the only manner in which Defendants are alleged to have unfairly competed was by stealing trade secrets, then the claim would be preempted, but the transfer to ERSI of other documents not considered to be trade secrets defeats that argument. Based on the allegations in the Amended Complaint, information other than trade secrets taken from SKF provided Defendants with a shortcut to starting business at ERSI. This distinction between trade secrets and other information is made clear by the cases relied upon by Defendants. In *C.H. Robinson Worldwide, Inc. v. Command Transp., LLC*, the court found an unfair competition claim preempted by the ITSA where the complaint alleged that the proprietary business information taken by the defendants constituted trade secrets. No. 05 C 3401, 2005 WL 3077998, at *7 (N.D. Ill. Nov. 16, 2005). Similarly, the court in *CardioNet, Inc. v. LifeWatch Corp.* concluded that an unfair competition claim

was preempted when the claim "inextricably depend[ed]" upon trade secrets allegedly misappropriated by Defendants. No. 07 C 6625, 2008 WL 567223, at *5 (N.D. Ill. Feb. 27, 2008). Unlike these complaints, the Amended Complaint in the case before this court does not claim that all of the transferred data constitutes trade secrets—indeed, neither the unfair competition nor the breach of fiduciary duty counts even contain the phrase "trade secret"—and is thus reasonably read to claim that Defendants received an unfair competitive advantage in its use of non-trade secret information.

The court further notes the tension between Defendants' argument in this motion—that any alleged wrongdoing by Defendants was a misappropriation of trade secrets—and Defendants' argument in their opposition to the injunction—that none of the pilfered documents constitutes a trade secret. Accepting both of these arguments would place SKF's claim in the no-man's land contemplated by *Hecny*, where the breach of fiduciary duty claim is preempted by the ITSA, but the ITSA does not govern the harm because none of the information taken by Defendants constitutes a trade secret. The court's conclusion that the breach of fiduciary duty and unfair competition claims are not preempted by the ITSA avoids such a troubling outcome.

## II.    Count VI

Defendants also claim that Plaintiff did not adequately state a claim under the Computer Fraud and Abuse Act. The CFAA states:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i).

18 U.S.C. § 1030(g).[12]  The Amended Complaint alleges that Defendants violated section 1030 by making unauthorized transfers of information from SKF's computers to their own devices, in violation of both subsection (a)(2)(C) (violated by one who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer") and (a)(4) (violated by one who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value").[13]  Defendants do not dispute that the Amended Complaint sufficiently pleads facts to support a violation of (a)(2)(C) and (a)(4), but rather present two separate arguments.

First, Defendants argue that the statute requires the plaintiff to show both damages *and* loss, despite the clear language of section 1030(g) that requires "damages *or* loss." Understanding this counterintuitive argument requires tracking various cross-references through the statute: section 1030(g) says a civil action may only be brought "if the conduct involves one of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)"; subsection (c)(4)(A)(i) in turn references subsection (a)(5)(B); and subsection (a)(5)(B) applies to individuals who "recklessly

---

[12]     Congress amended the CFAA on September 26, 2008, after Defendants' conduct that allegedly violated the CFAA.  Pub. L. No. 110-326, § 204, 122 Stat. 3560, 3561-62 (2008). Although substantive amendments to statutes are not applied retroactively, amendments that are merely procedural may be.  *Turkhan v. Perryman*, 188 F.3d 814, 826 (7th Cir. 1999) (citing *Landgraf v. USI Film Prods., Inc.*, 511 U.S. 244, 273-75 (1994)).  Both parties cite exclusively to the statute as amended, and the court agrees that the amendments to the CFAA do not affect SKF's claims under the statute.  *But see Motorola, Inc. v. Lemko Corp.*, --- F. Supp. 2d ---, ---, No. 08 C 5427, 2009 WL 383444, at *3 (N.D. Ill. Feb. 11, 2009) (declining to apply the amended statute to plaintiff's claims where plaintiff failed to provide "any authority or legal argument" that the amendments were merely procedural).  Accordingly, the citations to the CFAA throughout this opinion are to the amended version.

[13]     The heightened pleading standards of Rule 9(b) do not apply to the Computer Fraud and Abuse Act.  Neither of the statutory provisions relied upon by SKF require an allegation of fraud; intent to defraud is not the same and does not implicate the heightened standard.  *Motorola*, 2009 WL 383444, at *3 (holding that Rule 9(b) does not apply to a section 1030(g) claim alleging violations of sections 1030(a)(2) and (a)(4)); *see also* FED. R. CIV. P. 9(b).

28

cause[] damage." This elaborate line of reasoning raises a number of problems, not the least of which is that it complicates the far simpler and more straightforward statement in section 1030(g) itself that damage *or* loss suffices. *See O'Kane v. Apfel*, 224 F.3d 686, 688 (7th Cir. 2000) ("When interpreting congressional statutes, we first look at the plain language of the statute because that is the best way to determine congressional intent.") In addition, section 1030(g) refers only to the "factors" listed in subclauses (I) through (V) of subsection (c)(4)(A)(i); those subclauses list only "possible harmful results of violations of other parts of the statute" rather than "any action or behavior that is [itself] prohibited."[14] *Charles Schwab & Co. v. Carter*, No. 04 C 7071, 2005 WL 351929, at *3 (N.D. Ill. Feb. 11, 2005). A clearer reading of the second sentence of section 1030(g) would thus read: A civil action for a violation of this section may be brought only if the conduct involves (I) loss during a one-year period greater than $5,000; (II) modification or impairment of an individual's medical care; (III) physical injury; (IV) a threat to public health or safety; or (V) damage affecting a United States government computer. This reading gives full meaning to all the language used in section 1030(g), and generally accords with the interpretation of the statute provided by several of the Courts of Appeals—that the (c)(4)(A)(i) factors describe the harms recognized by a civil action rather than the pleading requirements. *See Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1157 (5th Cir. 2006); *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore,*

---

[14]    Specifically, the five subsections apply to:
(I) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;
(II) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;
(III) physical injury to any person;
(IV) a threat to public health or safety;
(V) damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security . . . .
18 U.S.C. § 1030(c)(4)(A)(i)(I)-(V).

*LLC*, 428 F.3d 504, 512 (3d Cir. 2005); *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 n.5 (9th Cir. 2004). The court thus concludes that the most natural reading of section 1030(g), that either damage or loss suffices, is also the correct one.

Second, Defendants argue that SKF has not adequately alleged that it has incurred a loss. The CFAA provides:

> the term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service

*Id.* § 1030(e)(11). SKF contends that it adequately pleaded loss in the Amended Complaint by alleging that Defendants transferred data to a competitor without SKF's authorization, and that "[a]s a result of Defendants' conduct as alleged herein, SKF has suffered damages or loss aggregating at least $5,000 . . . ." (Am. Compl. ¶¶ 157-58.) According to SKF, this suffices to show loss.

The court is less certain. As defined in section 1030(e)(11), "loss" means two things: first, "any reasonable cost to the victim," such as responding to the offense or otherwise restoring lost material; second, lost revenue or other damages incurred as a result of an interruption of service. Purely economic harm unrelated to the computer systems is not covered by this definition. *See Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468 (S.D.N.Y. 2004) (reviewing the legislative history of section 1030 and concluding that nothing "suggest[s] that the 'loss' or costs alleged can be unrelated to the computer"), *aff'd*, 166 Fed. Appx. 559 (2d Cir. 2006). As a number of courts have observed, "Costs not related to computer impairment or computer damages are not compensable under the CFAA." *Civic Ctr. Motors, Ltd. v. Mason St. Imp. Cars, Ltd.*, 387 F. Supp. 2d 378, 382 (S.D.N.Y. 2005); *see also Nexans Wires S.A. v. Sark-USA, Inc.*, 166 Fed. Appx. 559, 562-63 (2d Cir. 2006); *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l Inc.*, No. 07 C 5902, 2009 WL 743215, at *4 (N.D. Ill. Mar. 19, 2009); *Modis, Inc. v. Bardelli*, 531 F. Supp. 2d 314,

320 (D. Conn. 2008).[15]  Although the lost revenues that SKF alleges were caused by Defendants' unauthorized transfer of SKF data might fit the usual understanding of the term "loss," the CFAA provides a different definition that trumps the ordinary definition.  *See Del Monte*, 2009 WL 743215, at *4 ("While this is certainly a legitimate business concern, it does not transform the harms suffered by [plaintiff] into 'losses' under the CFAA.").

Defendants argue in their briefs that Defendants' conduct itself falls outside of the purpose of the CFAA.  This is incorrect; Plaintiff has cited a number of cases that uphold a lawsuit by an employer against a former employee under the CFAA after the employee took trade secrets and other confidential information to a new employer.  *See, e.g., TEKsystems, Inc. v. Modis, Inc.*, No. 08 C 5476, 2008 WL 5155720, at *5 (N.D. Ill. Dec. 5, 2008); *C.H. Robinson Worldwide, Inc. v. Command Transp., LLC*, No. 05 C 3401, 2005 WL 3077998, at *3 (N.D. Ill. Nov. 16, 2005); *Charles Schwab & Co.*, 2005 WL 351929, at *3; *Pac. Aerospace & Elec., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1195 (E.D. Wash. 2003).  But while Defendants' conduct itself may be addressed by the CFAA, Plaintiff nevertheless is required to show that it suffered a harm recognized by the statute. Plaintiff has failed to plead such a harm, and has only alleged that its business was harmed by Defendants' alleged violations of the statute.  Such economic losses are better addressed, as they are here, under state contract and trade secrets law.  Because SKF did not plead that it suffered any costs related to its computers in responding to Defendants' actions nor that it suffered any service interruptions, it has failed to show any loss redressable under the CFAA.  Therefore, Count VI of the Amended Complaint must be dismissed.

## CONCLUSION

---

[15]    Plaintiff cites *C.H. Robinson Worldwide, Inc. v. Command Transp., LLC*, which permits recovery for economic loss, including "the loss in value of trade secrets" and "the loss of competitive advantage."  No. 05 C 3401, 2005 WL 3077998, at *3 (N.D. Ill. Nov. 16, 2005).  That case, however, does not discuss the statutory definition of "loss" contained in section 1030(e)(11) and predates most of the authority cited above.  The court thus declines to follow *C.H. Robinson* and instead relies upon the more recent case law, as well as its own interpretation of the statute.

Plaintiff's Motion for a Preliminary Injunction [4] is granted and an injunction is entered pursuant to the attached order. Defendants' Motion to Dismiss Counts IV, V, and VI of Plaintiff's Amended Complaint [77] is granted in part and denied in part; Count VI of Plaintiff's Amended Complaint is dismissed without prejudice.

ENTER:

Dated:         April 24, 2009

REBECCA R. PALLMEYER
United States District Judge