# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| SKF USA INC., | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 08 C 4709 |
| DALE H. BJERKNESS, KEVIN KOCH, JOSEPH J. SEVER, and WALTER REMICK, JR., | ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) ) | |
| SKF USA INC., | ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 09 C 2232 |
| EQUIPMENT RELIABILITY SERVICES, INC., | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Dale Bjerkness worked for Preventive Maintenance Company, Inc. ("PMCI"), which was acquired by Plaintiff SKF USA in January 2007. Bjerkness left the company in May 2008 and started a competing firm, Defendant Equipment Reliability Services, Inc. ("ERSI"). Defendants Kevin Koch, Joseph Sever, and Walter Remick followed Bjerkness from SKF to ERSI. Before leaving, the individual Defendants copied thousands of SKF computer files onto their own computer storage devices. Several of SKF's customers took their business to ERSI, and in servicing those customers, ERSI used some of the SKF files that they had taken.

SKF has sued Bjerkness, Koch, Sever, and Remick, alleging, as relevant here, that they violated the Illinois Trade Secrets Act ("ITSA"), committed the tort of unfair competition, and breached secrecy agreements. In addition, SKF alleges that Bjerkness breached his fiduciary

duties owed to SKF.  In a separate lawsuit, which was consolidated with this one, SKF has sued ERSI, alleging that ERSI misappropriated trade secrets and committed tortious interference with current and prospective contractual interests.

On April 24, 2009, the court entered a preliminary injunction requiring the individual Defendants to destroy the proprietary information taken from SKF.  The parties then proceeded to a bench trial.  Based on the evidence presented at that trial, the court concludes that the individual Defendants violated ITSA by taking and using SKF's trade secrets, and awards compensatory damages equal to the profits that ERSI earned while using those trade secrets, $41,068.40.  The court also finds that the individual Defendants' conduct was willful and malicious, and, therefore, orders an award of exemplary damages of $40,000 and the payment of attorney's fees in an amount to be determined.

## **BACKGROUND**

SKF/PMCI and ERSI are competitors in the "reliability services" business, providing customers with services focused on monitoring the performance of industrial equipment.  These monitoring services enable the companies to "provide basic maintenance for [their customers'] equipment, suggest ways to improve its functioning, and detect problems to avoid unexpected equipment failures."  *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 703 (N.D. Ill. 2009). Before SKF acquired PMCI on January 1, 2007, Defendant Bjerkness worked for PMCI as a director for the Northern Upper Midwest Region, Defendant Koch was a technical reliability engineering manager, and Defendants Remick and Sever were technicians.  (Trial Tr., Vol. I, at 40-41.)  After the acquisition, all four became employees of SKF.  (*Id.* at 267-68; Uncontested Facts ¶ 1.)

Before the merger, each of the individual Defendants had signed an employment agreement with PMCI that restricted them from competing with PMCI or soliciting PMCI's customers.  (Pl's Ex. 11, 27, 34, 122.)  After the merger, they each signed a secrecy agreement with SKF that, unlike the earlier agreement, did not contain non-competition provisions.  (Trial Tr., Vol. II, at 389-90, 400-01,

2

437-38, Vol. III, at 492-93; Pl's Ex. 13, 29, 36, 124.) The court has previously held that the SKF Secrecy Agreement superseded the PMCI Agreement, and that the SKF Secrecy Agreement is enforceable. *SKF*, 636 F. Supp. 2d at 706-710. Defendants are, therefore, not bound by non-competition language, but are bound by secrecy provisions as set forth below:

> Employee agrees that he will not in any way during his employment and at any time thereafter, without SKF's written approval, disclose or publish to any unauthorized person, firm or corporation any technical or proprietary information, trade secrets and confidential business matters, including but not limited to, secret processes, formulae, sequences, equipment, research items and results, drawings, prints, customer lists, costs, technical sales and marketing programs. All documents, memoranda, reports, prints, and drawings, including all copies thereof in respect of the above items, are the sole and entire property of SKF which Employee will surrender to SKF upon any termination of employment with SKF.

(Pl's Ex. 13, 29, 36, 124.)

Defendant Bjerkness's last day at SKF was May 23, 2008. (Trial Tr., Vol. III, at 493; Uncontested Facts ¶ 3.) He had filed papers to incorporate ERSI three days earlier. (P.I. Hearing Tr., at 712; Pl's Ex. 50.) Within two months, Defendants Koch, Sever, and Remick had all followed Bjerkness from SKF to ERSI. (Trial Tr., Vol. II, at 390, 401, 438; Uncontested Facts ¶¶ 5-6, 8-9, 11-12.) Before leaving SKF, all four individual Defendants transferred files from SKF computers to their own electronic storage devices–USB flash drives, external hard drives, CDs, and DVDs. At trial, Stephen Wareham, an SKF employee with responsibilities for human resources as well as supporting technical operations, testified at length about the files found on thirty-one different computer storage devices owned by the individual Defendants. (Pl's Ex. 8.) Wareham testified that the thousands of files found on those devices included the following:

- A document outlining SKF's salary review process for employees. (Trial Tr., Vol. I. at 50.)
- SKF's code of conduct for employees and a training procedure for the code. (*Id.* at 51.)
- A folder of files from a salesman containing all of the information he assembled to present to a customer. (*Id.* at 53.)
- SKF's employee handbooks. (*Id.* at 54.)
- A draft training manual for technicians. (*Id.* at 55-56.)
- Reports from a customer's facility. (*Id.* at 58, 63.)

3

- A list of a customer's equipment that SKF was responsible for monitoring. (*Id.* at 59.)
- A report template created by PMCI. (*Id.*)
- Databases containing information produced by monitoring customers' machinery. (*Id.* at 62-63.)
- Customer reports generated by a proprietary program that SKF had developed. (*Id.* at 66-67.)
- Customer databases, training materials, and material used by SKF's software. (*Id.* at 67-69.)
- A database pattern for the CSI monitoring software that Wareham had created. (*Id.* at 95-96.)

According to Wareham's testimony, the evidence showed that Defendants were accessing the files taken from SKF at the same time that ERSI was making proposals and providing services to several former SKF customers. (*Id.* at 78-89.)

In letters dated between July 1 and July 17, 2008, counsel for SKF notified Defendants that SKF believed they were violating the PMCI Agreement and the SKF Secrecy Agreement. (Pl's Ex. 19, 26, 33, 52.) The letters specifically warned Defendants that they were prohibited "from using or disclosing SKF's trade secrets, proprietary information or confidential business information." (*Id.*) Counsel for Defendants initially responded in a letter dated July 10, 2008, asserting that Defendants Bjerkness and Koch (Sever and Remick had not yet received their letters) were not bound by the PMCI Agreement and that Bjerkness did not have any SKF property in his possession. (Pl's Ex. 112.) In another letter from Defendants' lawyer dated July 24, 2008, counsel specifically claimed that Bjerkness did not have "any outstanding customer proposals, customer drawings, customer files, or vibration poles." (Pl's Ex. 113.) SKF's lawyer responded in an August 7, 2008 letter reporting that SKF had discovered that Defendants had taken SKF files on electronic storage devices and requesting that those devices be turned over. (Pl's Ex. 54.) Defendants did turn the devices over to their attorneys on September 5, 2008. (Trial Tr., Vol. II, at 380, 396, 440, Trial Tr., Vol. III, at 472, 500.) Despite Defendants' testimony that they no longer have access to any SKF information, not every device that may have been used to transfer files has been accounted for. Forensic computer evidence shows the existence of two devices that were plugged into both an

4

SKF computer and an ERSI computer, but Defendants have not located those devices. (Trial Tr., Vol. II., at 456-58; Pl's Ex. 88.)

SKF filed this lawsuit on September 19, 2008. SKF sought a preliminary injunction and presented evidence at a hearing of several days, first before Judge Moran and then before this court. At those hearings, Defendants admitted that they took SKF's information knowing that they were not authorized to do so. *SKF*, 636 F. Supp. 2d at 704. Defendants offered no explanations for their violations of the employment agreement but suggested the matter was insignificant because, they contended, "they could easily have generated all the information that they transferred on their own, and that copying that information provided simply a 'shortcut.'" *Id.* On April 24, 2009, the court entered a preliminary injunction requiring the individual Defendants to destroy proprietary information taken from SKF. The court also ordered "that an independent expert examine ERSI's computers and determine whether Defendants have complied with this order." *Id.* at 717. The expert found fifteen files on ERSI computers that matched SKF files, and those files were deleted. (Pl's Ex. 210.)

In January 2010, the court conducted a bench trial at which SKF sought damages for Defendants' taking of SKF's materials. Of the information taken by Defendants, the database pattern received the most attention at trial. The database pattern consisted of a set of instructions telling a computer program how to present data to SKF from a customer's machinery. (Trial Tr., Vol. I, at 102-03.) Wareham, the SKF employee with HR and technical responsibilities, explained that he had created the database pattern, and that he considered it proprietary to SKF. (*Id.* at 95-96.) The commercially available computer program that used the database—witnesses referred to it as the "CSI software"—included a default database pattern, but SKF's proprietary pattern, which was developed over several years, gave SKF a competitive advantage. (*Id.* at 101-04.) Wareham testified that no publicly available manual would

contain SKF's database pattern and that Defendants could not have developed the pattern on their own. (*Id.* at 109-10, 118.)

On cross-examination, Wareham acknowledged that although the database pattern was developed based on historical data, it was possible to recreate it without having that data. (*Id.* at 119-20.) Wareham agreed, further, that every SKF reliability technician would have been familiar with the database pattern and that most of them knew it by heart. (*Id.* at 132-33.) Wareham conceded that Defendant Koch was capable of recreating the database on his own, but did not have enough experience with the other individual Defendants to know if they also were capable of doing so. (*Id.* at 140.) In his own testimony, Defendant Remick asserted that he could recreate the database pattern from information he had memorized. (Trial Tr., Vol. II, at 386-87.) In fact, though, as Remick testified, it was Defendant Koch who did the actual recreation. (*Id.* at 393.) In his testimony, Koch explained how he had recreated the database pattern on September 10, 2008, two days after Defendants turned over to their lawyers the devices containing SKF information:

> Q. How did you come up with the order?
> A. Oh, the order? You turn the–the pattern?
> Q. Yes, the pattern.
> A. It's just the way we always come up with it. Use velocity first, acceleration, displacement, and HFD. That's the way I learned it.
> Q. And when you put this pattern together, did you look or reference anything from SKF?
> A. No.
> Q. Did you use anything other than the CSI software?
> A. No.
> Q. Anything other than what was in your head?
> A. No.

(*Id.* at 430-31.)

Koch also testified that by the time of trial, ERSI staff had stopped using the database pattern because the company was no longer using the CSI software and had no plans to do so in the future. (*Id.* at 433-34.) Instead, ERSI had begun using new software, LUDECA Omnitrend, that did not rely on the database pattern. (*Id.* at 434.) Wareham had previously testified that the

6

database pattern would only be useful to a company using the CSI software. (Trial Tr., Vol. I, at 140.) According to Koch, ERSI switched to the LUDECA software because LUDECA is better, cheaper, and more reliable. (Trial Tr., Vol. II, at 434.) Koch said that the switch had nothing to do with the court's ruling on the preliminary injunction. (*Id.*) Koch's testimony included details about when ERSI had used CSI software, including the database pattern, to service customers. (*Id.* at 435-37.) Koch testified without rebuttal that ERSI last used the CSI software in July 2009. (*Id.*)

On cross-examination, Koch reiterated that the database pattern he used for the CSI software was one that he learned at SKF/PMCI. (*Id.* at 445.) He also testified, consistently with Wareham's testimony, that he did not have a role in developing that pattern for SKF. (*Id.*) Koch had asserted that no one ever told him that he could not use the database pattern after leaving SKF, but counsel for SKF directed Koch's attention to his own deposition testimony that the database setup was a secret. (*Id.* at 433, 447-48.) Koch explained that he was then speaking about the "database setup altogether" and not the specific pattern used to create that setup. (*Id.* at 447-48.) The court understands this distinction as between a database containing a customer's historical monitoring data, which Koch admitted is confidential, and a pattern for setting up a database to capture such information, which Koch contends is not confidential.

At trial, SKF presented a damages expert, Patricia Domzalski, who provided an estimate of the profits that SKF would have earned through 2014 from its business with the twelve customers who left SKF for ERSI. (Trial Tr., Vol. II, at 290-304.) Domzalski also provided an estimate for the profits that she calculates ERSI would actually receive from those customers through 2014. (*Id.* at 304-12.) In response, Defendants presented evidence to challenge SKF's theory that customers left SKF for ERSI because of the misappropriated information. Defendant Bjerkness testified that one client, Ainsworth, became an ERSI customer based on Bjerkness's maintenance knowledge, the quality of ERSI's service, and Bjerkness's relationship with Randy Reutzel, the plant manager. (Trial Tr., Vol. III, at 468.) Reutzel himself testified and confirmed

Bjerkness's account: Reutzel explained that after PMCI was acquired by SKF, he began to be dissatisfied with the service he was receiving. (*Id.* at 558.) Reutzel decided to explore other providers, and ultimately took Ainsworth's business to ERSI. (*Id.* at 560-62.) Reutzel did not know whether ERSI had any information from SKF and did not care. (*Id.* at 563.) Bjerkness asserts that he used the same resources—knowledge, quality, and relationships—to obtain the business of other customers, that he never attracted a customer by touting his access to the customer's information from SKF, and that he never used SKF information to attract or service a customer. (*Id.* at 468-72, 481-82.)

## ANALYSIS

**I.  Illinois Trade Secrets Act ("ITSA")**

SKF devotes the bulk of its post-trial briefing to its claims against the individual Defendants under ITSA. 765 ILCS 1065/1 *et seq.* In order to prevail on that claim, SKF "must demonstrate that the information at issue was a trade secret, that it was misappropriated and that it was used in the defendant's business." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003).[1] To constitute a trade secret under ITSA, information must (1) be sufficiently secret to derive economic value from being kept secret and (2) be the subject of reasonable efforts to maintain secrecy. 765 ILCS 1065/2(d). In addition to those statutory requirements, Illinois courts refer to six common-law factors in considering whether a trade secret exists under ITSA:

> (1) the extent to which the information is known outside of the plaintiff's business;
> (2) the extent to which the information is known by employees and others involved

---

[1] Whether trade secrets were actually used is not a dispositive issue here, but the court notes the uncertainty over whether use is a required element of an ITSA claim. In the vast majority of cases, including those from the Seventh Circuit and the Appellate Court of Illinois, the formulation of the elements of the claim does include use, but the statute defines misappropriation as "(1) acquisition of a trade secret . . .; *or* (2) disclosure *or* use of a trade secret." 765 ILCS 1065/2(b) (emphasis added). The issue is discussed at length in *Parus Holdings, Inc. v. Banner & Witcoff, Ltd.*, 585 F. Supp. 2d 995, 1003-05 (N.D. Ill. 2008), which concludes that use is not an element of an ITSA claim.

> in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort and money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Learning Curve Toys*, 342 F.3d at 722. These factors are "instructive guidelines" only; they do not define a six-part test. *Id.*

In the preliminary injunction order, the court found that information taken by the Defendants in the following four categories constituted confidential information covered by the SKF Secrecy Agreement: price quotes, databases, reports, and training materials. *SKF*, 636 F. Supp. 2d at 711-14. The court ruled that information in each of the four categories was not widely known in the industry and gave SKF a competitive advantage. *Id.* As the court explained, though, not every piece of confidential information is a trade secret. *Id.* at 711, 715. The court's ruling on confidential information satisfies only the first prong of ITSA's test for a trade secret: information not widely known in the industry that creates a competitive advantage must be information that is sufficiently secret to derive economic benefit from being kept secret. The court made no ruling on the second prong: whether SKF made reasonable efforts to maintain the secrecy of the information.

The court now finds that SKF did make reasonable efforts to maintain the secrecy of the information that Defendants took. SKF required employees to sign secrecy agreements relating to the information. (Pl's Ex. 13, 29, 36, 124.) SKF used password protection for important files and granted access to different sets of documents based on an employee's duties. (Trial Tr., Vol. I, at 42-43.) SKF instructed employees not to share its databases with customers, and when SKF did share a database with a customer, it did so only after obtaining a nondisclosure agreement. (P.I. Tr., at 495, 628, 691, 1056-57.) Defendants point to the availability of some SKF files on an FTP (File Transfer Protocol) server, a computer that anyone with the proper password can access through the internet to download stored files. (Defs' Br., at 13.) As the court explained in its earlier ruling, though, the server was not a generally accessible website; it was accessible only to

9

employees and former employees with the password. *SKF*, 636 F. Supp. 2d at 717. Perhaps the files on the server could have been protected *better*, but they were sufficiently protected. *Id.*

Much of Defendants' argument that the information taken did not constitute trade secrets focuses on the database pattern used by the CSI software. (Defs' Br., at 10-14.) It is important to distinguish the database pattern from the database itself. As the court understands the evidence—its presentation was not a model of clarity—the pattern is a guide for the manner in which data is collected into the database itself. Defendants do not argue that the historical data was not a trade secret; their argument is directed at the pattern used to generate that data. Defendants argue, first, that because Koch was able to recreate the database pattern without SKF data, the pattern is general knowledge and not a trade secret. (Defs' Br., at 10-12.) Defendants are certainly correct that "[g]eneral knowledge, skill, and experience gained by an employee during employment cannot be claimed as a trade secret." *U.S. Gypsum Co. v. LaFarge North America, Inc.*, 508 F. Supp. 2d 601, 624 (N.D. Ill. 2007) (citing *Delta Medical Systems v. Mid-America Medical Systems, Inc.*, 331 Ill. App. 3d 777, 791, 772 N.E.2d 768, 780 (1st Dist. 2002)). That general rule does not mean, however, that an employee who memorizes information constituting a trade secret may take that information to a competing company and use it freely: "Using memorization to rebuild a trade secret does not transform that trade secret from confidential information into non-confidential information." *Stampede Tool Warehouse, Inc. v. May*, 272 Ill. App. 3d 580, 590, 651 N.E.2d 209, 216-17 (1st Dist. 1995).

Rebuilding a trade secret based on memorization is exactly what Koch did here. The court concludes his conduct violated SKF's interest in its trade secrets. In challenging this conclusion, Defendants attempt to rely on a case where a spreadsheet containing bid information was held not to be a trade secret, in part, because it could be reproduced in two or three days. *Stenstrom Petroleum Services Group, Inc. v. Mesch*, 375 Ill. App. 3d 1077, 1093, 874 N.E.2d 959, 974 (2d Dist. 2007). In *Stenstrom*, all of the information needed to recreate the spreadsheet was readily

available from sources other than the original owner of the spreadsheet, and information about profit margins that was in the spreadsheet is, as a matter of law, not a trade secret. *Id.* The database pattern here is distinguishable from the spreadsheet in *Stenstrom* because the information needed to recreate the database pattern was not generally available. As Wareham testified, the database pattern was not reproduced in any publicly available manual; it was a proprietary pattern Wareham developed over the course of several years that gave SKF a competitive advantage. (Trial Tr., Vol. I., at 95-96, 101-04, 109-10.)

Defendants argue that the pattern was in fact general knowledge that Koch learned from his on-the-job experience and from a training course at an independent reliability training school. (Defs' Br., at 10.) The court agrees that general industry practices learned on the job are not trade secrets, but the court does not agree with Defendants that SKF's proprietary database pattern was nothing more than a general industry practice. *Cf. System Development Services, Inc. v. Haarmann,* 389 Ill. App. 3d 561, 577, 907 N.E.2d 63, 77-78 (5th Dist. 2009) (refusing to extend trade secret protection to knowledge of methods for servicing computer systems and networks learned during employment because such service was not novel or unknown in the industry). A technician could obtain independent training in how to use CSI software, but Defendant Koch testified that he learned the database pattern at SKF. (Trial Tr., Vol. II, at 445.) And, although similar patterns were used in the industry, the pattern at issue here was unique to SKF. *See Computer Associates Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 697 (N.D. Ill. 2004) (trade secret protectable even if it is not novel). Finally, Defendants argue that the pattern was used by other technicians after they left SKF, but the evidence supporting their argument is purely speculative. Although Wareham testified that former employees *might* be using the pattern, he also testified that he did not know if they were doing so. (Trial Tr., Vol. I, at 134.) The record shows that where SKF knew that former employees were using the pattern, the company took action: it filed this lawsuit.

For all these reasons, the court finds that the database pattern was a trade secret and concludes that the individual Defendants' misappropriation of the pattern and the other information violated ITSA.

## II. Other Claims

SKF has not submitted any briefing on its claims against Defendant ERSI; the court concludes SKF seeks no relief on those claims beyond what it has asked the court to award against the individual Defendants. With respect to the individual Defendants, SKF also seeks to impose liability under theories of breach of the SKF Secrecy Agreements, unfair competition, and breach of fiduciary duty by Defendant Bjerkness only. Again, however, SKF makes no damages argument under any of its non-ITSA claims that is distinct from its damages argument with respect to the ITSA claim. The court concluded earlier that these additional claims survive ITSA preemption only to the extent that they concern information that does not constitute trade secrets. *SKF*, 636 F. Supp. 2d at 718-19. The scope of ITSA preemption in this context is not free from doubt, *see U.S. Gypsum Co. v. Lafarge North America Inc.*, No. 03 C 6027, 2009 WL 3871823, at *3 (N.D. Ill. Nov. 17, 2009), but the issue need not detain the court here.

## III. Damages

The court has found that the individual Defendants misappropriated and used SKF's trade secrets in their new business; the remaining question is what damages SKF is owed. Under ITSA, "[d]amages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." 765 ILCS 1065/4(a). SKF's proposed measure of compensatory damages under ITSA is based on the profits that SKF itself would have received, and those that ERSI will receive, through 2014, from the twelve customers that left SKF for ERSI. (Pl's Br., at 13-14; Pl's Ex. 196.) Defendants respond that SKF is owed no damages at all because SKF did not prove that those twelve customers changed companies *because* of the information that Defendants misappropriated. (Defs' Br., at 14.)

12

Neither side has made a convincing damages argument. Defendants are mistaken in asserting that SKF can recover no damages unless it proves a causal link between the customers who left for ERSI and Defendants' misappropriation of trade secrets. Even if SKF cannot prove such a link, it is still entitled to damages for the harm of the misappropriation of its trade secrets; that is the injury under ITSA. "[T]he harm that results from wrongful misappropriation of information results from the defendant's use of that information." *U.S. Gypsum Co. v. Lafarge North America Inc.*, No. 03 C 6027, 2009 WL 3871824, at *1 (N.D. Ill. Nov. 16, 2009); *accord Thomas & Betts Corp. v. Panduit Corp.*, No. 93 C 4017, 1997 WL 603880, at *17 (N.D. Ill. Sept. 23, 1997).

SKF's damages argument does not fail as a matter of law; it fails on the evidence. SKF is correct that where a party does prove a causal link between the misappropriation of its trade secrets and its loss of business, it is entitled to compensation for that loss of business. *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1120 (Fed. Cir. 1996) (applying Illinois law to affirm damage award equal to plaintiff's lost profits from defendant's entry into the market where it was unlikely that defendant would have entered without plaintiff's trade secrets). As Defendants argue, though, SKF has failed to prove that causal link. The court is willing to assume that Defendants did intend to divert SKF customers. (Pl's Reply Br., at 9-10.) And Defendants' theft of thousands of computer files is circumstantial evidence that they intended to use SKF's trade secrets to accomplish the diversion. The only other evidence on the connection between Defendants' use of the trade secrets and its success in poaching SKF's customers points in the other direction. That evidence is the testimony of Defendant Bjerkness that he never told a potential customer that ERSI had SKF's trade secrets and the testimony of a customer who moved from SKF to ERSI that Defendants' misappropriation of the trade secrets had nothing to do with his decision to make the move. (Trial Tr., Vol. III, at 471, 563.) The evidence suggests that customers left SKF based on changes following SKF's acquisition of PMCI and because of personal relationships with Bjerkness; there is nothing illegal about that. *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415

13

(7th Cir. 1992).  The court finds that SKF, which bears the burden of establishing its damages, *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 107, 854 N.E.2d 607, 626-27 (2006), has not proven a link between its loss of customers and Defendants' ITSA violation.

Defendants are still liable for damages under ITSA, however, for "the unjust enrichment caused by misappropriation." 765 ILCS 1065/4(a).  The court finds that taking SKF's trade secrets gave Defendants' business an advantage it would not otherwise have had.  This finding follows from the court's ruling that the information taken was subject to trade secret protection in part because of its economic value.  The finding is also supported by the testimony of Bo Bergqvist, SKF's former CFO, about why SKF chose to acquire an existing provider of reliability services rather than start from scratch. (Trial Tr., Vol. II, at 264-69.)  Bergqvist explained that SKF paid $22 million for PMCI in order to obtain the existing company's valuable resources, which included the trade secrets that Defendants misappropriated. (*Id.*)  The value of the information also follows from the fact that Defendants chose to take it and use it.

Accordingly, the court awards damages equal to the profits that ERSI earned while using SKF's trade secrets.  SKF presented sufficient evidence from which to compute this amount, and Defendants have made no damages argument aside from their contention that they are liable for no damages at all.  Although Defendants turned over to their lawyers the devices containing SKF's information on September 5, 2008, ERSI continued to use a recreated version of SKF's database pattern to service some customers until July 2009.  (Trial Tr., Vol. II, at 435-37.)  Listed by customer, ERSI's revenues while using SKF's trade secrets are as follows:

| Customer | Dates using the database pattern | Revenue while using database pattern |
|---|---|---|
| Agri Control Technologies | Only in February 2009 | $2,389.20 (Pl's Ex. 133) |
| Ainsworth | Until September 2008 | $18,265 (Pl's Ex. 136) |
| Alerus Center | Until July 2009 | $1,796 (Pl's Ex. 139) |

14

| Case | Until April 2009 | $0 (Pl's Ex. 142) |
| Electrolux | Never | $0 |
| JBS Swift | Until April 2009 | $2,626.20 (Pl's Ex. 148) |
| Kraft | Until April 2009 | $25,938.25 (Pl's Ex. 151) |
| Liberty Carton | Until January 2009 | $8,144.50 (Pl's Ex. 154) |
| Liberty Paper | Never | $0 |
| Menasha | Until December 2008 | $2,436 (Pl's Ex. 160) |
| Potlatch | Never | $0 |
| Quebecor | Never | $0 |
| White Earth Center | Until July 2009 | $1,587 (Pl's Ex. 172) |

The total revenue then is $63,182.15. Adopting the estimate of SKF's damages expert that ERSI's profits represented 65% of their revenues, (Trial Tr., Vol. II, at 308-09), ERSI's profits from servicing customers using SKF's trade secrets is equal to $41,068.40.

SKF also seeks exemplary damages. Under ITSA, "[i]f willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award" of compensatory damages. 765 ILCS 1065/4(b). The Seventh Circuit has interpreted "willful and malicious misappropriation" to encompass "'an intentional misappropriation as well as a misappropriation resulting from the conscious disregard of the rights of another.'" *Learning Curve Toys,* 342 F.3d at 730 (quoting *Mangren Research & Development Corp. v. National Chemical Co.*, 87 F.3d 937, 946 (7th Cir. 1996)). The court finds that the misappropriation here was willful and malicious. The individual Defendants admitted to taking thousands of files, they knew that they had no permission to do so, and they were not immediately forthcoming when SKF demanded the return of the files. Exemplary damages, also referred to as punitive damages, "'are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future.'" *Slovinski v. Elliot*, 237 Ill.2d 51, 57-58, 927 N.E.2d. 1221, 1224-25 (2010) (quoting *Loitz v. Remington Arms Co.,* 138 Ill.2d 404,

414, 563 N.E.2d 397, 401 (1990)). The court finds that an award of $40,000 provides sufficient punishment and deterrence. *See Mangren*, 87 F.3d at 945-46 (affirming jury award of $252,684.69 in compensatory damages and $505,369.38 in exemplary damages); *Lucini Italia Co. v. Grappolini*, No. 01 C 6405, 2003 WL 1989605, at *19 (N.D. Ill. Apr. 28, 2003) (bench trial awarding $4,970,000 in compensatory damages and $1,000,000 in exemplary damages); *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 879-80 (N.D. Ill.2001) (bench trial awarding $100,000 in compensatory damages and $150,000 in exemplary damages). Attorney's fees are also appropriate in cases of willful and malicious misappropriation, and the court will award SKF reasonable attorney's fees. 765 ILCS 1065/5.

SKF suggests that it is entitled to punitive damages for Defendants' commission of the tort of unfair competition on top of the exemplary damages called for by ITSA. (Pl's Br., at 16; Pretrial Order Schedule G.) SKF offers no argument in support of the suggestion, though, and the court sees no reason to punish Defendants further.

## **CONCLUSION**

For the foregoing reasons, the court finds the individual Defendants jointly and severally liable for violating ITSA and orders them to pay $41,068.40 for compensatory damages, $40,000 for exemplary damages, and reasonable attorney's fees in an amount to be determined pursuant to the procedures established by this court's Local Rule 54.3.

ENTER:

Dated: August 9. 2010

_____
REBECCA R. PALLMEYER
United States District Judge